USDC SCAN INDEX SHEET

















SWD    6/9/04    9:22
3:04-CV-01143    AL-RAWI V. TITAN CORPORATION
*1*
*CMP.*





1  William J. Aceves (CA Bar # 151031)
   225 Cedar Street
2  San Diego, CA  92101
   (215) 772-7574
3
   Counsel for Plaintiffs
4



04 JUN -9  AM 8: 36

C. . . . 'S  D'ST?IC7 COURT
SOUTHERN DISTRICT OF CALIFORNIA

 BY:                         DEPUTY

6

7  ### IN THE UNITED STATES DISTRICT COURT

8  ### FOR THE SOUTHERN DISTRICT OF CALIFORNIA

9

10  SAMI ABBAS AL RAWI, an individual;
    MWAFAQ SAMI ABBAS AL RAWI, an
11  individual; AHMED, an individual; ISMAEL, an
    individual; NEISEF, an individual; ESTATE OF
12  IBRAHIEM, the heirs and estate of an individual;
    RASHEED, an individual; JOHN DOE NO. 1;
13  JANE DOE NO. 2; A CLASS OF PERSONS
    SIMILARLY SITUATED, KNOWN
14  HEREINAFTER AS JOHN and JANE DOES NOS.
    3 – 1050,
15
        Plaintiffs,
16  v.

17  TITAN CORPORATION, a Delaware Corporation;
    ADEL NAHKLA, a Titan employee located in Abu
18  Ghraib, Iraq; CACI INTERNATIONAL INC., a
    Delaware Corporation; CACI INCORPORATED –
19  FEDERAL, a Delaware Corporation; CACI N.V., a
    Netherlands corporation; STEPHEN A.
20  STEFANOWICZ, a CACI employee located in Abu
    Ghraib, Iraq; and JOHN B. ISRAEL, CACI
21  subcontractor located in Abu Ghraib, Iraq,

22      Defendants.

)  Case No.
)
)
) '04 CV 1 1 4 3    R (NLS)
)
)
)
) **CLASS ACTION**
) **ALLEGING VIOLATIONS OF**
) **RICO, CONSPIRACY TO**
) **VIOLATE RICO, VIOLATIONS**
) **OF THE ALIEN TORT CLAIMS**
) **ACT, VIOLATIONS OF THE**
) **GENEVA CONVENTIONS,**
) **VIOLATIONS OF THE UNITED**
) **STATES CONSTITUTION,**
) **VIOLATIONS OF THE**
) **RELIGIOUS LAND USE AND**
) **INSTITUTIONALIZED PERSONS**
) **ACT, AND COMMON LAW**
) **TORTS.**
)
)
) **[DEMAND FOR JURY TRIAL]**
)
)            BY FACSIMILE
)
)
)

23
24
25
26
27
28

 

## COMPLAINT

1.     This class action alleges that Defendants engaged in a pattern of racketeering activity, violated United States domestic and international law and intentionally and negligently committed a series of tortious acts against Plaintiffs.  Defendants contracted with the United States to provide interrogation and other related intelligence services.  Instead of providing such services in a lawful manner, they conspired with each other and with certain United States government officials to direct and conduct a scheme to torture, rape, and, in some instances, summarily execute Plaintiffs.  This action seeks a permanent injunction against this illegal conduct, compensatory and punitive damages, treble damages and attorneys fees under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), declaratory relief, and a permanent injunction against any future contracting with the United States.

## PARTIES

2.     Plaintiff Sami Abbas Majdel Al Rawi ("Plaintiff Sami") is a 56-year old Iraqi citizen, residing at Bhagdad – Amirya – PL636, St 74, House No. 19, Bhagdad, Iraq.  He owns and manages a company in Baghdad that had entered into a number of reconstruction contracts with the United States government.  On March 1, 2004, Plaintiff Sami was arrested and detained at the Baghdad International Airport Prison, together with his four sons.  Plaintiff Sami was tortured, abused, and otherwise mistreated by the Defendants and their co-conspirators.  Plaintiff Sami was released without charge on March 6, 2004.

3.     Plaintiff Mwafaq Sami Abbas Al Rawi ("Plaintiff Mwafaq") is the 28-year old son of Plaintiff Sami.  Plaintiff Mwafaq is a lawyer. He was arrested and detained with Plaintiff Sami and his three brothers on March 1, 2004 at the Baghdad International Airport.  Plaintiff Mwafaq was tortured, abused, and otherwise mistreated by the Defendants and their co-conspirators.  Plaintiff Mwafaq was released without charge on March 6, 2004.

4.     Plaintiff Ahmed ("Plaintiff Ahmed") is an Iraqi released without charge after five months of detention in Abu Ghraib Prison, Tent No. 7, Camp No. 3.  His prison number was No. 154120.  Plaintiff Ahmed was tortured, abused, and otherwise mistreated by the Defendants and their co-conspirators.

1      5.      Plaintiff Ismael ("Plaintiff Ismael") is an Iraqi released without charge on June 6,

2 2004, after months of detention in Abu Ghraib Prison in Tent No. 7, Camp No. 3. He also was

3 detained in the Buka Prison. His prison number was No. 154110. Plaintiff Ismael was tortured,

4 abused, and otherwise mistreated by the Defendants and their co-conspirators. He is concerned

5 about his son, Burban, who remains in detention in an unknown location.

6      6.      Plaintiff Neisef ("Plaintiff Neisef") is an Iraqi who was detained for seven months in

7 Abu Ghraib Prison, Tent No. 7, Camp No. 3, and for five months in Buka Prison. Plaintiff Neisef

8 was tortured, abused, and otherwise mistreated by the Defendants and their co-conspirators.

9      7.      Plaintiff Estate of Ibrahiem ("Ibrahiem Estate Plaintiff") is the heirs and estate of

10 Ibrahiem, a 63-year old man who died in Abu Ghraib Prison as a result of acts and inactions by

11 Defendants and their co-conspirators.

12      8.      Plaintiff Rasheed ("Plaintiff Rasheed") is an Iraqi citizen who was detained and

13 tortured in Iraq. Upon information and belief, the Defendants participated in torturing Plaintiff

14 Rasheed.

15      9.      Plaintiff John Doe No. 1 is an Iraqi citizen who was recently released without charge

16 from the Abu Gharib Prison. Plaintiff John Doe No. 1 was tortured, abused, and otherwise

17 mistreated by the Defendants and their co-conspirators. The identity of Plaintiff John Doe No. 1 is

18 known to counsel, but he has asked not to be publicly identified due to concerns about his safety.

19      10.      Plaintiff Jane Doe No. 2 is an Iraqi citizen who was released without charge on

20 January 22, 2004. She is a 55-year old English teacher. Her 70-year old husband had been tortured

21 to death in Abu Gharaib Prison during the Saddam Hussein regime. Plaintiff Jane Doe No. 2 was

22 tortured and otherwise mistreated by the Defendants and their co-conspirators. The identity of

23 Plaintiff Jane Doe No. 1 is known to counsel, but she has asked not to be publicly identified due to

24 concerns about her safety.

25      11.      Plaintiffs John and Jane Does Nos. 3 - 500 are the Class of persons who (a) have

26 been forcibly detained in prisons or facilities in or around Iraq subsequent to the fall of the Hussein

27 regime; (b) have been subjected to conditions and abuses that violate United States domestic law,

28 international treaties, and norms of customary international humanitarian and human rights law;

COMPLAINT          - 3 -



1  and (c) have suffered injuries to their properties and businesses as a result of those conditions and

2  abuses. (This Class shall hereinafter be known as the "RICO Class.")

3       12.     Plaintiffs John and Jane Does Nos. 500 - 1000 are the Class of persons who (a) have

4  been forcibly detained in prisons or facilities in or around Iraq subsequent to the fall of the Hussein

5  regime; (b) have been or will be subjected to conditions and abuses that violate United States

6  domestic law, international treaties, and norms of customary international humanitarian and human

7  rights law; and (c) have suffered injuries as a result of the treatment. (This Class shall hereinafter

8  be known as the "Common Law Class.")

9       13.     Plaintiffs John and Jane Does Nos. 1001-1050 are the Class of the estates and heirs

10  of persons who (a) were detained in Iraq; (b) were subjected to conditions and abuse that violates

11  United States domestic law, international treaties, and norms of customary international

12  humanitarian and human rights law; and (c) wrongfully died as a result of those conditions and

13  abuses. (This Class shall hereinafter be known as the "Wrongful Death Class.")

14       14.     Defendant Titan Corporation (hereinafter "Defendant Titan") is a publicly traded

15  corporation with headquarters located at 3033 Science Park Road, San Diego, California 92121-

16  1199. Defendant Titan Corporation was formed and incorporated under the laws of Delaware.

17  Defendant Titan Corporation acted at all times relevant to this action through individual agents and

18  employees, who are hereinafter subsumed within the term "Defendant Titan."

19       15.     Defendant Titan Corporation employed and directed the action of Defendant Adel

20  Nahkla, an individual identified by the United States as participating in illegal conduct at the Abu

21  Ghraib Prison in Iraq.

22       16.     As an employee and agent of Defendant Titan, Defendant Nahkla directed and

23  participated in illegal conduct at the Abu Ghraib Prison in Iraq and, upon information and belief,

24  other locations.

25       17.     Defendant CACI International Inc. (hereafter "Defendant CACI") is a publicly

26  traded corporation with headquarters located at 1100 North Glebe Road, Arlington, Virginia

27  22201. Defendant CACI was formed in 1962 and incorporated under the laws of Delaware.

28  Defendant CACI Corporation acted at all times relevant to this action through individual agents and



1  employees, who are hereinafter subsumed within the term "Defendant CACI" and the term "CACI

2  Corporate Defendants." Defendant CACI does business throughout the United States and the rest

3  of the world.

4       18.  Defendant CACI Incorporated – Federal is a subsidiary wholly owned and

5  controlled by Defendant CACI. Defendant CACI Incorporated – Federal was formed and

6  incorporated under the laws of Delaware. Defendant CACI Incorporated – Federal acted at all

7  times relevant to this action through individual agents and employees, who are hereinafter

8  subsumed within the term "Defendant CACI" and the term "CACI Corporate Defendants."

9       19.  Defendant CACI N.V. is a subsidiary wholly owned and controlled by Defendant

10  CACI. Defendant CACI N.V. is a Netherlands corporation doing business in the United States at

11  1100 North Glebe Road, Arlington, Virginia 22201. Defendant CACI N.V. acted at all times

12  relevant to this action through individual agents and employees, who are hereinafter subsumed

13  within the term "Defendant CACI" and the term "CACI Corporate Defendants."

14       20.  Defendant Stephen A. Stefanowicz, a resident of Pennsylvania, is employed by

15  Defendant CACI, Defendant CACI Incorporated—Federal, and Defendant CACI N.V. (hereinafter

16  "CACI Corporate Defendants"). As an employee and agent of the CACI Corporate Defendants,

17  Defendant Stefanowicz directed and participated in illegal conduct at the Abu Ghraib Prison in Iraq

18  and, upon information and belief, other locations.

19       21.  Defendant John B. Israel is employed by or contracted with CACI Corporate

20  Defendants. Defendant Israel directed and participated in illegal conduct at the Abu Ghraib Prison

21  in Iraq and, upon information and belief, other locations.

22       22.  Acting together, Defendants Titan, CACI Corporate Defendants, Stefanowicz, Israel,

23  and Nahkla conspired with certain United States officials (a) to engage in a series of wrongful and

24  illegal acts, including but not limited to, summary execution, torture or other cruel, inhuman or

25  degrading treatment, arbitrary arrest and detention, assault and battery, false imprisonment and

26  intentional interference with religious practices; (b) to inflate artificially by these acts the demand

27  for interrogation and other related services such as interpretation and translation; and (c) to profit

28

1   and gain a competitive advantage from this artificially-inflated demand for such services and from

2   additional government contracts directed to Defendant Titan and CACI Corporate Defendants.

3       23.     Each of the Defendants was the agent, employee and/or joint venturer, or working in

4   concert with, other Defendants and was acting within the course and scope of such agency,

5   employment and/or joint venture or concerted activity.  To the extent that any particular act was

6   perpetrated by a certain Defendant or Defendants, the remaining Defendant or Defendants

7   confirmed and ratified the same.

8       24.     Each Defendant conspired with other Defendants by entering into an agreement to

9   commit wrongful and tortious acts contained herein and each Defendant participated in or

10  committed a wrongful act in furtherance of said conspiracy that resulted in injury to the Plaintiffs.

11                                  **JURISDICTION AND VENUE**

12      25.     This Court has original jurisdiction over the subject matter of this action pursuant to

13  28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity jurisdiction); 28 U.S.C. § 1367

14  (supplemental jurisdiction); 28 U.S.C. § 2201 (declaratory judgment); 28 U.S.C.A. § 1350 (Alien

15  Tort Claims Act); and 18 U.S.C. § 1964 (Racketeer Influenced and Corrupt Organizations Act).

16      26.     Venue is proper pursuant to 28 U.S.C. § 1331(a) (3) and § 1391(b) (2).

17                                      **CLASS ALLEGATIONS**

18      27.     This action should be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(2),

19  which permits the certification of a class when the defendants "have acted or refused to act on

20  grounds generally applicable to the class, thereby making appropriate final injunctive relief or

21  corresponding declaratory relief with respect to the class as a whole . . ." Fed. R. Civ. P. 23(b) (2).

22      28.     This action should be certified as a class action pursuant to Fed. R. Civ. P.

23  23(b)(1)(A), which permits the certification of a class if the lack of a class could lead to

24  inconsistent or varying adjudication with respect to individual members which would establish

25  incompatible standards of conduct for the defendants.

26      29.     This action should be certified as a class action pursuant to Fed. R. Civ. P. 23(b) (1)

27  (B), which permits the certification of a class when adjudication with respect to individual Plaintiffs

28  would, as a practical matter, be dispositive of the interests of the other putative Class Members.

 

30.     This action should be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(3) because common questions of law and fact predominate over any questions affecting only individual members and a class action is superior to other method for the fair and efficient adjudication of the controversy.

31.     This action should be certified as a class because Plaintiffs satisfy all of the prerequisites to a class action set forth in Fed. R. Civ. P. 23(a).  Specifically,

        (a)     the class is so numerous that joinder of all members is impracticable;

        (b)     there are questions of law common to the class;

        (c)     there are questions of fact common to the class;

        (d)     the claims of the named Plaintiffs are typical of the claims of the class; and

        (e)     the representative parties will fairly and adequately protect the interests of the class.

32.     Counsel are experienced in bringing and defending class actions and will adequately represent the class interests.

33.     There should be at least three subclasses certified.  These subclasses should be defined as follows:

        (a)     The RICO Class consists of persons who (i) have been forcibly detained in prisons or detention facilities in or around Iraq subsequent to the fall of the Hussein regime; (ii) have been subjected to conditions and treatment that violate United States domestic law, international treaties, and customary international humanitarian and human rights law; and (iii) have suffered or will suffer injuries to their properties and/or businesses as a result of those conditions and abuses;

        (b)     The Common Law Class consists of persons who (i) have been forcibly detained in prisons or detention facilities in or around Iraq subsequent to the fall of the Hussein regime; (ii) have been subjected to conditions and treatment that violate United States domestic law, international treaties, and customary international humanitarian and human rights law; and (iii) have suffered injuries as a result.

COMPLAINT                                     - 7 -

(c)     The Wrongful Death Class consists of persons and other legal entities who are the estates and heirs of persons who (i) were forcibly detained in prisons or detention facilities in prisons or detention facilities in or around Iraq subsequent to the fall of the Hussein regime; (ii) were subjected to conditions and treatment that violate United States domestic law, international treaties, and universally accepted norms of customary international humanitarian and human rights law; and (iii) who wrongfully died as a result of those conditions.

(d)     There may be additional subclasses suitable for certification.

## ALLEGATIONS OF FACT

### DEFENDANTS' FINANCIAL GROWTH DEPENDED ON CREATING AND MAINTAINING A DEMAND FOR INTERROGATION SERVICES

34.     Defendant Titan performs the government contracts at issue in this action through a division previously known as "Titan Systems" and now known as "National Security Solutions." That division has approximately 1,000 government contracts.

35.     Defendant Titan invested significantly in building capacity for services such as interrogation, interpretation, translation, intelligence gathering, and security (hereinafter referred to as "Interrogation Services").

36.     As revealed in Defendant Titan's 2003 annual report, "[s]ince January 1, 1998, Titan has acquired 19 government information technology businesses as part of Titan's strategy of consolidating government information technology business." Among others, Titan bought SEMCOR, Pulse Engineering, BTG Inc., Unidyne Corp., VisiCom Services Inc., and Eldyne Inc.

37.     Defendant Titan became increasingly dependent on federal revenues. Always a high portion of its overall business, Defendant Titan's federal revenues went from 90% in 2000 to 96% in 2004. No business other than federal government business mattered significantly to the bottom line of Defendant Titan.

38.     Defendant Titan relied almost exclusively on increased demand for the type of intelligence and interrogation services provided by its National Security Solutions business to sustain the company and reach its revenue targets. As recently as May 3, 2004, Defendant Titan attributed a 21 percent increase in revenues -- up to $459 million for the first quarter of 2004 as

1  compared to $378 million for the first quarter in 2003 – to revenue growth in the National Security

2  Solutions business.

3     39.    Defendant Titan also relied heavily on relationships with certain government

4  officials.  As the Securities and Exchange Commission ("SEC") filings reveal, Defendant Titan

5  believed the industry experience of its executives was a reason why it obtained new business: "The

6  industry experience of Titan Systems executives and general managers has also helped Titan

7  Systems to develop a significant presence with many civilian government agencies, which has

8  contributed to Titan Systems' success in securing new contracts."

9     40.    CACI Corporate Defendants have been involved in government contracting for

10  many years.  Beginning in 2001, the CACI Corporate Defendants began to grow dramatically – in

11  terms of both employees (approximately 5,000 employees in 2001 to 6,300 employees in 2003) and

12  revenue.

13     41.    CACI Corporate Defendants hit a new revenue record, reporting revenue of $263.4

14  million in the second quarter of FY04.  This represents a 29% growth from the prior year's results.

15     42.    In 2001, CACI Corporate Defendants received an additional $108.8 million in

16  revenue from the Department of Defense (hereinafter "DoD") over and above what they had

17  received in 2000.  In 2003, DoD revenue grew by another $102.3 million as compared to 2002.

18     43.    As with Defendant Titan, CACI Corporate Defendants' growth resulted from a

19  deliberate strategy to build capacity and provide increased amounts of Interrogation Services to the

20  United States.  CACI Corporate Defendants' SEC filings reveal "a significant part of the

21  company's growth over the past two years was primarily due to the expansion of the managed

22  network services and intelligence community work."

23     44.    To implement the strategy to build Interrogation Services capacity, CACI Corporate

24  Defendants made the following acquisitions:

25        (a)    On February 1, 2000, they acquired all the common stock of a company

26  known as XEN for $4.3 million.

27        (b)    On October 6, 2000, they acquired the contracts and selected assets of the

28  Special Projects Business of Radian International, LLC, a subsidiary of URS Corp. for $1.3 million.

COMPLAINT                    - 9 -

1        (c)     On February 28, 2003, they purchased all of the stock of Applied

2 Technology Solutions of Northern Virginia, Inc. for $13.1 million.

3        (d)     On May 15, 2003, they acquired all of the assets of Premier Technology

4 Group, Inc. ("PTG") for $49 million. The company paid $45.6 million in cash and paid the balance

5 of $3.4 million "in the form of earn-out payments tied to the continuation of existing business."

6 PTG had been providing professional services to the DoD and United States government

7 intelligence agencies.

8        (e)     On October 16, 2003, they acquired yet another intelligence company, C-

9 CUBED Corporation. C-CUBED was described in press reports as providing specialized services

10 in support of C4ISR (command control communications computers intelligence surveillance and

11 reconnaissance initiatives) to the DoD and the United States intelligence agencies.

12        (f)     On October 16, 2003, they acquired all of the outstanding capital stock of

13 Acton Burnell, Inc., another company providing services to the intelligence agencies.

14      45.    CACI Corporate Defendants viewed these acquisitions as a means of increasing their

15 intelligence services offerings to the DoD and other unidentified intelligence agencies, which likely

16 include the Central Intelligence Agency (hereinafter "CIA") and the National Security

17 Administration (hereinafter "NSA").

18      46.    As reflected in the SEC filings, CACI Corporate Defendants became increasingly

19 financially dependent on revenues generated from federal intelligence agency contracts and

20 permitted their other revenue sources (such as commercial, state and local governments) to

21 dwindle. As stipulated in their SEC filings, "continued and expanded focus on DoD and federal

22 civilian agency opportunities has resulted in a reduced emphasis on state and local government

23 business."

24      47.    CACI Corporate Defendants maintained close relationships with certain government

25 officials. As their SEC filings reveal, "our senior management team is very important to our

26 business because personal reputations and individual business relationships are a critical element of

27 obtaining and maintaining client engagements in our industry, *particularly with agencies*

28 *performing classified operations. The loss of any our senior executives could cause us to lose*



1  *client relationships or new business opportunities*, which could cause actual results to differ

2  materially from those anticipated." (Emphasis added.)

3      48.    Defendant Titan and Corporate CACI Defendants contracted with the United States

4  using two types of government contract (among others): "indefinite delivery/indefinite quantity" or

5  "ID/IQ" contracts and blank purchase agreements (BPA). These contract vehicles permitted the

6  United States government to award substantial contracts for Interrogation Services to Defendants

7  without disclosure to the public and to modify the contract terms without any competitive bidding.

8      49.    Defendant Titan and CACI Corporate Defendants recruited heavily throughout the

9  United States to build their capacity to provide Interrogation Services.

10      50.    Defendant Titan advertised throughout the United States by posting job positions on

11  websites and in newspapers and other print media to obtain persons with relevant skills. These

12  advertisements sought, among other persons, persons skilled in interrogation and persons who had

13  "secret" security clearances.

14      51.    CACI Corporate Defendants advertised throughout the United States by posting job

15  positions on websites and in newspapers and other print media to obtain persons with relevant

16  skills. These advertisements sought, among other persons, persons skilled in interrogation and

17  persons who had "secret" security clearances.

18      52.    CACI Corporate Defendants and Defendant Titan, together with a third party,

19  formed a joint Enterprise known as "Team Titan."

20      53.    Team Titan revealed that it had been retained by the United States to provide

21  Interrogation Services in both Guantánamo and Iraq. Team Titan publicly declared it had won the

22  "re-compete" for a contract relating to intelligence services (known as "Assistance and Advisory

23  Services" contract) and sought to recruit persons willing to travel overseas. Team Titan sought

24  persons with knowledge about the "cultural, social and ethnic significance of conversations,

25  *situations, documents, etc.*" Team Titan described the work in Guantánamo as "support[ing] the

26  full range of day-to-day activities involving interactions between Camp X-ray military police force

27  and support personnel with Camp X-ray detainees." Team Titan described the work in Iraq as a

28  "24 x 7" operation. The Team Titan posting is attached as *Exhibit A.*

 

54.    Team Titan offered persons with the necessary skill sets salaries far in excess of what had been the prevailing market rates for their services. Team Titan members (namely, Defendant Titan, CACI Corporate Defendants, and a third entity) were willing to pay above-market rates for interrogation services because they had entered into significant numbers of contracts with various United States agencies, including the United States military, which called for them to provide Interrogation Services.

55.    Upon information and belief, neither Defendant Titan nor CACI Corporate Defendants properly screened persons being hired.

56.    Upon information and belief, neither Defendant Titan nor CACI Corporate Defendants nor the Individual Defendants properly supervised persons conducting Interrogation Services.

57.    Some of the contracts between Defendants and the United States government relating to Interrogation Services are identified in *Exhibit B.*  Upon information and belief, some contracts cannot be identified by review of publicly available records because the United States and Defendants kept secret certain contracts, such as those with the CIA and NSA. Upon information and belief, Defendant Titan and the CACI Corporate Defendants provided Interrogation Services under blanket-purchase agreements with agencies not related to Interrogation Services, such as the Interior Department.

58.    CACI Corporate Defendants and Defendant Titan knew that the amount of Interrogation Services being contracted for by the United States was directly related to the United States government's perception of the amount of information able to be obtained by interrogation from Plaintiffs.

**DEFENDANTS KNEW OR SHOULD HAVE KNOWN
THE UNITED STATES INTENDED TO CONDUCT INTERROGATIONS
IN ACCORD WITH THE RELEVANT DOMESTIC AND INTERNATIONAL LAWS.**

59.    Defendants knew, or should have known, that the United States intended to conduct interrogations in accord with the relevant domestic and international laws.

60. The laws that prohibit summary execution, torture, or other cruel, inhuman and degrading treatment, arbitrary arrest and detention, assault and battery, false imprisonment and intentional interference with religious practices include, but are not limited to, the following:

(a) The Constitution of the United States, including the Eighth Amendment, which prohibits cruel and unusual punishment; the Fifth and Fourteenth Amendments, which prohibit deprivation of life and liberty without due process of law; and the Fourth Amendment, which prohibits unlawful searches and seizures.

(b) Treaties Ratified or Signed By the United States, including Articles 55 and 56 of the Charter of the United Nations, June 26, 1945, 59 Stat. 1031, T.S. 993, 3 Bevans 1153, *entered into force* Oct. 24, 1945, which protects human rights and fundamental freedoms and specifically guarantees the right to be free from torture; the Third Geneva Conventions, *Geneva Conventions relative to the Treatment of Prisoners of War*, 75 U.N.T.S. 135, arts. 13, 14, 17, 21, 25, 87, 130, *entered into force*, Oct. 21, 1950, which prohibits acts of torture and abuse against prisoners of war; the Fourth Geneva Conventions, *Geneva Conventions relative to the Protection of Civilian Persons in Time of War*, 75 U.N.T.S. 287, arts. 5, 27, 31, 32, 33, 27, 41, 42, *entered into force* Oct. 21, 1950, which prohibits acts of torture and abuse against civilians; the Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts, art. 75, 1125 U.N.T.S. 3, *entered into force* Dec. 7, 1978, which requires the humane treatment of *any* person who is in the power of a party to an armed conflict, regardless of status or national origin, and specifically prohibits the use of torture at any time; Article 7 of the *International Covenant on Civil and Political Rights*, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 3, *entered into force* Mar. 23, 1976, which provides that: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment;" Article 4 of ICCPR, which states that Article 7 is non-derogable even in times of public emergency; Article 1 of the *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), *entered into force* June 26, 1987, which prohibits any act: "by which severe pain or suffering, whether physical or mental, is intentionally

1  inflicted on a person for such purposes as obtaining from him or a third person information or a

2  confession, punishing him for an act he or a third person has committed or is suspected of having

3  committed, or intimidating or coercing him or a third person, or for any reason based on

4  discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or

5  with the consent or acquiescence of a public official or other person acting in an official capacity."

6          (c)     Customary International Law, as reflected in the above treaties and

7  international instruments and others, including the *Universal Declaration of Human Rights*, G.A.

8  res. 217A (III), U.N. Doc A/810 at 71 (1948) which states "no one shall be subjected to torture or to

9  cruel, inhuman or degrading treatment or punishment"; the United Nations Declaration on the

10  Protection of All Persons from Being Subjected to Torture, General Assembly Resolution 3452, 30

11  U.N. GAOR Supp. (No. 34) 91, U.N. Doc. A/1034 (1975), which expressly prohibits "any act by

12  which severe pain and suffering, whether physical or mental, is intentionally inflicted by or at the

13  instigation of a public official on a person for such purposes as . . . intimidating him or other

14  persons"; the *American Convention on Human Rights*, O.A.S. Treaty Series No. 36, 1144 U.N.T.S.

15  123 *entered into force* July 18, 1978, *reprinted in* Basic Documents Pertaining to Human Rights in

16  the Inter-American System, OEA/Ser.L.V/II.82 doc.6 rev.1 at 25 art. 5 (1992), which provides, "no

17  one shall be subjected to torture or to cruel, inhuman, or degrading punishment or treatment"; the

18  European Convention on the Protection of Human Rights and Fundamental Freedom, Nov. 4, 1950,

19  Art. 3, 213 U.N.T.S. 221, 224, which provides "no one shall be subjected to torture or to inhuman

20  or degrading treatment or punishment"; and the Restatement (Third) of the Foreign Relations Law

21  of the United States, section 702, which provides: "A state violates international law if, as a matter

22  of state policy, it practices, encourages or condones . . . (d) torture or other cruel, inhuman or

23  degrading treatment or punishment."

24          (d)     Statutes and common law of the United States, including but not limited to

25  the common law of the State of California, including the common law relating to wrongful death,

26  assault and battery, intentional infliction of emotional distress, negligent infliction of emotional

27  distress, negligent hiring and supervision, and negligence.

28

61.     The United States government in official pronouncements has repeatedly and forthrightly denounced the use of torture and other cruel, inhuman or degrading treatment at all times.  In its Initial Report to the United Nations Committee Against Torture, the United States Department of State noted that, "[t]orture is prohibited by law throughout the United States.  It is categorically denounced as a matter of policy and as a tool of state authority . . . .  No official of the government, federal, state or local, civilian or military is authorized to commit or to instruct anyone else to commit torture.  Nor may any official condone or tolerate torture in any form."  *U.S. Department of State: Initial Report of the United States of America to the U.N. Committee Against Torture, Introduction (1999).*

62.     In the same report, the United States explicitly stated that no exigent circumstances permit the use of torture:  "No exceptional circumstances may be invoked as a justification for torture.  U.S. law contains no provision permitting otherwise prohibited acts of torture or other cruel inhuman or degrading treatment or punishment to be employed on grounds of exigent circumstances (for example, during a "state of public emergency") or on orders from a superior officer or public authority."  *Id.*

63.     More recently, President Bush, in an address on United Nations International Day in Support of Victims of Torture, reiterated the United States position on the use of torture and other cruel, inhuman and degrading treatment:  "The United States is committed to the worldwide elimination of torture and we are leading the fight by example.  I call on all governments to join with the United States and the community of law-abiding nations in prohibiting, investigating and prosecuting all acts of torture and in undertaking to prevent other cruel and unusual punishment."  *President George W. Bush, United Nations International Day in Support of Victims of Torture, June 26, 2003.*

64.     The United States annually publishes a compilation of practices and techniques used by foreign governments that transgress the laws against torture and abuse.  This publication, called the U.S. Department of State Select Country Reports on Human Rights Practices, criticized the following practices and techniques when engaged in by other countries: repeated slapping, exposure to cold, stripping and blindfolding, food and sleep deprivation, threats to detainees or

 

1 family members, dripping water on the head, squeezing of the testicles, mock executions, and

2 sexual humiliation.

3      65.    The United States has adopted regulations to govern the military to ensure its

4 adherence to the Geneva Conventions and United States laws generally, including a 1995 Central

5 Command regulation.

6
### FORMATION OF A CONSPIRACY
### TO INCREASE DEMAND FOR INTERROGATION SERVICES
7

8      66.    Defendants knew or should have known that United States domestic and

9 international law governing the conduct of interrogations and other methods of obtaining

10 intelligence from detained persons prohibits them from torturing, abusing, or otherwise mistreating

11 Plaintiffs.

12      67.    Defendants knew or should have known that torturing, abusing, and otherwise

13 mistreating Plaintiffs would result in their divulging information (whether true or untrue) in order

14 to end their torture or other mistreatment.

15      68.    Upon information and belief, Defendants were indifferent as to whether their

16 Interrogation Services yielded useful or reliable information able to be used by the United States.

17 Instead, they wanted to ensure that the Interrogation Services created the impression of

18 effectiveness and met with "quotas" imposed by the United States government for intelligence

19 gathering.

20      69.    Certain government officials who were involved with Defendants' intelligence

21 gathering efforts were indifferent to whether Defendants' Interrogations Services complied with the

22 relevant laws.  Those government officials who were indifferent to the lawfulness of Defendants'

23 conduct and who were otherwise involved with, directed, supervised or ignored Defendants'

24 wrongful acts are hereinafter referred to as "conspirators," or "co-conspirators," or are subsumed

25 within the term "Torture Conspirators" defined below.

26      70.    Defendants and co-conspiring government officials decided that the efforts to

27 acquire information from Plaintiffs should not be hampered by ensuring that interrogation efforts

28 complied with the mandates of United States domestic and international law.

COMPLAINT                - 16 -



71.     The Torture Conspirators knew, or should have known, that there are many United States and international laws that strictly circumscribe the manner in which the Plaintiffs could lawfully be treated.

72.     Certain government officials and Defendants conspired and formed an ongoing criminal enterprise designed to flout the United States domestic and international laws prohibiting the torture, abuse and other mistreatment of the Plaintiffs (hereinafter "Torture Conspiracy"). (The actors implementing this Torture Conspiracy are hereinafter referred to as "Torture Conspirators," which includes the corporate defendants, individual defendants and certain government officials).

73.     This criminal enterprise was premised on the fact that certain government officials and Defendants knew, and intended, that creating an environment in which persons were being tortured, abused, and mistreated would result in more persons "willing" to provide so-called "intelligence" (of whatever value) to their interrogators in order to end their mistreatment. In turn, an environment in which the United States perceived the Interrogation Services as being productive and useful would create, maintain, and increase the United States' demand for Defendants' Interrogation Services.

74.     The Torture Conspiracy began in or around 2001 and is on-going. The Torture Conspiracy exists separate and apart from the ongoing lawful operations of the corporate Defendants.

75.     Certain government officials and senior management in Defendant Titan and CACI Corporate Defendants had relationships that assisted in the formation and implementation of the Torture Conspiracy. Upon information and belief, these relationships were formed and fostered by meetings, telephonic discussions, in-person discussions, email discussions and other communications that occurred in, among other places, California, Virginia and the District of Columbia.

76.     The corporate Defendants formed and implemented the Torture Conspiracy in order to make money selling Interrogation Services to the United States and in order to gain a competitive advantage in the market. The corporate Defendants also formed and implemented the



1  Torture Conspiracy to ensure that they did not lose money on their past acquisitions of

2  Interrogation Services capacity.

3       77.    The individual Defendants formed and implemented the Torture Conspiracy in order

4  to obtain personal financial rewards and/or financial rewards for their employers.

5       78.    The Torture Conspirators actively recruited individuals willing to participate in the

6  illegal conspiracy. Upon information and belief, the Torture Conspiracy took steps in California,

7  Virginia and other locations throughout the United States to screen potential applicants to ascertain

8  whether they would be willing to engage in illegal acts. Certain Team Titan postings sought "male

9  U.S. citizens" and revealed that applicants "must undergo a favorable U.S. Army

10  Counterintelligence screening interview." Applicants perceived as potentially willing to participate

11  in the conspiracy were retained to provide Interrogation Services.

12       79.    The Torture Conspiracy was successful in achieving its unlawful ends. With

13  assistance from certain conspiring government officials, Defendants were able to reap handsome

14  monetary rewards in exchange for assisting the United States government in detaining the Plaintiffs

15  under unlawful conditions and torturing, abusing and otherwise mistreating them.

16       80.    During the period 2001 to present, upon information and belief, Defendant Titan

17  earned millions of dollars in revenue from the provision of Interrogation Services. These fruits of

18  the criminal Torture Conspiracy have been invested in the ongoing operations of Defendant Titan.

19       81.    During the period 2001 to present, upon information and belief, CACI Corporate

20  Defendants earned millions of dollars in revenues from their provision of Interrogation Services.

21  These fruits of the criminal Torture Conspiracy have been invested in the ongoing operations of

22  CACI Corporate Defendants.

23       82.    Upon information and belief, each individual Defendant, through their participation

24  in the Torture Conspiracy, earned far more money per hour than they could otherwise have earned,

25  and had far more demand for their services than would have existed, absent the Torture Conspiracy.

26       83.    Upon information and belief, the corporate Defendants also benefited financially by

27  forming the Torture Conspiracy because their co-conspirators used their influence to ensure that the

28



1  corporate Defendants were awarded contracts or modifications of existing contracts on a no-bid

2  basis.  Some of these no-bid contracts are identified in *Exhibit B*.

3      84.     Numerous predicate acts have been committed by the conspirators (and others acting

4  at their direction) in their implementation of the Torture Conspiracy.

5      85.     The predicate acts include, but are not limited to, kidnapping, murder, assault and

6  battery, unlawful imprisonment, obstruction of justice, and other acts intended to be humiliating

7  and mentally devastating to those who practice the faith of Islam.

8      86.     On information and belief, the Torture Conspirators working in Guantánamo

9  developed an approach to interrogation ("tiger teams") based on study and review of what practices

10  would be most humiliating to those who practice the Muslim faith.  On information and belief, the

11  Torture Conspirators conspired to, and adopted this same interrogation method in Iraq.

12  Specifically, in or around October 2003, five Interrogation Teams (including Torture Conspirators)

13  who had been conducting interrogations in Guantánamo were sent to Iraq to set up a "Gitmo-style"

14  prison at Abu Ghraib.  ("Gitmo" is the colloquial term used for Guantánamo Bay.)

15      87.     Certain employees of the Defendants have admitted to engaging in these predicate

16  acts.  For example, on or before May 21, 2004, an unknown employee of Defendant Titan working

17  in Iraq admitted to stripping, handcuffing, and forcibly restraining putative Class Members as they

18  were placed by the employee and others in sexual positions.

19      88.     Upon information and belief, the United States government has sought and obtained

20  additional admissions from employees of Defendant Titan and CACI Corporate Defendants during

21  the course of ongoing investigations into the allegations of the torture and other mistreatment of

22  detainees in Iraq.

23  **SPECIFIC EXAMPLES OF WRONGFUL ACTS
    RELATING TO PLAINTIFF AHMED**

24

25      89.     The Torture Conspirators detained Plaintiff Ahmed and his father Ibrahiem (now

26  deceased) without cause in the Abu Ghraib Prison.

27      90.     The Torture Conspirators tortured and abused Plaintiff Ahmed and his father

28  Ibrahiem by committing the following acts, among others:

 

(a)     Removing their clothes and spraying them with cold water during the cold winter;

(b)     Stripping them of their clothes entirely and then tying their hands and legs together and allowing fierce and hungry dogs to come two inches away from their faces and bark in their faces;

(c)     Kicking them with their heavy military boots on all parts of their bodies including their heads, backs, private parts, and stomach;

(d)     Hitting them with guns on their bodies, including their heads, backs, stomach, and private parts;

(e)     Removing all their clothes and leaving them outside for days;

(f)     Depriving them of food and keeping them in the cold for such lengths of time as to cause fainting;

(g)     Lifting their hands above their heads and leaving them standing in that position for days, and beating them whenever they moved or twitched;

(h)     Leaving them lying on their stomachs naked on the floor with their hands tied above their heads for long hours.

91.     Plaintiff Ahmed was forced to observe the Torture Conspirators torturing his father and putative Class Plaintiffs by physically and verbally assaulting them, humiliating them, including sexual humiliation.

92.     Plaintiff Ahmed was forced to observe the Torture Conspirators torturing his father to such a degree that he died.

93.     Plaintiff Ahmed also suffered property losses as a result of actions by the Torture Conspirators.  They destroyed his house, took $3,200 in cash, $1,500 worth of gold, jewelry and other property.

### SPECIFIC EXAMPLES OF WRONGFUL ACTS
### RELATING TO PLAINTIFF ISMAEL

94.     The Torture Conspirators detained Plaintiff Ismael without cause in the Abu Ghraib Prison and the Buka Prison.

 

95.     Thereafter the Torture Conspirators continued to detain and abuse Plaintiff Ismael and committed the following acts, among others, during his Abu Ghraib Prison detention:

(a)     During interrogation, hitting him with electric cables and kicking him with boots if he did not answer or did not answer in the manner desired by the Torture Conspirators;

(b)     Tying his hands behind his backs and terrorizing him by shooting electric guns at him;

(c)     Stripping him, tying his hands behind his back and releasing dogs to attack his private parts;

(d)     Using demeaning and dehumanizing language;

(e)     Depriving him of sleep by use of loud music or loose dogs roaming around the tent;

(f)     Stripping his clothes off and forcing him to stand on one leg for as long as 6 hours, during which they would hit him with a rifle if he showed any sign of fatigue or moved in any manner;

(g)     Hitting his private parts repeatedly.

96.     During a particular interrogation, the Torture Conspirators asked Plaintiff Ismael a question that he refused to answer.  As a result, they stripped off his clothes and covered his face with a bag.  Hours later they removed the bag and showed him two photographs of sexual torture committed on detainees known to Plaintiff Ismael.  The first photograph showed a young boy (age 12-15) being sexually molested by a person in a United States' uniform.  The Torture Conspirators told Plaintiff Ismael that he would be treated in the same fashion if he did not answer their question.  The Torture Conspirators then showed him another photograph of a different detainee, also known to Plaintiff Ismael, who was being forced to perform oral sex on a person in a United States' uniform.  The Torture Conspirators again threatened Plaintiff Ismael with similar treatment if he refused to answer questions.

97.     The Torture Conspirators also tortured Plaintiff Ismael during his detention at the Buka Prison.  The committed the following acts, among others:




1          (a)    Turning on very loud music whenever he and other detainees tried to pray or

2 read the Quran and otherwise preventing any type of worship;

3          (b)    Placing him standing outside in the burning sun for long hours;

4          (c)    Stripping him and tying him together with other detainees and dragging their

5 naked bodies with a leash across the hot summer sand;

6          (d)    Kicking him with their heavy boots on their heads;

7          (e)    Tying him to other detainees by their feet and forcing them to sleep on their

8 stomachs on the hot sand.

9      98.    Even after Plaintiff Ismael's release, the Torture Conspirators continue to inflict

10 harm on him because they are continuing to detain his 27-year old son named Burban in an

11 unknown location. Plaintiff Ismael has not seen his son since they were both detained.

**SPECIFIC EXAMPLES OF WRONGFUL ACTS
RELATING TO PLAINTIFF NEISEF**

14      99.    The Torture Conspirators detained Plaintiff Neisef without cause in the Abu Ghraib

15 and Buka Prisons.

16      100.    During his detention in the Abu Ghraib Prison, the Torture Conspirators tortured

17 Plaintiff Neisef by committing the following acts, among others:

18          (a)    Placing brown mesh bags on his head as they questioned him;

19          (b)    Hitting him on his face and body with heavy military boots if he did not

20 provide the desired answers;

21          (c)    Placing him and other male detainees in a room with a naked female detainee

22 who had a brown mesh bag on her head and who was screaming;

23          (d)    Depriving him of sleep for as much as 48 hours by placing him in a room

24 with very loud music close to his ears;

25          (e)    Spraying cold water on him and placing him outside in the cold for long

26 periods of time.

27      101.    During his detention in the Buka Prison, the Torture Conspirators committed the

28 following acts, among others:

 

1    (a)  Stripping him, tying his hands and feet together with other detainees, and

2 placing them on a dog's leash and dragging their naked bodies on the hot summer sand;

3     (b)  Hitting him with their heavy boots on his head;

4    (c)  Forcing him to stand in the hot summer outside with his hands tied behind

5 his neck for periods between 6 hours to 24 hours without movement, and beating him if he showed

6 any sign of movement or fatigue.

7   102.  The Torture Conspirators raped Plaintiff Neisef.  A female conspirator placed a hood

8 over his head and called in two other conspirators, who held Neisef down while she raped him.

9 After sexually abusing him for approximately thirty minutes, she left him naked on the floor and

10 told him "it is our job to take your manhood away from you by the time you leave, you son of a

11 bitch."

12   103.  The Torture Conspirators forced Plaintiff Neisef to touch other detainees' body parts

13 by threatening him with attack dogs.  The Torture Conspirators poured cold water on Plaintiff

14 Neisef and the other detainees, wrapped electric wire around their penises, and gave them electric

15 shocks.  Plaintiff Neisef started to bleed and suffered a ruptured vein on his penis.  The Torture

16 Conspirators refused to tend his wounds.

17   104.  The Torture Conspirators again degraded Plaintiff Neisef sexually by forcing him to

18 assume a dog position and by threatening to sodomize him with a stick.

19   105.  The Torture Conspirators prevented Plaintiff Neisef from praying.  Whenever he and

20 other detainees tried to pray the religious prayer of salah, the Torture Conspirators would place

21 their heavy boots on their heads and prevent them from lifting their heads off the ground.  When

22 asked, "why do you torture us and prevent us from worshipping God?", the Torture Conspirators

23 answered "you are under our authority, we can do whatever we want with you."

24   106.  Plaintiff Neisef suffered property losses as a result of actions by the Torture

25 Conspirators.  They damaged his house, took $6,000 in cash, $1,000 worth of gold and jewelry.

26

27

28




## SPECIFIC EXAMPLES OF WRONGFUL ACTS
## RELATING TO PLAINTIFF IBRAHIEM ESTATE

107.    The Torture Conspirators detained and tortured Ibrahiem as described above in the paragraphs relating to Plaintiff Ahmed.

108.    The Torture Conspirators wrongfully killed Ibrahiem by torturing him and thereafter refusing to provide him the needed medical attention to prevent his death.

## SPECIFIC EXAMPLES OF WRONGFUL ACTS
## RELATING TO PLAINTIFF SAMI

109.    The Torture Conspirators subjected Plaintiff Sami to a series of unlawful acts, including, but not limited to, the following:

    (a)    Hooding him for extended periods of time so that he was completely disoriented and had difficulty breathing.

    (b)    Handcuffing him with flexi-cuffs around the wrists for extended periods causing skin lesions.

    (c)    Depriving him of food, water and hygiene facilities.

    (d)    Repeatedly kicking and beating him;

    (e)    Subjecting him to loud rock music;

    (f)    Depriving him of sleep;

    (g)    Making him stand on one leg for a prolonged period and beating him whenever he fell down;

    (h)    Forcing him to crouch up and down repeatedly until he fell over.

110.    At the time of his arrest, Plaintiff Sami had in his possession $65,750 and 15,350,000 Iraqi dinars, as well as other valuables.  The Torture Conspirators wrongfully confiscated and kept this money and property following Plaintiff Sami's arrest.

## SPECIFIC EXAMPLES OF WRONGFUL ACTS
## RELATING TO PLAINTIFF MWAFAQ

111.    While detained the Torture Conspirators subjected Plaintiff Mwafaq to a series of unlawful acts, including, but not limited to, the following:

 

1       (a)     Hooding him for two days so that he was completely disoriented and had

2  difficulty breathing;

3       (b)     Handcuffing him with flexi-cuffs around the wrists for extended periods

4  causing skin lesions;

5       (c)     Depriving him of food, water and hygiene facilities;

6       (d)     Repeatedly kicking and beating him, particularly around the head, which

7  required stitches to his eyelids;

8       (e)     Subjecting him to loud rock music;

9       (f)     Depriving him of sleep;

10      (g)     Making him stand on one leg for a prolonged period and beating him

11  whenever he fell down;

12      (h)     Forcing him to crouch up and down repeatedly until he fell over.

13
### SPECIFIC EXAMPLES OF WRONGFUL
### ACTS RELATING TO PLAINTIFF RASHEED
14

15    112.    The Torture Conspirators participated in detaining Plaintiff Rasheed without cause.

16    113.    Throughout his detention and interrogation the Torture Conspirators participated in

17  torturing and otherwise mistreated Plaintiff Rasheed by subjecting him to the following acts, among

18  others:

19      (a)     Forcing him to lie on a cold floor and pouring cold water on him;

20      (b)     Electrocuting his tongue and anus;

21      (c)     Beating his feet with iron skewers;

22      (d)     Pulling out his toe nails; and

23      (e)     Tying his hands, hanging him on the ceiling and beating him severely on all

24  parts of his body.

25
### SPECIFIC EXAMPLES OF WRONGFUL
### ACTS RELATING TO PLAINTIFF JOHN DOE NO. 1
26

27    114.    On or about August 24, 2003, the Torture Conspirators detained Plaintiff John Doe

28  No. 1 without cause.  Initially detained and interrogated at the United States military prison facility

 

1    at the Baghdad International Airport, Iraq, Plaintiff John Doe No. 1 was eventually transferred to

2    Abu Ghraib Prison. Plaintiff John Doe No. 1 was recently released without charge from detention.

3         115.    Throughout his detention and interrogation the Torture Conspirators tortured and

4    otherwise mistreated Plaintiff John Doe No. 1 by subjecting him to the following acts, among

5    others:

6         (a)     Hooding him for extended periods of time so that he was completely

7    disorientated and had difficulty breathing;

8         (b)     Humiliating and degrading him by making him walk "like a dog" on all

9    fours;

10        (c)     Restraining him in awkward and painful positions;

11        (d)     Sexually humiliating him by stripping him naked and parading him in front

12    of other prisoners and prison guards, including women;

13        (e)     Subjecting him to extremes of temperature by pouring cold water on him,

14    causing him to lose consciousness;

15        (f)     Threatening to kill him as well as his wife;

16        (g)     Placing electric cables on his body and threatening to use electrical shocks

17    on him;

18        (h)     Hanging weights on his neck for extended periods resulting in spinal

19    damage;

20        (i)     Continually mocking his Islam faith and interrupting his efforts to pray;

21        (j)     Sexually humiliating and degrading him by stripping him naked and

22    attempting to make him masturbate in front of women and fondling his penis with a stick so as to

23    give him an erection;

24        (k)     Subjecting him to prolonged interrogation while he was tied tightly by the

25    hands and hung up;

26        (l)     Hanging him by his feet;

27        (m)     Beating and kicking him until he fainted;

28        (n)     Coercing him to beat other prisoners;

 

1    (o)    Subjecting him to loud music for extended periods; and

2    (p)    Applying electric shocks to his body parts.

3    116.    Throughout his detention, Plaintiff John Doe No. 1 observed the Torture

4    Conspirators torturing and otherwise mistreating other Plaintiffs in similar fashion. In particular,

5    Plaintiff John Doe No. 1 learned that the Torture Conspirators tortured to death two Generals from

6    the Hussein regime who had been detained at the same time.

7
                    **SPECIFIC EXAMPLES OF WRONGFUL ACTS**
                    **RELATING TO PLAINTIFF JANE DOE NO. 2**
8

9    117.    On or about September 24, 2003, the Torture Conspirators detained Plaintiff Doe

10    No. 2 without cause.  Plaintiff Jane Doe No. 2 is a 55-year old English teacher by profession.

11    Plaintiff Jane Doe No. 2's 70-year old husband had been tortured to death in Abu Ghraib Prison

12    during the Saddam Hussein regime.

13    118.    Plaintiff Jane Doe No. 2 was detained and interrogated by the Torture Conspirators

14    in four of its prison facilities in Iraq -- Samarra Airport, Tikrit, Abu Ghraib, and Sahia -- before

15    being released without charge on January 22, 2004.

16    119.    During her detention and interrogation, the Torture Conspirators tortured, abused,

17    and otherwise mistreated Plaintiff Jane Doe No. 2 by subjecting her to the following acts, among

18    others:

19    (a)    Detaining her incommunicado, in isolation, for prolonged periods in a tiny (3

20    metres by 2 metres) dark, unhygienic, cold cell;

21    (b)    Hooding her for extended periods of time so that she was completely

22    disorientated and had difficulty breathing;

23    (c)    Handcuffing her with flexi-cuffs around the wrists and ankles for extended

24    periods causing skin lesions;

25    (d)    Depriving her of food, water, and hygiene facilities;

26    (e)    Threatening and intimidating her with guard dogs;

27    (f)    Threatening her and members of her family with death; and

28

 

(g)     Interrogating her for extended periods while she was restrained in awkward positions.

### SPECIFIC EXAMPLES OF WRONGFUL ACTS
### RELATING TO PUTATIVE CLASS PLAINTIFFS

120.    On or about August 31, 2003 to September 9, 2003, the Torture Conspirators issued, or caused to be issued, a report that expressly directed other non-conspirators to violate the law and set the conditions for the continued success of the Torture Conspiracy.  The report stated "it is essential that the guard force be actively engaged in setting the conditions for the successful exploitation of the internees." *See* Maj. Gen. Antonio M. Taguba, *U.S. Army Report on Iraqi Prisoner Abuse* (May 5, 2004) at 8 (attached as *Exhibit C*).

121.    On September 13, 2003, the Torture Conspirators located in Basrah, Iraq, arrested nine putative Class Plaintiffs in a hotel.  They forced the nine men to kneel, face and hands against the ground, as if in a prayer position.  They then stamped on the back of the neck of those persons raising their head.  They confiscated their money without issuing a receipt. This torture and theft is documented by a report prepared by the International Committee of the Red Cross (hereinafter "ICRC) attached as *Exhibit D*.

122.    Thereafter, also on September 13, 2003, the Torture Conspirators took the nine putative Class Plaintiffs to Al-Hakimiya, a former office previously used by the *mukhabarat* in Basrah, and beat them.

123.    On or about September 13, 2003, the Torture Conspirators beat one man to death. He was aged 28, married, and the father of two children.  This murder is documented in Exhibit E, the report prepared by the ICRC.

124.    On or about September 13, 2003, the Torture Conspirators beat two other putative Class Plaintiffs so severely that they had to be hospitalized with severe injuries, including, but not limited to, broken noses, severely broken ribs and skin lesions on the faces.   Approximately one week after the injuries were intentionally inflicted by the conspirators, an International Red Cross physician examined the victims in the hospital and observed haematomas with dried scabs on the abdomen, buttocks, sides, thigh, wrists, nose and forehead.

125.    A few weeks prior to September 22, 2003, the Torture Conspirators located at Camp Buka, Iraq, kidnapped a 61-year old putative Class Plaintiff, tied him up, placed a hood over his head, and forced him to sit on the hot surface of a vehicle until he lost consciousness and suffered severe burns to his buttocks.

126.    In September or October 2003, the Torture Conspirators located in the so-called "High Value" section of a prison in Iraq tortured a putative Class Plaintiff. They placed a hood over his head, handcuffed his hands behind his back, and forced him to lie on a hot surface until he was severely burned. Conspirators' assault on this person caused such substantial injuries that he was hospitalized for three months and forced to undergo several skin grafts, and the amputation of his right index finger. He suffered the permanent loss of the use of his left fifth finger secondary to burn-induced skin retraction, and extensive burns over the abdomen, anterior aspects of the lower extremities, the palm of his right hand and the sole of his left foot.

127.    In or around November 2003, Torture Conspirators located in Ramadi, Iraq, detained approximately 30 putative Class Plaintiffs in a house. The conspirators released German shepherd dogs into the house and encouraged the dogs to attack the detainees.

128.    On or about November 19, 2003, Torture Conspirators located in Iraq managed to wrest control over the detention conditions in Abu Ghraib prison from those charged with such control under normal military procedures. The Torture Conspirators' success in gaining control over the conditions of detention is reflected in a memorandum signed by General Sanchez, which formally transferred tactical control over the conditions of detention to the 205th Military Intelligence Brigade.

129.    On or about December 12, 2003, the Torture Conspirators located in Abu Ghraib, Iraq, terrorized a putative Class Plaintiff with German shepherds. They stripped this victim and subsequently permitted the dogs to attack him.

130.    On or around Ramadan, 2003, the Torture Conspirators located in Abu Ghraib, Iraq tortured putative Class Plaintiff by putting sandbags on his head, stripping him naked, forcing him onto his hands and knees, piling other naked prisoners on top of him, taking pictures from front and back views of the pile of naked prisoners, forcing him to stroke his penis, pretending to put his

1 | penis in the mouth of a guard while taking pictures, playing with his penis with a pen, writing on

2 | his buttocks, leaving him naked in a cell with no mattress for two days and denying him all food but

3 | bread and water for three days.

4 |     131.    On or around Ramadan, 2003, the Torture Conspirators located in Abu Ghraib, Iraq

5 | tortured putative Class Plaintiff by stripping him naked, ordering him to stroke his penis in front of

6 | a female guard, placing three other naked prisoners on his back, forcing him onto his stomach and

7 | then placing six other prisoners on top, taking pictures of him in a pile of naked prisoners, writing

8 | on his body, forcing him and others to walk and bark like dogs, beating him on the face and chest

9 | and forcing him to sleep on the floor with bags on his head for ten days.

10 |     132.    The Torture Conspirators located in Abu Ghraib, Iraq tortured putative Class

11 | Plaintiff by handcuffing him to a cell door for two hours, pouring cold water on him, putting his

12 | head in urine, beating him with a broom, stepping on his head and legs, pressing a broom into his

13 | buttocks, spitting on him and yelling at him over a loudspeaker for three hours.

14 |     133.    On September 10, 2003 the Torture Conspirators in Abu Ghraib, Iraq tortured

15 | putative Class Plaintiff by placing him in solitary confinement for sixty-seven days, during which

16 | time they further tortured him by hitting him on the chest, cuffing him to a window for five hours,

17 | and depriving him of food for twenty-four hours.

18 |
19 | **CONTINUING PATTERN AND PRACTICE OF<br>WRONGFUL AND ILLEGAL ACTS**

20 |     134.    Beginning in January 2002 and continuing to present, the Torture Conspirators have

21 | engaged in an ongoing pattern and practice of illegal acts designed to generate "intelligence" from

22 | Plaintiffs and putative Class Plaintiffs.  Defendants and their co-conspirators used physical and

23 | psychological coercion in a systematic way to extract "information" or other forms of co-operation

24 | from Plaintiffs deemed to have "intelligence value."

25 |     135.    The Torture Conspirators committed a series of acts specifically designed to

26 | mentally devastate Plaintiffs and putative Class Plaintiffs by attacking and ridiculing their religious

27 | faith of Islam.

28 |

1    136.   The Torture Conspirators conducted this illegal activity in several prisons and

2    detention centers, including but not limited to, the Umm Qasr camp in Iraq, Camp Buka in Iraq, the

3    Abu Ghraib prison in Iraq, Camp Cropper near the Bhagdad Airport in Iraq, the Wood Building in

4    Iraq, the Steel Building in Iraq, and the Tikrit holding area formerly known as the Saddam Hussein

5    Islamic School.

6    137.   Beginning in January 2002 and continuing to present, the Torture Conspirators,

7    including but not limited to the corporate Defendants and the named Individual Defendants,

8    continually tortured and otherwise mistreated Plaintiffs and putative Class Plaintiffs by repeatedly

9    engaging in the following acts:

10            (a)   Hooding, used to prevent Plaintiffs and putative Class Plaintiffs from seeing

11   and to disorient them, and also to prevent them from breathing freely.  The conspirators used one or

12   sometimes two bags, sometimes with an elastic blindfold over the eyes which, when it slips down,

13   further impedes proper breathing.  The Torture Conspirators use hooding in conjunction with

14   beatings, thus increasing anxiety as to when blows would come.  The practice of hooding also

15   allows the Torture Conspirators to remain anonymous and act with impunity.  At times, Plaintiffs

16   and putative Class Plaintiffs are hooded up to 2 to 4 consecutive days, during which hoods are

17   lifted only for drinking, eating or going to the toilets;

18            (b)   Handcuffing with flexi-cuffs, which are sometimes made so tight and used

19   for such extended periods that they caused skin lesions and long-term after-effects on the hands

20   (nerve damage);

21            (c)   Beatings with hard objects (including pistols and rifles), slapping, punching,

22   kicking with knees or feet on various parts of the body (legs, sides, lower back, groin);

23            (d)   Pressing the face into the ground with boots;

24            (e)   Threatening further ill-treatment, reprisals against family members, and

25   imminent execution or transfer to Guantánamo;

26            (f)   Stripping them naked and holding them naked for several days while held in

27   solitary confinement in an empty and pitch black cell;

28            (g)   Placing them in solitary confinement for extended periods of time;

 

(h)  Depriving them of food and water and access to showers and open air;

(i)  Holding them incommunicado for prolonged periods;

(j)  Parading them naked outside cells in front of other detainees, and guards, and sometimes hooded with women's underwear over the head;

(k)  Humiliating them by making them stand naked against the wall of their cells with their arms raised or with women's underwear over the head for prolonged periods - while being laughed at by guards, including female guards

(l)  Urinating on them;

(m)  Force-feeding them foreign objects, such as baseballs;

(n)  Photographing them in humiliating positions:

(o)  Raping them;

(p)  Restraining them while government officials raped them;

(q)  Forcing them to engage in sex acts;

(r)  Repeatedly attacking and beating them over several days, for several hours each time, as they are handcuffed to the bars of their cell door in humiliating (*i.e.* naked or in underwear) and/or uncomfortable positions causing physical pain;

(s)  Exposing them to loud noise or music, prolonged exposure to the sun over several hours, including during the hottest time of the day when temperatures could reach 122 degrees Fahrenheit or higher;

(t)  Forcing them to remain for prolonged periods in stressful positions such as squatting or standing with or without their arms raised;

(u)  Depriving them of sleep for days or weeks, by various means, including but not limited to throwing cold water on them and illuminating their cells with powerful arc lighting for 24-hours per day;

(v)  Engaging in other acts for the purpose of ridiculing and attacking their religious faith of Islam.

138.  In addition to torturing and abusing Plaintiffs and putative Class Plaintiffs in order to make them more willing to talk, Torture Conspirators failed to provide Interrogation Services that

1  complied with the laws governing arrest and detention as well as interrogation. As observed by the

2  ICRC, for example, the Torture Conspirators failed to inform detainees of the reasons for their

3  arrest, even when repeatedly asked to do so. The Torture Conspirators also interrogated Plaintiffs

4  and putative Class Plaintiffs without charging them.

**CONTINUING PATTERN AND PRACTICE OF
ATTEMPTING TO OBSTRUCT JUSTICE**

7          139.    The Torture Conspiracy's activities have been observed by, among others, the

8  ICRC. These observations were verbally shared with the United States on several occasions,

9  including April 1, 2003. These observations were also shared with the United States in memoranda

10  dated May 2003, July 2003, and February 2004. Upon information and belief, the ICRC also had

11  additional communications on dates not known to Plaintiffs.

12          140.    ICRC reports as well as reports by other entities, such as Amnesty International and

13  allied countries, resulted in concerns being raised by some United States government officials about

14  Plaintiffs' treatment. For example, Secretary of State Colin Powell wrote a strongly worded letter

15  to Secretary of Defense Donald Rumsfeld on April 14, 2003, urging that the mistreatment of the

16  detainees cease. Secretary Powell asserted that the mistreatment of the detainees was a threat to

17  national security.

18          141.    Torture Conspirators took steps to obstruct justice and interfere with the steps being

19  taken by the ICRC and certain United States' government officials to investigate allegations of

20  mistreatment.

21          142.    The Torture Conspirators repeatedly acted to obstruct justice by persuading and

22  attempting to persuade others in positions of authority that the ICRC reports were not credible and

23  should not be used to guide the United States' actions. However, the conspirators had no

24  information or evidence upon which to rely to suggest the ICRC reports were not credible. Rather,

25  the Torture Conspirators intentionally made false statements in order to prevent the certain United

26  States officials from discovering and ending the Torture Conspiracy.

27          143.    Among other steps taken to obstruct justice, the Torture Conspirators attempted to

28  move Plaintiffs and putative Class Plaintiffs out of the view of the investigators. *See Exhibit D.*

 

144.    On and after September 13, 2003, the Torture Conspirators took a series of steps to obstruct justice in relation to the summary executions.  They issued an "International Death Certificate" for the person they killed that attributed the death directly to "card-respiratory arrest – asphyxia" and claimed the "cause of the condition" was "unknown." The conspirators made these false statements on official documents to obstruct the on-going investigations into the murder, including an investigation conducted by the United States' military which began on or about October 3, 2003.  Upon information and belief, these documents were sent to the United States.

145.    For example, the Torture Conspirators, beginning in or around October 2003 and continuing to present, attempted to prevent the commencement of an investigation into the assault on a putative Class Plaintiff.

146.    Upon information and belief, the Torture Conspirators took steps to obstruct justice in the District of Columbia, Virginia, California, and other states, as well as abroad.

## DAMAGES

147.    Upon information and belief, the Torture Conspirators have summarily executed at least 15 persons.

148.    Upon information and belief, the Torture Conspirators have caused as many as 50 suicides.

149.    The Torture Conspirators have caused serious physical injuries, including irreversible brain damage, broken bones, permanent paralysis, and permanent physical ill health.

150.    The Torture Conspirators have caused persons to become seriously mentally ill. Plaintiffs subjected to abuse by the Torture Conspirators have developed, among other conditions, concentration difficulties, memory problems, verbal expression difficulties, incoherent speech, acute anxiety reactions, abnormal behavior and suicidal tendencies.  For example, the ICRC observed one person held in isolation to be unresponsive to verbal and painful stimuli.  His heart rate was 120 beats per minute and his respiratory rate 18 per minute.  He was diagnosed as suffering from somatoform (mental) disorder, specifically a conversion disorder.

 

151. The Torture Conspirators have caused extensive damage to certain Plaintiffs' businesses and properties, including, upon information and belief, putative RICO Class Members' businesses and properties located in the United States.

**COUNT I**
**VIOLATION OF RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT ("RICO")**

152. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

153. Defendant Titan and CACI Corporate Defendants, together with the Individual Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

154. The corporate Defendants operated and continue to operate ongoing publicly-traded corporations formed under Delaware law. These corporations have combined to conduct legitimate business for the United States government in California and other states in the United States as well as overseas. These publicly traded corporations are listed on the stock exchange, conduct business throughout the fifty states, and otherwise impact interstate commerce. These corporations' combined business efforts constitute an ongoing Enterprise as that term is defined by RICO. The Enterprise is an ongoing organization that continues to function as a unit and engage in activity separate and apart from the criminal and illegal activity. The Enterprise operated, and continues to operate, legitimate business on behalf of the United States.

155. Defendant Titan, CACI Corporate Defendants and the Individual Defendants together with the co-conspiring government officials worked together on a repeated and continuous basis to engage in the illegal racketeering activity. The predicate acts described above include, but are not limited to, acts and threats of murder, assault and abuse, kidnapping, and obstruction of justice.

156. Defendants were and continue to be associated with and employed by the Enterprise.

157. Defendants directed that employees employed by the Enterprise engage in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5) and as described above and in the accompanying exhibits.

COMPLAINT                                    - 35 -

 

1   158.   The Enterprise engaged and is engaging in a multi-year pattern of criminal conduct.

2   159.   The Enterprise has earned millions of dollars in exchange for participating with co-

3   conspiring government officials in the racketeering activities described above. The Enterprise and

4   the co-conspirators designed and implemented the Torture Conspiracy in order to earn millions of

5   dollars for Interrogation Services that would not have been earned through the Enterprise's

6   legitimate conduct of business.

7   160.   Plaintiff Sami and Plaintiff Ahmed have been injured in their business or property,

8   as required by 18 U.S.C. §1964(c). The impact caused by Defendants' pattern and practice of

9   criminal conduct, if not remedied by this Court, will continue to harm the named Plaintiffs and

10   putative RICO Class Members.

11   161.   The Enterprise's victims include all detainees who have been killed, tortured or

12   otherwise mistreated by the Torture Conspirators. The Enterprise's victims also include United

13   States' citizens were harmed by Defendants' illegal conduct, such as former military police officer

14   Spc. Dean Baker who was injured while posing as an uncooperative prisoner during a training

15   session.

16   162.   As a direct and proximate result of the Torture Conspirators' actions as aforesaid,

17   Plaintiff Sami, Plaintiff Ahmed, and the putative RICO Class have been damaged in an amount to

18   be determined at trial.

**COUNT II**
**CONSPIRACY TO VIOLATE**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**

19
20
163.   All preceding paragraphs are hereby incorporated by reference as if fully set forth

21   herein.

22
164.   Defendants and their co-conspirators in the government conspired to violate the

23   Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

24
165.   The corporate Defendants operated and continue to operate ongoing publicly traded

25   corporations formed under Delaware law. These corporations have combined to conduct legitimate

26   business for the United States government in California and other states in the United States as well

27   as overseas. These publicly traded corporations are listed on the stock exchange, conduct business

28



1   throughout the fifty states, and otherwise impact interstate commerce. These corporations'

2   combined business efforts constitute an ongoing Enterprise as that term is defined by RICO. The

3   Enterprise is an ongoing organization that continues to function as a unit and engage in activity

4   separate and apart from the fraudulent activity. The Enterprise operated, and continues to operate,

5   legitimate business on behalf of the United States. Defendant Titan, CACI Corporate Defendants,

6   and the Individual Defendants together with the co-conspiring government officials worked

7   together on a repeated and continuous basis to engage in the illegal racketeering activity. The

8   predicate acts described above include, but are not limited to, acts and threats of murder, assault

9   and abuse, kidnapping, and obstruction of justice.

10          166.   Defendants were and continue to be associated with and employed by the Enterprise.

11          167.   Defendants directed that employees employed by the Enterprise engage in a pattern

12   of racketeering activity as that term is defined in 18 U.S.C. § 1961(5) and as described above and in

13   the accompanying exhibits.

14          168.   The Enterprise engaged and is engaging in a multi-year pattern of criminal conduct.

15          169.   Defendants and their co-conspirators conspired together to conduct, and to

16   participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity

17   as that term is defined in 18 U.S.C. § 1961(5) and as described above with specificity in Paragraphs

18   46-107 and the accompanying exhibits.

19          170.   The Enterprise engaged and is engaging in a multi-year pattern of criminal conduct.

20          171.   The Enterprise has earned millions of dollars in exchange for participating with co-

21   conspiring government officials in the racketeering activities described above. The Enterprise and

22   the co-conspirators designed and implemented the Torture Conspiracy in order to earn millions of

23   dollars for Interrogation Services that would not have been earned through the Enterprise's

24   legitimate conduct of business.

25          172.   Plaintiff Sami and Plaintiff Ahmed have been injured in their businesses or

26   properties, as required by 18 U.S.C. §1964(c). The impact caused by Defendants' pattern and

27   practice of criminal conduct, if not remedied by this Court, will continue to harm the named

28   Plaintiffs and putative RICO Class Members.

COMPLAINT                                   - 37 -

 

173.   The Enterprise's victims include not only the named Plaintiffs but all detainees who have been killed, tortured or otherwise mistreated by the Torture Conspirators.  The Enterprise's victims also include all United States' citizens, who are subjected to greater security risks as a result of Defendants' illegal conduct.

174.   As a direct and proximate result of the Torture Conspirators' actions as aforesaid, Plaintiff Sami, Plaintiff Ahmed, and the putative RICO Class have been damaged in an amount to be determined at trial.

**COUNT III**
**CLAIM UNDER THE ALIEN TORT CLAIMS ACT –**
**SUMMARY EXECUTION**

175.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

176.   The deliberate killings, under color of law, of Ibrahiem and putative Wrongful Death Class Members were not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

177.   The acts described herein constitute summary execution in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting summary execution as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

178.   Defendants are liable for said conduct in that Defendants directed, ordered, confirmed, ratified, and/or conspired with certain government officials to execute summarily Ibrahiem and other members of the putative Wrongful Death Class.

179.   Plaintiffs and putative Class Members were forced to suffer severe physical and psychological abuse and agony.

180.   Plaintiffs are entitled to monetary damages in an amount to be determined at trial.

**COUNT IV**
**CLAIM UNDER THE ALIEN TORT CLAIMS ACT –**
**TORTURE**

181.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

182.    Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

183.    The acts described herein were inflicted deliberately and intentionally for purposes which included, among others, punishing the victim or intimidating the Plaintiffs and putative Class Members. Torture includes rape and other sexual assault.

184.    The acts described herein constitute torture in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting torture as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

185.    Defendants are liable for said conduct in that Defendants directed, ordered, confirmed, ratified, and/or conspired with certain government officials to commit the acts of torture against the Plaintiffs and potential class members.

186.    Plaintiffs and putative Class Members were forced to suffer severe physical and psychological abuse and agony.

187.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

**COUNT V**
**CLAIM UNDER THE ALIEN TORT CLAIMS ACT –**
**CRUEL, INHUMAN AND DEGRADING TREATMENT**

188.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

189.    Plaintiffs bring this claim on their own behalf and on behalf of the putative Class Members against all Defendants.

190.    The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs and class members, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical or moral resistance.

 

191.    The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

192.    Defendants are liable for said conduct in that Defendants directed, ordered, confirmed, ratified, and/or conspired with certain government officials to cause the cruel, inhuman or degrading treatment of Plaintiffs and class members.

193.    Plaintiffs and putative Class Members were forced to suffer severe physical and psychological abuse and agony.

194.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### COUNT VI
### CLAIM UNDER THE ALIEN TORT CLAIMS ACT –
### ENFORCED DISAPPEARANCE

195.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

196.    Plaintiffs bring this claim on their own behalf and on behalf of the putative Class Members against all Defendants.

197.    The Torture Conspirators abducted Plaintiffs and class members and thereafter refused to acknowledge their abduction or their fate.

198.    The acts described herein constitute the enforced disappearance of Plaintiffs and class members in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting enforced disappearances as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

199.    Defendants are liable for said conduct in that Defendants directed, ordered, confirmed, ratified, and/or conspired with certain government officials in bringing about the enforced disappearance of Plaintiffs and putative Class Members.

 

1    200.   As result of Defendants' unlawful conduct, Plaintiffs and putative Class Members

2 were deprived of their freedom, separated from their families and forced to suffer severe physical

3 and mental abuse.

4    201.   Plaintiffs seek compensatory and punitive damages in an amount to be determined at

5 trial.

6                                  **COUNT VII**
                    **CLAIM UNDER THE ALIEN TORT CLAIMS ACT –**
7                          **ARBITRARY DETENTION**

8    202.   All preceding paragraphs are hereby incorporated by reference as if fully set forth

9 herein.

10    203.   Plaintiffs bring this claim on their own behalf and on behalf of the putative Class

11 Members against all Defendants.

12    204.   The acts described herein constitute arbitrary arrest and detention of Plaintiffs and

13 class members in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. §

14 1350, in that the acts violated customary international law prohibiting arbitrary detention as

15 reflected, expressed, and defined in multilateral treaties and other international instruments,

16 international and domestic judicial decisions, and other authorities.

17    205.   Defendants are liable for said conduct in that Defendants directed, ordered,

18 confirmed, ratified, and/or conspired with certain government officials in bringing about the

19 arbitrary arrest detention of Plaintiffs and putative Class Members.

20    206.   As result of Defendants' unlawful conduct, Plaintiffs and putative Class Members

21 were deprived of their freedom, separated from their families and forced to suffer severe physical

22 and mental abuse.

23    207.   Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

24                                 **COUNT VIII**
                    **CLAIM UNDER THE ALIEN TORT CLAIMS ACT –**
25                              **WAR CRIMES**

26    208.   All preceding paragraphs are hereby incorporated by reference as if fully set forth

27 herein.

28

COMPLAINT                          - 41 -

 

209.    The acts described herein constitute war crimes in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting war crimes as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

210.    Defendants are liable for said conduct directly and also in so far as they directed, ordered, confirmed, ratified, and/or conspired with certain government officials to commit the war crimes against Plaintiffs and putative Class Members.

211.    Defendants' acts described above constitute war crimes and/or crimes against humanity, in violation of the applicable provisions of the Geneva Conventions, and the Additional Protocols thereto.

212.    Defendants' acts violated, among others, Common Article III of the Geneva Conventions, Additional Protocol II of the Geneva Conventions, the Fourth Geneva Convention and Additional Protocol I of the Geneva Conventions.

213.    Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages to be determined at trial. Plaintiffs and putative Class Members were forced to suffer severe physical and psychological abuse and agony.

214.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### COUNT IX
### CLAIM UNDER THE ALIEN TORT CLAIMS ACT –
### CRIMES AGAINST HUMANITY

215.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

216.    The acts described herein committed against Plaintiffs constitute crimes against humanity, which prohibits inhumane acts of a very serious nature such as willful killing, torture including rape, and arbitrary arrest and detention and other inhumane acts committed as part of a widespread or systematic attack against any civilian population or persecutions on political, racial or religious grounds. Leaders, organizers, instigators and accomplices participating in the

 

1  formulation of these acts are responsible for all acts performed by any person in execution of such

2  plan.

3      217.    The acts described herein constitute crimes against humanity in violation of the law

4  of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary

5  international law prohibiting crimes against humanity as reflected, expressed, and defined in

6  multilateral treaties and other international instruments, international and domestic judicial

7  decisions, and other authorities.

8      218.    Defendants are liable for said conduct directly and also in so far as they directed,

9  ordered, confirmed, ratified, and/or conspired with certain government officials to commit the

10  crimes against humanity against the Plaintiffs and putative Class Members.

11      219.    Plaintiffs and putative Class Members were forced to suffer severe physical and

12  psychological abuse and agony.

13      220.    Plaintiffs are entitled to monetary damages and such other relief as to be determined

14  at trial.

15                              **COUNT X**
                **VIOLATION OF THE GENEVA CONVENTIONS**
16

17      221.    All preceding paragraphs are hereby incorporated by reference as if fully set forth

18  herein.

19      222.    Plaintiffs bring this claim on their own behalf and on behalf of the putative Class

20  Members against all Defendants.

21      223.    As detailed above, Plaintiffs and putative Class Members were tortured and

22  otherwise mistreated in violation of specific protections of the Third and Fourth Geneva

23  Conventions.

24      224.    Violations under the Geneva Conventions are direct treaty violations, and are also

25  violations of customary international law.

26      225.    Defendants are liable for said conduct directly and in so far as they directed,

27  ordered, confirmed, ratified, and/or conspired with certain government officials to violate the

28  Geneva Conventions.




226.    As result of Defendants' unlawful conduct, Plaintiffs are entitled to monetary damages in an amount to be determined at trial.

### COUNT XI
### CLAIMS UNDER THE CONSTITUTION OF THE UNITED STATES – VIOLATION OF THE 8th AMENDMENT

227.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

228.    Plaintiffs and putative Class Members were treated in a manner that violates the Constitution of the United States and its Amendments.  Defendants imprisoned Plaintiffs and putative Class Members and thereafter intentionally, and with deliberate disregard for any injury Plaintiffs would suffer, inflicted cruel and unusual punishment on them.

229.    Defendants were acting under the color of the law of the United States when they imprisoned Plaintiffs and putative Class Members.  Defendants were acting under the color of the law of the United States when they inflicted cruel and unusual punishment on Plaintiffs and putative Class Members.

230.    Defendants' actions were accorded the color of United States law because they were conspiring with certain public officials, including certain military officials, and other persons acting in an official capacity on behalf of the United States.

231.    As a direct and proximate result of Defendants' violations of the 8th Amendment, Plaintiffs suffered physical and mental injuries.  In addition, they have suffered present and future economic damage.

232.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

### COUNT XII
### CLAIMS UNDER THE CONSTITUTION OF THE UNITED STATES – VIOLATION OF THE 5th and 14th AMENDMENTS

233.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

234.    Plaintiffs and putative Class Members were treated in a manner that violates the Constitution of the United States and its Amendments.  Defendants intentionally, and with



1   deliberate disregard for any injury Plaintiffs and putative Class Members would suffer, deprived

2   Plaintiffs of life and liberty without due process of law.

3       235.   Defendants were acting under the color of the law of the United States when they

4   deprived Plaintiffs of life and liberty without due process of law.

5       236.   Defendants' actions were accorded the color of the United States law because they

6   were conspiring with certain public officials, including certain military officials, and other persons

7   acting in an official capacity on behalf of the United States.

8       237.   As a direct and proximate result of Defendants' violations of the 5th and 14th

9   Amendments, Plaintiffs suffered physical and mental injuries.  In addition, they have suffered

10  present and future economic damage.

11      238.   Plaintiffs are entitled to compensatory and punitive damages in an amount to be

12  determined at trial.

13                          **COUNT XIII**
        **CLAIM UNDER THE CONSTITUTION OF THE UNITED STATES –**
14              **VIOLATION OF THE 4th AMENDMENT**

15      239.   All preceding paragraphs are hereby incorporated by reference as if fully set forth

16  herein.

17      240.   Plaintiffs and putative Class Members were treated in a manner that violates the

18  Constitution of the United States and its Amendments.  Defendants intentionally, and with

19  deliberate disregard for any injury Plaintiffs and putative Class Members would suffer, violated the

20  right to be free from unlawful seizures.

21      241.   Defendants were acting under the color of the law of the United States when they

22  unlawfully searched and seized Plaintiffs and putative Class Members.

23      242.   Defendants' actions were accorded the color of the United States law because they

24  were conspiring with certain public officials, including certain military officials, and other persons

25  acting in an official capacity on behalf of the United States.

26      243.   As a direct and proximate result of Defendants' violations of the 4th Amendment,

27  Plaintiffs suffered physical and mental injuries.  In addition, they have suffered present and future

28  economic damage.

 

244. Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

## COUNT XIV
### CLAIM UNDER THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT

245. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

246. Plaintiffs and putative Class Members were treated in a manner that violates the Religious Land Use and Institutionalized Persons Act, 24 U.S.C. §2000cc-1 (hereinafter "RLUIPA"). Defendants intentionally imposed a substantial burden on the Plaintiffs' and putative Class Members' exercise of their religious beliefs.

247. Defendants were acting under the color of the law of the United States when they imposed this substantial burden on Plaintiffs' exercise of their religious beliefs.

248. Defendants' actions were accorded the color of the United States law because they were conspiring with certain public officials, including certain military officials, and other persons acting in an official capacity on behalf of the United States.

249. As a direct and proximate result of Defendants' violations of the RLUIPA, Plaintiffs suffered damages.

250. Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial. Plaintiffs also are entitled to recover attorneys fees under RLUIPA.

## COUNT XV
### ASSAULT AND BATTERY

251. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

252. Defendants intentionally assaulted and battered, and aided and abetted the assaulting and battering, of the Plaintiffs and putative Class Members.

253. Plaintiffs and putative Class Members did not consent to the offensive contacts.




254. As a direct and proximate result of the assaults and batteries, Plaintiffs and putative Class Members suffered physical and mental injuries. In addition, they have suffered present and future economic damage.

255. Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

### COUNT XVI
### SEXUAL ASSAULT AND BATTERY

256. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

257. Certain Plaintiffs and certain putative Class Members were raped and otherwise sexually assaulted and battered by Defendants and their co-conspirators.

258. Defendants intended to, and did, cause offensive sexual contacts with intimate parts of another, including but not limited to Plaintiffs. Plaintiffs and putative Class Members did not consent to the contacts.

259. As a direct and proximate result of the rapes and other sexual assaults, Plaintiffs and putative Class Members suffered physical and mental injuries. In addition, they have suffered present and future economic damage.

260. Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

### COUNT XVII
### WRONGFUL DEATH

261. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

262. Detainee Ibrahiem wrongfully died as a result of intentional and negligent actions and inactions by Defendants and their co-conspirators.

263. The Ibrahiem Estate Plaintiff and the putative Wrongful Death Class are the estates and heirs of the dead detainees, which seek redress for the emotional, physical and financial injuries caused by the deaths.



264.   Plaintiff Ibrahiem Estate is entitled to compensatory and punitive damages in an amount to be determined at trial.

**COUNT XVIII**
**FALSE IMPRISONMENT**

265.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

266.   Plaintiffs and putative Class Members were falsely imprisoned and had their liberty restrained without proper authority by Defendants and their co-conspirators.  Plaintiffs and putative Class Members did not consent to the imprisonment.

267.   As a direct and proximate result of the false imprisonment, they suffered physical and mental injuries.  In addition, they have suffered present and future economic damage.

268.   Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

**COUNT XIX**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

269.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

270.   Defendants intentionally inflicted severe emotional distress by way of extreme and outrageous conduct on Plaintiffs and putative Class Members.

271.   As a direct and proximate result of the intentional infliction of emotional distress, they suffered and continue to suffer physical and mental injuries.  In addition, they have suffered present and future economic damage.

272.   Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

**COUNT XX**
**NEGLIGENT HIRING AND SUPERVISION**

273.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

 

274.    Defendants Titan and CACI Corporate Defendants acted negligently and directly harmed Plaintiffs and putative Class Members by failing to take appropriate steps in hiring persons to perform Interrogation Services.    They knew or should have known that they were hiring persons willing to engage in illegal acts.

275.    Defendants Titan and CACI Corporate Defendants acted negligently and directly harmed Plaintiffs and putative Class Members by failing to take appropriate steps to supervise those persons performing Interrogation Services. They knew or should have known that their agents and employees were engaging in illegal acts.

276.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

## COUNT XXI
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

277.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

278.    Defendants negligently inflicted severe emotional distress on Plaintiffs and putative Class Members.

279.    Defendants had a custodial duty to Plaintiffs and putative Class Members, which they breached.

280.    Defendants had a duty to bystanders Plaintiffs and putative Class Members, who had relationships to the victims and were present at the scene of the infliction of injury.

281.    As a direct and proximate result of the negligent infliction of emotional distress, Plaintiffs and putative Class Members suffered and continue to suffer physical and mental injuries. In addition, they have suffered present and future economic damage.

282.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

COMPLAINT                                                    - 49 -

## COUNT XXII
## CONVERSION

283.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein. Defendants converted certain Plaintiffs' and the putative RICO Class Members' possessions.

284.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

## COUNT XXIII
## UNJUST ENRICHMENT

285.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

286.    Defendants' were unjustly enriched by their criminal conduct.  Defendants should be prevented from benefiting from their illegal and criminal conduct.

287.    Plaintiffs are entitled to an order requiring Defendants to disgorge their ill-gotten gains.  Plaintiffs are entitled to an order preventing Defendants from continuing to be unjustly enriched by their co-conspiring government officials influencing the award of government contracts.

## COUNT XXV
## VIOLATION OF LAWS GOVERNING
## CONTRACTING WITH THE UNITED STATES

288.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

289.    Defendants violated the United States Federal Acquisition Regulations, the United States Truth in Negotiations Act, the United States Cost Accounting Standards, and other laws and regulations that govern the placement and implementation of contracts.

290.    Defendants should be prevented from benefiting from conduct that violates these laws and regulations.

 

291.   Plaintiffs are entitled to an order requiring Defendants to disgorge their ill-gotten gains.  Plaintiffs are entitled to an order preventing Defendants from being awarded any future contracts from the United States.

## COUNT XXVI
## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

292.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

293.   Plaintiffs request declaratory and injunctive relief to prevent Defendants from continuing their illegal and inhuman treatment of Plaintiffs.

294.   Plaintiffs request declaratory and injunctive relief to prevent Defendants from continuing to receive payments under existing contracts and from entering into new contracts with the United States.  Plaintiffs do not have any other remedy available at law.

295.   Plaintiffs request declaratory and injunctive relief to prevent any additional torture and abuse, including all of the acts described above.

## PRAYER FOR RELIEF

296.   Plaintiffs are entitled to any and all remedies available to them as a result of the conduct alleged herein, including, but not limited to:

(a)   compensatory damages to make them whole;

(b)   punitive damages in an amount sufficient to punish Defendants and to deter them from engaging in similar misconduct;

(c)   equitable declaratory and injunctive relief as is permitted by law (including RICO), including, but not limited to, an injunction against any continued torture and abuse and an injunction against any future government contract awards;

(d)   treble damages to the extent permitted by RICO and RULIPA;

(e)   attorneys' fees and costs, including but not limited to such fees and costs as may be awarded under RICO and RULIPA.

*Attorneys for Plaintiffs and Class Plaintiffs*

William J. Aceves (CA Bar # 151031)
225 Cedar Street
San Diego, CA  92101
Telephone:     (619) 515-1589
Facsimile:      (619) 696-9999
*Serving as Local Counsel Only*

Michael Ratner
Barbara Olshansky
Jeffrey Fogel
Jennifer Green
Judith Brown Chomsky
Jules Lobel
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone:     (212) 614-6439
Facsimile:      (212) 614-6499

Susan L. Burke
Joyce S. Meyers
MONTGOMERY, MCCRACKEN,
       WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA  19109
Telephone:     (215) 772-7514
Facsimile:      (215) 772-7620

Shereef Hadi Akeel
MELAMED, DAILEY & AKEEL, P.C.
26611 Woodward Avenue
Huntington Woods, MI  48072-2026
Telephone:     (248) 591-5000
Facsimile:      (248) 541-9456

Susan Feathers
UNIVERSITY OF PENNSYLVANIA
LAW SCHOOL
3400 Chestnut Street
Philadelphia, PA  19104-6204
Telephone:     (215) 898-0459

Date:  June 9, 2004

COMPLAINT                              – 52 –



## INDEX OF EXHIBITS

| Exhibit | Title of Document |
|---------|-------------------|
| A | Titan Corporation employment advertisement |
| B | List of government contracts |
| C | Report of the International Committee of the Red Cross (ICRC) on the Treatment by the Coalition Forces of Prisoners of War and Other Protected Persons by the Geneva Conventions in Iraq During Arrest, Internment and Interrogation |
| D | Article 15-6 Investigation of the 800th Military Police Brigade |

# Exhibit A

The Titan Corporation and its partners CACI and Alion, collectively known as Team Titan, recently won the re-compete for the Assistance and Advisory Services (A&AS) contract (previously referred to as the USAFE SETA) supporting United States Air Forces Europe (USAFE), European Command (EUCOM), US Army Europe (USAREUR), the Joint Analysis Center (JAC), and the Warrior Preparation Center (WPC). Awarded by the USAFE Contracting command in Ramstein, Germany, the contract calls for Titan to provide A&AS; Engineering and Technical services; Management and Professional Support; and Studies, Analyses and Evaluation services to maintain and enhance government owned computer software and provide intelligence analysis support for USAFE, WPC, EUCOM and USAREUR and intelligence analysis for the JAC programs and support functions.

The Titan Corporation is a leading provider of comprehensive information and communications products, solutions, and services for National Security and the Security of our Homeland. Serving the Department of Defense, intelligence agencies, and other government customers, Titan's business focus includes homeland security, C4ISR, transformational programs and enterprise information technology. Titan holds to the strong ethical values expressed in its operating principles and its business strategy. The company is proud that dedicated and talented employees have chosen to work at Titan and together create value for the corporation's shareholders.

Our vast experience and dynamic workforce creates an environment that encourages our employees to innovate, design and develop solutions for our customers in a collaborative, highly energized environment. We are committed to providing a work environment that is sensitive and responsive to the workforce needs. Titan's philosophy of compensation includes more than just a paycheck. In addition to salaries, our compensation package includes health and welfare benefits, incentive awards, training, professional development and recognition programs.

| Location: | **Guantanamo, Cuba** | Req. No.: | **OAT536** |
|---|---|---|---|
| Division: | **Technical & Operational Support Group** | | |

Provide operational contract linguist support to Joint Task Force-160 detainee operations at Camp X-ray, Naval Air Station Guantanamo, Cuba. Support the full range of day-to-day activities involving interaction between Camp X-ray military police force and support personnel with Camp X-ray detainees. Interpret and translate written and spoken communications. Review written correspondence, performing document exploitation. Scan, research, and analyze foreign language documents for key information. Translate and gist foreign language documents. Identify and extract information

components that meet the criteria contained in the information requirements lists. Provide input to reports.

Background and Experience: (including education, skills, work activities)

(a) Minimum required:

An excellent command of Uyghur, as well as strong verbal and written American English skills (grammar, vocabulary, idioms, spelling) because linguist work products are prepared in English. A 4/4 (i.e., native) or higher Uyghur listening/reading comprehension rating according to the ILR scale and as measured by the DLPT or comparable language test vehicle. Must be a male U.S. citizen who holds a current U.S. passport. Must undergo a favorable U.S. Army Counterintelligence screening interview. Must be willing to travel/work local to Naval Air Station Guantanamo, Cuba. Ability to deal unobtrusively with camp personnel and detainees. Familiarity with and ability to conduct oneself in accordance with the Central Asian culture and customs. Willingness to work shifts and extended hours in support of 24 x 7 Operations. Must be able to live and work in a harsh environment.

(b) Desired:

A SECRET security clearance. Secondary language skills in Turkish or Uzbek. Auxiliary skills in related languages, to include: Russian, Tadjik, Georgian, Persian Farsi, and Urdu. A thorough knowledge of cultural, economic, geopolitical, and military issues of the Mid East and Arab-speaking countries within that region. Previous operational experience as linguist in support of government operations. An

ability to operate standard and specialized office automation equipment to process foreign language material.

| Location: | **Iraq** | Req. No.: | **TOSG26** |
|-----------|----------|-----------|------------|
| Division: | **Technical & Operational Support Group** | | |

Provide operational contract linguist support to reconstruction efforts in Iraq. Provide general linguistic support for military operations and interpret during interviews, meeting, and conferences. Interpret and translate written and spoken communications. Transcribe and analyze verbal communications. Perform document exploitation. Scan, research, and analyze foreign language documents for key information. Translate and gist foreign language documents. Identify and extract information components meeting military information requirement list criteria. Provide input to reports. Linguists are required to work 12-hour shifts and in excess of 60-hour weeks in order to provide continuous contract linguist support that this 24 x 7 operation requires. Linguists must be available for worldwide deployment as the mission dictates.

Minimum required: Native proficiency in the Arabic/Iraqi dialect, (Interagency Language Roundtable skill level 4-5). Must be capable of providing idiomatic translations of non-technical material using correct syntax and expression from

English to the native language or vice versa; ability to conduct consecutive, accurate translations/interpretation of on going conversations/activities; must be capable of providing cultural social, ethnic context of translations and interpretations, and advise supported organization on the cultural, social and ethnic significance of conversations, situations, documents, etc., in one or more Iraqi cultural traditions and or regions; must be familiar with the local culture, conduct oneself in accordance with local customs, and deal unobtrusively with the populace; must be familiar with and adhere to U.S. Army standards of conduct and the laws of the host nation in performing work assignments; must have good interpersonal skills and ability to work as part of a civil-military team in an unstructured environment; must be willing and capable to live and work in a harsh environment. Desired: University degree from accredited North American or European university.

# Exhibit B

## Government Contracts

### TITAN CORPORATION

**Date Announced:** 3/22/04
**Contract Number:** Not Reported
**Company:** Titan Corporation
**Type:** ID/IQ
**Branch:** Not Reported
**Contracting Activity:**
Defense Contract Command
Washington

This contract is a "Joint Analytical Support contract having a potential ceiling value of up to $172 million over five years (one base year and four option years). Under this multiple-awarded, task-based contract, Titan will compete against one other company to provide analytical support services to the Joint Staff Force Structure, Resources, and Assessment Office (J8) and U.S. Combatant Commands." Tasks include "analysis support for military operations and campaigns; information technology support; knowledge engineering; support to policy, planning, and process improvement; requirements analysis support; and military exercises, simulation and experimentation." [Information obtained from press release.]

**Date Announced:** 3/16/04
**Contract Number:** Not Reported
**Company:** Titan Corporation
**Type:** BPA
**Branch:** Not Reported
**Contracting Activity:**
Department of Homeland Security
(DHS)

The DHS awarded Titan with two BPAs. "The first is a single award BPA for Independent Verification and Validation (IV&V) support to the DHS CFO's Resource Management Transformation Office, and the second is a multiple award BPA to provide Project Management Support Services (PMSS) throughout the DHS. Titan expects to receive orders on these BPAs in excess of $10 million during the contract period of five years if all options are exercised." The purpose of the first BPA is to "provide planning, technical analysis, consulting, architecture assurance, and testing support." The second BPA "will afford solutions to DHS in the areas of establishing and operating a project management function, providing oversight of the implementation of various programs and projects, and establishing processes and procedures for effectively planning, initiating and managing major initiatives at DHS. Titan will compete for individual task orders under this award." [Information from press release.]



**Date Announced:** 2/6/04
**Contract Number:** Not Reported
**Company:** Titan Corporation
**Type:** BPA
**Branch:** Not Reported
**Contracting Activity:**
Department of Defense Intelligence
Information System
and Intelligence Community

Titan received "a Defense Intelligence Agency Blanket Purchase Agreement (BPA) for the Defense Intelligence Information Systems Integration and Engineering Support Services Contract 3 (DIESCON 3) to provide the Department of Defense Intelligence Information System and Intelligence Community a wide range of information technology support. Titan anticipates that this multiple-award, multiyear BPA will have a potential value to titan of $50 million over the next five years. The total potential value of the DIESCON 3 blanket purchase agreement for all seven awardees is $300 million, with Titan having to compete for future task orders with the six other pre-qualified contractor teams." [Information obtained from press release.]

**Date Announced:** 9/27/03
**Contract Number:** F41621-03-D-6300
**Company:** Titan Corporation
**Type:** ID/IQ
**Branch:** Air Force
**Contracting Activity:**
Air Force Information Warfare Center
Lackland Air Force Base, Texas

Titan was awarded this contract along with five other contractors. This contract is to "provide professional and engineering services, and other services in the information warfare arena to include offensive and defensive warfare capabilities in support of the operations, acquisition and testing activities of the Air Force Information Warfare Center, Lackland Air Force Base, Texas. This effort will include systems planning, feasibility studies, system engineering, analysis, prototyping, software development, verification, validation, documentation, software maintenance, systems integration, and systems testing." The total value of the six contracts is up to $252,000,000 and will be completed by August 2009.

**Date Announced:** 7/22/03
**Contract Number:** N66001-03-D-0008
**Company:** Titan Corporation,
Integrated Services Division
**Type:** ID/IQ, cost-plus-fixed-fee
**Branch:** Navy
**Contracting Activity:**
The Space and
Naval Warfare Systems Center
San Diego, California

This contract provides "for engineering and related technical, logistical and direct fleet-support services in support of the Space and Naval Warfare Systems Activity Pacific." The value of this contract is $7,916,326 with a potential value of $40,927,801. "Work will be performed in Hawaii (75%); Japan (10%); and at sites located in Guam, the continental U.S. or foreign countries (15%), and is expected to be completed July, 2004."



**Date Announced:** 10/28/02
**Contract Number:** Not Reported
**Company:** Titan Corporation
**Type:** Not Reported
**Branch:** Not Reported
**Contracting Activity:** Not Reported

Titan "has been selected by an undisclosed government customer as prime contractor for a program having a potential value of $533 million over a two year base period and five option years." [Information obtained from press release.]

**Date Announced:** 10/15/01
**Contract Number:** F08635-02-A-0013
**Company:** Titan Systems Corp.
**Type:** BPA
**Branch:** Air Force
**Contracting Activity:**
The Air Armament Center
Eglin Air Force Base, Florida

The Airforce awarded Titan this contract along with three other contractors. The purpose of this contract is "to provide advisory and assistance service in support of Department of Defense Joint Test and Evaluation (JT&E) programs. These services will include data collection and analysis, task management, engineering analysis, financial management and administrative and presentation support." The maximum value for these four contracts is $400,000,000 and work should be completed by October 2007.

**Date Announced:** 6/27/01
**Contract Number:** N66001-01-D-0028
**Company:** Titan Systems Corp.,
Eldyne, Inc. Division
**Type:** ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Space and
Naval Warfare Systems Center
San Diego, California

This contract is for "engineering, development, production and related technical support services for Antenna Titling Group Systems and related equipment." The value of this contract is $11,666,476 with a possible future value of up to $60,724,714. Ten percent of work will be performed "onboard U.S. Navy vessels and shore activities worldwide." Completion is expected by June 2002.

**Date Announced:** 4/30/02
**Contract Number:**
DAAB07-02-D-M012
**Company:** Datron World
Communications Inc.
**Type:** ID/IQ, firm-fixed-price
**Branch:** Army
**Contracting Activity:**
The U.S. Army Communications
Electronics Command
Fort Monmouth, New Jersey

The contract is for "various communications, spare part packages, training, engineering services and other services. Work will be performed in Vista, and is to be completed by April 29, 2007." The value of this contract is $100,000,000.



**Date Announced:** 3/13/02
**Contract Number:**
USZA22-02-D-0017
**Company:** BTG, Inc.
**Type:** ID/IQ
**Branch:** United States Special
Operations Command
**Contracting Activity:**
The United States
Special Operations Command
MacDill Air Force Base, Florida

This contract is for "enterprise information technology in support of special operations forces world-wide. The maximum dollar value of this contract is $189,405,469. Work will primarily be performed within the continental U.S. and managed out of Tampa, Fla." There is no completion date reported for this contract.

**Date Announced:** 4/8/99
**Contract Number:**
MDA908-99-A-2022
**Company:** BTG, Inc.
**Type:** BPA
**Branch:** Army
**Contracting Activity:**
The Virginia Contracting Activity
Washington, D.C.

BTG was one of six contractors awarded this BPA against a General Services Administration contract. The estimated total value of these six contracts is $200,000,000. The contract is for "Defense Intelligence Agency Information Technology Commodities and Information Technologies Commodities." The expected completion date is April 2001.

**Date Announced:** 7/2/96
**Contract Number:** N00189-96-D-0101
**Company:** SEMCOR, Inc.
**Type:** ID/IQ, time and material
**Branch:** Navy
**Contracting Activity:**
The Fleet and Industrial Supply Center
Norfolk Acquisition Group
Hampton Roads Detachment
Norfolk, Virginia

This contract is "for engineering and technical services as required by the Naval Command and Control and Ocean Surveillance Center, ISE (IN Service Engineering) East Coast Detachment Norfolk, Virginia." The work will occur at various locations in the U.S. as well as "stateside and worldwide areas as required by individual delivery orders supporting U.S. or foreign governments at shore and shipboard based facilities." The value of this contract is $10,106,054 with a possible total value of $50,655,270. Completion is expected by July 2001.



## CACI International, Inc.

**Date Announced:** 4/5/04
**Contract Number:** N/A
(N00178-04-D-4001 through N00178-04-D4014 and N00178-04-D-4014,
N00178-04-D-4016 through N00178-04-D-4152)
**Company:** CACI, Inc.
**Type:**
Indefinite Demand, Indefinite Quantity
(ID/IQ)
**Branch:** Navy
**Contracting Activity:**
The Naval Surface Warfare Center
Dahlgren Division
Dahlgren, Virginia

CACI was one of 151 contractors awarded this contract. This contract is for "support services for all phases of naval ship and shipboard weapon systems acquisition and life-cycle support including research & development support, prototyping, acquisition logistics, modeling, test & evaluation trials, and engineering support for Naval Sea Systems Command Headquarters, field activities, and affiliated program executive offices." The maximum combined value of this contract is $1,300,000,000 per year.

**Date Awarded:** 2/26/04
**Contract Number:** W91QV1-04-F-0077
**Company:** CACI, Inc.
**Type:** firm-fixed-price
**Branch:** Army
**Contracting Activity:**
U.S. Army Contracting Agency
Fort Belvoir, Virginia

This contract is "for 24 contract specialists to work in Iraq. Work will be performed in Baghdad, Iraq." The contract is worth $10,118,040. Completion is expected by February 28, 2005.

**Date Announced:** 2/11/04
**Contract Number:** Not Reported
**Company:** CACI International, Inc.
**Type:** Not Reported
**Branch:** Not Reported
**Contracting Activity:** Not Reported

CACI received "approximately $60 million in new contracts with national security clients within the federal government. The awards call for CACI to provide technical support in the areas of systems integration, information assurance, and Command, Control, Communications, Computers, Intelligence, Surveillance, and Reconnaissance (C4ISR)." These contracts were "previously unannounced." [Information obtained from press release.]



**Date Announced:** 10/14/03
**Contract Number:** Not Reported
**Company:** CACI International, Inc.
**Type:** Not Reported
**Branch:** Not Reported
**Contracting Activity:** Not Reported

CACI received "approximately $128 million in new contracts with national security clients in the federal government." These contracts were "previously unannounced." The contracts require "CACI to provide managed network services, information assurance, systems engineering, and financial management support, among other solutions." [Information obtained from press release.]

**Date Announced:** 9/16/03
**Contract Number:** Not Reported
**Company:** CACI International, Inc.
**Type:** Not Reported
**Branch:** Army
**Contracting Activity:** Not Reported

The contract was awarded by the "Headquarters, United States Army Intelligence and Security Command (INSCOM) to provide mission support services at INSCOM sites, other national intelligence agency sites, and for other army tactical units worldwide. This contract, known as GENESIS II, is awarded for one base year and four option years. CACI's role is to provide information technology solutions to help combat commanders collect intelligence and deploy countermeasures against enemy communications and intelligence systems." The value of this contract is $154.7 million. [Information obtained from press release.]

**Date Awarded:** 8/29/03
**Contract Number:**
DASC01-03-C-0003
**Company:** CACI, Inc.
**Type:** cost-plus-award-fee
**Branch:** Army
**Contracting Activity:**
The U.S. Army Intelligence
and Security Command
Fort Belvoir, Virginia

This contract is "for maintenance, engineering and facility support services." Services will be conducted "worldwide." Completion is expected by September 20, 2008.

**Date Announced:** 2/26/03
**Contract Number:** Not Reported
**Company:** CACI International, Inc.
**Type:** BPA
**Branch:** Not Reported
**Contracting Activity:** Not Reported

This contract is a "five-year blanket purchase agreement to provide information technology (IT) support for Department of Defense (DoD) national security network and computer infrastructures. The multiple award contract, which CACI won through its General Service Administration Federal Supply Service schedule, is valued at $450 million. Under the terms of the agreement, CACI will compete with three other companies for tasks in a wide range of life-cycle IT services. The contract positions CACI to continue expanding its support for DoD security and intelligence capabilities with solutions for communications, systems engineering, and technical and program management services." [Information obtained from press release.]

**Date Awarded:** 9/11/01
**Contract Number:** N00600-01-D-7113
**Company:** CACI Field Services, Inc.
**Type:** ID/IQ, cost-plus-fixed-fee
**Branch:** Navy
**Contracting Activity:**
The Fleet and Industrial
Supply Center Norfolk
Detachment Washington
Washington, D.C.

CACI received this contract along with two other contractors. The purpose of this contract is to "provide technical support services for the Naval Supply Systems Command (NACSUP), Mechanicsburg, Pa., and its associated field activities. Services include independent analysis and technical studies as well as project management and trouble shooting in response to tasks involving the development and initiatives assigned to NACSUP." The contract has options, which could bring the total value to $53,000,000.

**Date Announced:** 3/16/01
**Contract Number:** F33615-01-D-1833
**Company:** CACI Technologies, Inc.
**Type:** ID/IQ
**Branch:** Air Force
**Contracting Activity:**
Air Force Research Laboratory
Wright-Patterson Air Force Base, Ohio

The Air Force awarded this contract to CACI and another contractor. The purpose of this contract is "to participate in the Integrated Electronic Warfare Systems Effectiveness Evaluation (IEWSEE) program." The total value of this contract is $18,500,000.

**Date Announced:** 11/30/00
**Contract Number:**
DAAB07-01-D-G002
**Company:** CACI Technologies, Inc.
**Type:** time and materials, ID/IQ
**Branch:** Army
**Contracting Activity:**
The U.S. Army Communications-
Electronics Command
Fort Monmouth, New Jersey

CACI and one other contractor received this contract. The purpose of this contract is to "provide support services to the U.S. Army Communications Electronics Command, Research, Development and Engineering Center, Intelligence and Information Warfare Directorate (I2WD), and includes operational, program management, technical, engineering, integration, prototype development, and fabrication support services and products necessary for I2WD to meet its mission and customer needs. This may encompass all elements of the acquisition cycle, subsequent support of systems in the field, and quick reaction requirements." The two contracts are valued at $100,000,000 with a potential worth of $500,000,000.

**Date Announced:** 10/26/00
**Contract Number:**
N00140-01-C-E403
**Company:** CACI Field Services, Inc.
**Type:** cost-plus-fixed-fee
**Branch:** Navy
**Contracting Activity:**
The Fleet and Industrial
Supply Center Norfolk
Detachment Philadelphia, Pennsylvania

This contract is for "logistics and training support in automated supply management to Navy and Marine Corps activities . . . . Services also will be provided to Navy and Marine Corps units worldwide, both deployed and non deployed." The potential value of the contract is $34,421,693. Completion is expected by November 2001.

**Date Awarded:** 9/18/98
**Contract Number:** Not Reported
CACI Contracts under
GSA Schedule Group 70:
GS-35F-5872H, GS-35F-0342N,
GS-35F-0362K, GS-35F-4476G,
GS-35F-4483G, GS-35F-5403H,
GS-35F-5163H, GS-35F-5454H,
GS-35F-5922H
**Company:** Premier Technology Group
**Type:** BPA
**Branch:** Not Reported
**Contracting Activity:** Not Reported

The "Directorate of Contracting, Fort Hauchuca, Arizona, awarded a Blanket Purchase Agreement (BPA) to Premier Technology Group against the GSA Schedule Group 70 (Information Technology) in September, 1998. The BPA was transferred to the National Business Center (NBC), Department of Interior on January 14, 2001 and was extended for an additional five years by the NBC. The BPA was modified on July 31, 2003 to reflect the acquisition by CACI." CACI notes that "GSA defines the Information Technology Services available under this schedule very broadly." In addition, "[a]ll federal agencies, other specified activities and agencies are eligible buyers under this contract." [Information obtained from press release and company website.]

- 8 -
Exhibit B

## NO BID CONTRACTS

**Date Reported:** 12/18/03
**Contract Number:** N00421-04-D-0008
**Company:** CACI AB, Inc.
**Type:** ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Naval Air Systems Command
Aircraft Division
Patuxent River, Maryland

The purpose of this contract is "to provide technical support services to the Chief of Naval Operations, and the Naval Air Systems Command, Naval Aviation Training Program. The procured services include technical support for the review, analysis, design, development, implementation, and evaluation of process, policy and structure improvement initiatives for aviation training pipeline management." The estimated worth of the contract is $15,077,923.  "This contract was not competitively procured."

**Date Announced:** 5/25/00
**Contract Number:** N66001-00-D-5014
**Company:** CACI Technologies, Inc.
**Type:** ID/IQ, cost-plus-fixed-fee
**Branch:** Navy
**Contracting Activity:**
The Space and
Naval Warfare Systems Center
San Diego, California

The purpose of this contract is "for engineering support services for the Command and Control Processor (C2p)/Common Data Link Management System (CDLMS) and Independent Verification and Validation (IV&V)."  The contract is valued at $8,082,323. "This contract was not competitively procured."

**Date Announced:** 3/28/03
**Contract Number:** N00421-01-D-0065
**Company:** Acton Burnell, Inc.
**Type:** modification to ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Naval Air Systems Command
Patuxent River, Maryland

The modification is to "provide technical support services to the Office of the Chief of Naval Operations and the Naval Air Systems Command Aviation Training Systems Program Office." This modification increases the value of the contract by $9,900,000.

**Date Announced:** 11/26/01
**Contract Number:** N00421-01-D-0065
**Company:** Acton Burnell, Inc.
**Type:** modification to ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Naval Air Systems Command,
Naval Air Warfare Center
Aircraft Division
Patuxent River, Maryland

The purpose of the modification is "to exercise an option to provide technical support services to the Office of Chief of Naval Operations and the Naval Air Systems Command Aviation Training Systems Program Office." The modification increases the value of the contract by $9,005,545.

**Date Announced:** 11/21/00
**Contract Number:** N00421-01-D-0065
**Company:** Acton Burnell, Inc.
**Type:** ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Naval Air Systems Command,
Naval Air Warfare Center
Aircraft Division
Patuxent River, Maryland

The purpose of this contract is to "provide technical support services to the Office of the Chief of Naval Operations and the Naval Air Systems Command Aviation Training Systems Program Office." The value of this contract is $7,482,474. "This contract was not competitively procured."

**Date Announced:** 8/29/2003
**Contract Number:** N00421-01-D-0147
**Company:** Titan Systems Corp.,
SEMCOR Aviation Engineering Group
**Type:** modification to ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Naval Air Systems Command,
Naval Air Warfare Center
Aircraft Division
Patuxent River, Maryland

The purpose of this modification is to "exercise an option for engineering and technical services in support of the VH Executive Helicopter Transport Program and the Satellite Navigation Program." Work should be completed by August 2004. This modification increases the value of the contract by $7,872,376.



**Date Awarded:** 10/3/02
**Date Announced:** 2/27/03
**Contract Number:** N00014-03-C-0150
**Company:** Titan Corporation
**Type:** modification
**Branch:** Navy
**Contracting Activity:**
The Office of Naval Research
Washington, D.C.

This modification is "for the construction, integration and certification and delivery of the X-Craft and data. This effort will involve the planning, shipyard selection, detail design, construction, certification and delivery of an approximately 1000 ton high-speed aluminum catamaran, meeting the requirements of the X-Craft performance specification." The value of this modification is $32,638,715. The contract should be completed by October 2004.

**Date Announced:** 8/29/02
**Contract Number:**
N00421-01-D-0147
**Company:** Titan Systems Corp.
**Type:** modification to ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Naval Air Systems Command,
Naval Air Warfare Center
Aircraft Division,
Patuxent River, Maryland

The purpose of the modification is "to exercise an option for engineering and technical services in support of the VH Executive Helicopter Transport Program and the Satellite Navigation Program. Work will be performed in Patuxent River, Md., and is expected to be completed by 2003." The modification increased the value of the contract by $7,621,653.

**Date Announced:** 8/12/02
**Contract Number:** N00383-99-G-023G
**Company:** Titan Linkabit Wireless
**Type:** ceiling-price-order under a basic ordering agreement
**Branch:** Navy
**Contracting Activity:**
The Naval Inventory Control Point
Philadelphia, Pennsylvania

This contract is for the "purchase of 19 An/USC-42A(v)3 Mini-DAMA (Demand Assigned Multiple Access) Systems used on P-3 and E2C aircraft. These items are communications related. Work will be performed in San Diego and is to be completed by October 2003." The value of this contract is $5,250,916. "This contract was not competitively procured."

**Date Announced:** 2/14/02
**Contract Number:**
DTRA01-02-D-0005
**Company:**
Titan Pulse Sciences Division
**Type:** cost-plus-award-fee
**Branch:** Army
**Contracting Activity:**
The Defense Thread Reduction Agency
Alexandria, Virginia

The purpose of this contract is "for maintenance of laboratory radiation simulator development testbeds." The contract is valued at $2,157,660 and should be completed by December 31, 2006. "One bid was solicited on Sep. 4, 2001, and one bid received."

**Date Announced:** 2/26/01
**Contract Number:** N00383-99-G-023G
**Company:** Titan Linkabit Wireless
**Type:** ceiling-price-order under a basic ordering agreement
**Branch:** Navy
**Contracting Activity:**
The Naval Inventory Control Point
Philadelphia, PA

This contract is for the "purchase of 15 AN/USC-42A(v)2 Dual Channel Mini-DAMA (demand assigned multiple access) Communication Sets used on various aircraft and shipboard platforms. This contract is for the Government of the Republic of Korea (100%) under the Foreign Military Sales Program." The value of this contract is $5,159,430 and completion is expected by January 2002. "This contract was not competitively procured."

**Date Announced:** 8/8/00
**Contract Number:** N00039-00-C-3204
**Company:** Titan Systems Corp., Linkabit Division
**Type:** firm-fixed-price
**Branch:** Navy
**Contracting Activity:**
The Space and
Naval Warfare System Command
San Diego, California

Titan was awarded this contract to "develop, produce and test Miniaturized Demand Assigned Multiple Access (Mini-DAMA) Advanced Digital Waveform (ADW) upgrade circuit cards." This contract is valued at $6,685,548 with a possible maximum value of $10,000,000. "This contract was not competitively procured."

**Date Announced:** 4/26/00
**Contract Number:** N00383-99-G-023G
**Company:** Titan Linkabit Wireless
**Type:** ceiling-price-order under a basic ordering agreement
**Branch:** Navy
**Contracting Activity:**
The Naval Inventory Control Point
Philadelphia, PA

Titan was awarded this contract to "purchase 35 (V)3 modems, 29 (V)3 power amps and 10 display entry panels used on various aircraft." The value of this contract is $8,189,646 and completion is expected by April 2001. "This contract was not competitively procured."

**Date Announced:** 2/9/00
**Contract Number:**
N00383-99-G-023G
**Company:** Titan Linkabit Wireless
**Type:** firm-fixed-price order
**Branch:** Navy
**Contracting Activity:**
The Naval Inventory Control Point
Philadelphia, PA

This contract is "for the purchase of 16 single-channel communications sets and seven dual-channel communications sets used on various aircraft for the country of Germany (100%) under the Foreign Military Sales Program." The value of this contract is $5,970,608 and completion is expected by February 2001. "This contract was not competitively procured."



**Date Announced:** 8/29/03
**Contract Number:** N00421-01-D-0147
**Company:** Titan Systems Corp.,
SEMCOR Aviation Engineering Group
**Type:** modification to ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Naval Air Systems Command,
Naval Air Warfare Center Aircraft
Division
Patuxent River, Maryland

This modification is "to exercise an option for engineering and technical services in support of the VH Executive helicopter Transport Program and the Satellite Navigation Program." This modification increases the value of the original contract by $7,872,376. Completion is set at August 2004.

**Date Announced:** 6/16/03
**Contract Number:**
19628-01-C-0033, P00022
**Company:** BTG, Inc.
**Type:** modification
**Branch:** Air Force
**Contracting Activity:**
The Electronic Systems Center
Hanscom Air Force Base, Massachusetts

The purpose of this modification is "to provide for integrated broadcast service (IBS)." This modification increases the value of the original contract by $32,890,308. The date of completion is June 2009.

**Date Announced:** 9/24/03
**Contract Number:** N00421-99-D-1698
**Company:** AverStar, Inc.
**Type:** not-to-exceed modification to an existing ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Naval Air Systems Command
Aircraft Division
Patuxent River, Maryland

The modification was awarded "to exercise an option for engineering services for acoustic and non-acoustic sensor system research and development, test and evaluation to support both fleet aircraft and special projects. Work will be performed in Lexington Park, Md., and is expected to be completed in September 2004." This modification increases the value of the original contract by $13,632,247.

**Date Announced:** 9/25/02
**Contract Number:** N00421-99-D-1698
**Company:** AverStar, Inc.
**Type:** not-to-exceed modification to ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Naval Air Systems Command
Naval Air Warfare Center
Aircraft Division
Patuxent River, Maryland

The Navy awarded AverStar this modification to "exercise an option for engineering services for acoustic and non-acoustic sensor system research, development, test and evaluation to support both fleet aircraft and special projects. Work will be performed in Lexington Park, Md., and is to be completed by September 2003." This modification increases the value of the original contract by $28,826,413.

**Date Announced:** 9/27/01
**Contract Number:** N00421-99-D-1698
**Company:** AverStar, Inc.
**Type:** modification to ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Naval Air Systems Command
Naval Air Warfare Center
Aircraft Division
Patuxent River, Maryland

The Navy awarded AverStar this modification to "exercise an option for engineering services for acoustic and non-acoustic sensor system research, development, test and evaluation to support both fleet issue aircraft and special projects. The estimated level of effort for this option is 158,669 man-hours. Work will be performed in Lexington Park, Md., and is expected to be completed in September 2002." This modification increases the value of the original contract by $16,797,090.

**Date Announced:** 12/20/00
**Contract Number:**
N00421-99-D-1698
**Company:** AverStar, Inc.
**Type:** time and materials task order to fixed-rate time and material ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Naval Air Systems Command
Naval Air Warfare Center
Aircraft Division
Patuxent River, Maryland

This materials task order is "for engineering and technical support services to support the development of the advanced sensor capabilities for special purpose and fleet-issued aircraft, and land and sea-based sensor applications. Work will be performed in Lexington Park, Md., and is expected to be completed by December 2001." This task order increases the value of the original contract by $10,169,410.



**Date Announced:** 12/10/97
**Contract Number:**
N00019-95-C-5013
**Company:** SEMCOR, Inc.
**Type:** modification
**Branch:** Navy
**Contracting Activity:**
The Naval Air Systems Command
Naval Air Warfare Center
Aircraft Division
Patuxent River, Maryland

The modification is "for systems engineering, integration, and design analysis for the f-14B upgrade, the EA-6B and the V-22 programs in support of the Naval Air Warfare Center Aircraft Division, Patuxent River, Md. Work will be performed in Lexington Park, Md. (85%), and Patuxent River, Md. (15%), and is expected to be completed in June 1998. This modification increases the value of the original contract by $7,667,777.

**Date Announced:** 9/26/96
**Contract Number:** N66001-96-D-5077
**Company:** SEMCOR, Inc.
**Type:** cost-plus-fixed-fee, ID/IQ,
sole source
**Branch:** Navy
**Contracting Activity:**
The Naval Command
Control and Ocean Surveillance Center
RDT&E Division
San Diego, California

This contract is "for program/project technical system support, configuration system support and systems engineering support services for transitioning the Space and Naval Warfare Systems Command from Arlington, Virginia, to San Diego, California." The 9/26/96 announcement originally reported that the "contract was competitively procured with 26 proposals solicited and one offer received." However, this statement was corrected on 10/4/96. This contract "was not competitively procured."

**Date Announced:** 9/15/03
**Contract Number:** N65236-99-D-3812
**Company:** Unidyne Corp.
**Type:** modification to ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Space and Naval Warfare
Systems Center
Charleston, South Carolina

This modification is "for an increase in the number of man-hours in the level of effort for engineering, technical, and logistics services for the installation, removal, and testing of navigation and other systems in ships and shore facilities supporting Naval Sea Systems Command." The value of this modification is $8,415,530 bringing the "cumulative value of the contract to $52,301,688."



**Date Announced:** 8/16/01
**Contract Number:** N65236-99-D-3812
**Company:** Unidyne Corp.
**Type:** modification to ID/IQ
**Branch:** Navy
**Contracting Activity:**
The Space and Naval Warfare
Systems Center
Charleston, South Carolina

This modification is "for engineering, technical, installation, manufacturing and logistics of navigation systems and equipment for all Navy ships." The value of this modification is $9,982,110 with "options, which if exercised, would bring the cumulative value of this contract to $43,279,298." Completion is expected by December 2003.

**Date Announced:** 3/28/01
**Contract Number:**
F19628-99-F-8059-P00028
**Company:** SenCom Corp.
**Type:** modification
**Branch:** Air Force
**Contracting Activity:**
Electronic Systems Center
Hanscom AFB, Massachusetts

This modification is "to provide for information technology support form April 2001 through March 2002 for system acquisition and development planning in support of the Strategic and Nuclear Defense Directorate, headquarters, Electronic Systems Center, Hanscom Air Force Base, Mass." This modification increases the value of the original contract by $17,051,810.

**Date Announced:** 4/17/03
**Contract Number:** N66001-00-D-5045
**Company:**
Advanced Communication Systems
(ACS)
**Type:** modification to ID/IQ, cost-plus-fixed-fee multiple-award
**Branch:** Navy
**Contracting Activity:**
The Space and Naval Warfare
Systems Center

This modification awards $16,000,000 to ACS and four other contractors. The purpose of the modification is to "exercise options to increase the estimated level of effort of each existing contract by an overall total of 215,520 man-hours for support of the mission-critical Tactical Data Information Exchange System B broadcast family of systems." Tasks will "be performed at the contractor facilities in San Diego, Calif, at various other sites, and military facilities worldwide as specified in task orders." Completion is expected by February 2005.

**Date Announced:** 6/02/95
**Contract Number:**
F04735-95/C-0036
**Company:** JAYCOR
**Type:** cost-plus-award-fee
**Branch:** Air Force
**Contracting Activity:**
Sacramento Air Logistics Center
McClellan Air Force Base, California

The contract is "for operation and maintenance of the logistics support facility for the Commander-in-Chief Mobile Alternate Headquarters Program. The work will be performed at JACOR's facility in Albuquerque, New Mexico. Contract is expected to be completed September 1998." The value of this contract is $23,596,928. "One firm was solicited and 1 firms submitted a proposal."

- 16 -
Exhibit B

# Exhibit C

REPORT OF THE INTERNATIONAL COMMITTEE OF THE RED CROSS (ICRC)
ON THE TREATMENT BY THE COALITION FORCES OF PRISONERS OF WAR
AND OTHER PROTECTED PERSONS BY THE GENEVA CONVENTIONS IN IRAQ
DURING ARREST, INTERNMENT AND INTERROGATION

FEBRUARY 2004

Table of contents

## Executive Summary

### Introduction

**1.    Treatment during arrest**

1.1    Notification to families and information for arrestees

**2.    Treatment during transfer and initial custody**

**3.    Treatment during interrogation**

3.1    Methods of ill-treatment
3.2    Military Intelligence section, Abu Ghraib Correctional Facility
3.3    Umm Qasr (JFIT) and Camp Bucca (JIF/ICE)
3.4    Previous action taken by the ICRC in 2003 on the issue of treatment
3.5    Allegations of ill-treatment by the Iraqi police

**4.   Treatment in regular internment facilities**

4.1    General conditions of treatment
4.2    "High Value Detainees" section, Baghdad International Airport

**5.    Disproportionate and excessive use of force against persons deprived of their liberty by the detaining authorities**

**6.    Seizure and confiscation of personal belongings of persons deprived of their liberty**

**7.    Exposure of persons deprived of their liberty to danger tasks**

**8.    Protection of persons deprived of their liberty against shelling**

## EXECUTIVE SUMMARY

In its "Report on the Treatment by the Coalition Forces of Prisoners of War and other protected persons in Iraq", the International Committee of the Red Cross (ICRC) draws the attention of the Coalition Forces (hereafter called "the CF") to a number of serious violations of International Humanitarian Law. These violations have been documented and sometimes observed while visiting prisoners of war, civilian internees and other protected persons by the Geneva Conventions (hereafter called persons deprived of their liberty when their status is not specifically mentioned) in Iraq between March and November 2003. During its visits to places of internment of the CF, the ICRC collected allegations during private interviews with persons deprived of their liberty relating to the treatment by the CF of protected persons during their capture, arrest, transfer, internment and interrogation.

The main violations, which are described in the ICRC report and presented confidentially to the CF, include:

- Brutality against protected persons upon capture and initial custody, sometimes causing death or serious injury
- Absence of notification of arrest of persons deprived of their liberty to their families causing distress among persons deprived of their liberty and their families
- Physical or psychological coercion during interrogation to secure information
- Prolonged solitary confinement in cells devoid of daylight
- Excessive and disproportionate use of force against persons deprived of their liberty resulting in death or injury during their period of internment

Serious problems of conduct by the CF affecting persons deprived of their liberty are also presented in the report:

- Seizure and confiscation of private belongings of persons deprived of their liberty
- Exposure of persons deprived of their liberty to dangerous tasks
- Holding persons deprived of their liberty in dangerous places where they are not protected from shelling

According to allegations collected by ICRC delegates during private interviews with persons deprived of their liberty, ill-treatment during **capture** was frequent. While certain circumstances might require defensive precautions and the use of force on the part of battle group units, the ICRC collected allegations of ill-treatment following capture which took place in Baghdad, Basrah, Ramadi and Tikrit, indicating a consistent pattern with respect to times and places of brutal behavior during arrest. The repetition of such behavior by CF appeared to go beyond the reasonable, legitimate and proportional use of force required to apprehend suspects or restrain persons resisting arrest or capture, and seemed to reflect a usual modus operandi by certain CF battle group units.

According to the allegations collected by the ICRC, ill-treatment during **interrogation** was not systematic, except with regard to persons arrested in connection with suspected security offences or deemed to have an "intelligence" value. In these cases, persons deprived of their liberty under supervision of the Military Intelligence were at high risk of being subjected to a variety of harsh treatments ranging from

insults, threats and humiliations to both physical and psychological coercion, which in some cases was tantamount to torture, in order to force cooperation with their interrogators.

The ICRC also started to document what appeared to be widespread abuse of power and ill-treatment by the Iraqi police which is under the responsibility of the Occupying Powers, including threats to hand over persons in their custody to the CF so as to extort money from them, effective hand over of such persons to the custody of the CF on allegedly fake accusations, or invoking CF orders or instructions to mistreat persons deprived of their liberty during interrogation.

In the case of the "High Value Detainees" held in Baghdad International Airport, their continued internment, several months after their arrest, in strict solitary confinement in cells devoid of sunlight for nearly 23 hours a day constituted a serious violation of the Third and Fourth Geneva Conventions.

The ICRC was also concerned about the excessive and disproportionate use of force by some detaining authorities against persons deprived of their liberty involved during their internment during periods of unrest or escape attempts that caused death and serious injuries. The use of firearms against persons deprived of their liberty in circumstances where methods without using firearms could have yielded the same result could amount to a serious violation of International Humanitarian Law. The ICRC reviewed a number of incidents of shootings of persons deprived of their liberty with live bullets, which have resulted in deaths or injuries during periods of unrest related to conditions of internment or escape attempts. Investigations initiated by the CF into these incidents concluded that the use of firearms against persons deprived of their liberty was legitimate. However, non-lethal measures could have been used to obtain the same results and quell the demonstrations or neutralize persons deprived of their liberty trying to escape.

Since the beginning of the conflict, the ICRC has regularly brought its concerns to the attention of the CF. The observations in the present report are consistent with those made earlier on several occasions orally and in writing to the CF throughout 2003. In spite of some improvements in the material conditions of internment, allegations of ill-treatment perpetrated by members of the CF against persons deprived of their liberty continued to be collected by the ICRC and thus suggested that the use of ill-treatment against persons deprived of their liberty went beyond exceptional cases and might be considered as a practice tolerated by the CF.

The ICRC report does not aim to be exhaustive with regard to breaches of International Humanitarian Law by the CF in Iraq. Rather, it illustrates priority areas that warrant attention and corrective action on the part of CF, in compliance with their International Humanitarian Law obligations.

Consequently the ICRC asks the authorities of the CF in Iraq:

    to respect at all times the human dignity, physical integrity and cultural sensitivity of the persons deprived of their liberty held under their control
  • to set up a system of notifications of arrest to ensure quick and accurate transmission of information to the families of persons deprived of their liberty

- - to prevent all forms of ill-treatment, moral or physical coercion of persons deprived of their liberty in relation to interrogation
- - to set up an internment regime which ensures the respect of the psychological integrity and human dignity of the persons deprived of their liberty
- - to ensure that all persons deprived of their liberty are allowed sufficient time every day outside in the sunlight, and that they are allowed to move and exercise in the outside yard
- • to define and apply regulations and sanctions compatible with International Humanitarian Law and to ensure that persons deprived of their liberty are fully informed upon arrival about such regulations and sanctions
  to thoroughly investigate violations of International Humanitarian Law in order to determine responsibilities and prosecute those found responsible for violations of International Humanitarian Law
- - to ensure that battle group units arresting individuals and staff in charge of internment facilities receive adequate training enabling them to operate in a proper manner and fulfill their responsibilities as arresting authority without resorting to ill-treatment or making excessive use of force.

**INTRODUCTION**

1. The International Committee of the Red Cross (ICRC) is mandated by the High Contracting Parties to the Geneva Conventions to monitor the full application of and respect for the Third and Fourth Geneva Conventions regarding the treatment of persons deprived of their liberty. The ICRC reminds the High Contracting Parties concerned, usually in a confidential way, of their humanitarian obligations under all four Geneva Conventions, in particular the Third and Fourth Geneva Conventions as far as the treatment of persons deprived of their liberty is concerned and under Protocol I of 1977 additional to the Geneva Conventions, confirmed and reaffirmed rules of customary law and universally acknowledged principles of humanity.

The information contained in this report is based on allegations collected by the ICRC in private interviews with persons deprived of their liberty during its visits to places of internment of the Coalition Forces (CF) between March and November 2003. The allegations have been thoroughly revised in order to present this report as factually as possible. The report is also based on other accounts given either by fellow persons deprived of their liberty inside internment facilities or by family members. During this period, the ICRC conducted some 29 visits in 14 internment facilities in the central and southern parts of the country. The testimonies were collected in Camp Cropper (Core Holding Area, Military Intelligence section, "High Value Detainees" section); Al-Salihiyye, Tasferat and Al-Russafa prisons; Abu Ghraib Correctional Facility (including Camp Vigilant and the "Military Intelligence" section); Umm Qasr and Camp Bucca, as well as several temporary internment places such as Tallil Trans-shipment Place, Camp Condor, Amarah Camp and the Field Hospital in Shaibah.

The ICRC conditions for visits to persons deprived of their liberty in internment facilities are common for all countries where the organization operates. They can be expressed as follows:

- The ICRC must have access to all persons deprived of their liberty who come within its mandate in their place of internment
- The ICRC must be able to talk freely and in private with the persons deprived of their liberty of its choice and to register their identity
- The ICRC must be authorized to repeat its visits to the persons deprived of their liberty
- The ICRC must be notified of arrests, transfers and releases by the detaining authorities

Each visit to persons deprived of their liberty is carried out in accordance with ICRC's working procedures expressed as follows:

- At the beginning of each visit, the ICRC delegates speak with the detaining authorities to present the ICRC's mandate and the purpose of the visit as well as to obtain general information on internment conditions, total of interned population and movements of persons deprived of their liberty (release, arrest, transfer, death, hospitalization).
- The ICRC delegates, accompanied by the detaining authorities tour the internment premises.

- The ICRC delegates hold private interviews with persons of their choice who are deprived of their liberty, with no time limit in a place freely chosen and if necessary register them.
- At the end of each visit, the delegates hold a final talk with the detaining authorities to inform them about the ICRC's findings and recommendations.

2.    The aim of the report is to present information collected by the ICRC concerning the treatment of prisoners of war by the CF, civilian internees and other protected persons deprived of their liberty during the process of arrest, transfer, internment and interrogation.

3.    The main places of internment where mistreatment allegedly took place included battle group unit stations; the military intelligence sections of Camp Cropper and Abu Ghraib Correctional Facility; Al-Baghdadi, Heat Base and Habbania Camp in Ramadi governorate; Tikrit holding area (former Saddam Hussein Islamic School); a former train station in Al-Khaïm, near the Syrian border, turned into a military base; the Ministry of Defense and Presidential Palace in Baghdad, the former *mukhabarat* office in Basrah, as well as several Iraqi police stations in Baghdad.

4.    In most cases, the allegations of ill-treatment referred to acts that occurred prior to the internment of persons deprived of their liberty in regular internment facilities, while they were in the custody of arresting authorities or military and civilian intelligence personnel. When persons deprived of their liberty were transferred to regular internment facilities, such as those administered by the military police, where the behavior of guards was strictly supervised, ill-treatment of the type described in this report usually ceased. In these places, violations of provisions of International Humanitarian Law relating to the treatment of persons deprived of their liberty were a result of the generally poor standard of internment conditions (long term internment in unsuitable temporary facilities) or of the use of what appeared to be excessive force to quell unrest or to prevent attempted escapes.

## 1.    TREATMENT DURING ARREST

5.    Protected persons interviewed by ICRC delegates have described a fairly consistent pattern with respect to times and places of brutality by members of the CF arresting them.

6.    Arrests as described in these allegations tended to follow a pattern. Arresting authorities entered houses usually after dark, breaking down doors, waking up residents roughly, yelling orders, forcing family members into one room under military guard while searching the rest of the house and further breaking doors, cabinets and other property. They arrested suspects, tying their hands in the back with flexi-cuffs, hooding them, and taking them away. Sometimes they arrested all adult males present in a house, including elderly, handicapped or sick people. Treatment often included pushing people around, insulting, taking aim with rifles, punching and kicking and striking with rifles. Individuals were often led away in whatever they happened to be wearing at the time of arrest – sometimes in pyjamas or underwear – and were denied the opportunity to gather a few essential belongings, such as clothing, hygiene items, medicine or eyeglasses. Those who surrendered with a

suitcase often had their belongings confiscated. In many cases personal belongings were seized during the arrest, with no receipt being issued *(see section 6, below)*.

7.  Certain CF military intelligence officers told the ICRC that in their estimate between 70% and 90% of the persons deprived of their liberty in Iraq had been arrested by mistake. They also attributed the brutality of some arrests to the lack of proper supervision of battle group units.

8.  *In accordance with provisions of International Humanitarian Law which oblige the CF to treat prisoners of war and other protected persons humanely and to protect them against acts of violence, threats thereof, intimidation and insults (Art. 13, 14, 17, 87, Third Geneva Convention; Art. 5, 27, 31, 32, 33 Fourth Geneva Convention), the ICRC asks the authorities of CF to respect at all times the human dignity, physical integrity and cultural sensitivity of the persons deprived of their liberty held under their control. The ICRC also asks the authorities of CF to ensure that battle group units arresting individuals receive adequate training enabling them to operate in a proper manner and fulfill their responsibilities without resorting to brutality or using excessive force.*

### 1.1  Notification to families and information for arrestees

9.  In almost all instances documented by the ICRC, arresting authorities provided no information about who they were, where their base was located, nor did they explain the cause of arrest. Similarly, they rarely informed the arrestee or his family where he was being taken and for how long, resulting in the de facto "disappearance" of the arrestee for weeks or even months until contact was finally made.

10.  When arrests were made in the streets, along the roads, or at checkpoints, families were not informed about what had happened to the arrestees until they managed to trace them or received news about them through persons who had been deprived of their liberty but were later released, visiting family members of fellow persons deprived of their liberty, or ICRC Red Cross Messages. In the absence of a system to notify the families of the whereabouts of their arrested relatives, many were left without news for months, often fearing that their relatives unaccounted for were dead.

11.  Nine months into the present conflict, there is still no satisfactorily functioning system of notification to the families of captured or arrested persons, even though hundreds of arrests continue to be carried out every week. While the main places of internment (Camp Bucca and Abu Ghraib) are part of a centralized notification system through the National Information Bureau (and their data are forwarded electronically to the ICRC on a regular basis), other places of internment such as Mossul or Tikrit are not. Notifications from those places therefore depend solely on capture or internment cards as stipulated by the Third and Fourth Geneva Conventions.

Since March 2003 capture cards have often been filled out carelessly, resulting in unnecessary delays of several weeks or months before families were notified, and sometimes resulting in no notification at all. It is the responsibility of the detaining

authority to see to it that each capture or internment card is carefully filled out so that the ICRC is in a position to effectively deliver them to families. The current system of General Information Centers (GIC), set up under the responsibility of the Humanitarian Assistance Coordination Centers (HACC), while an improvement, remains inadequate, as families outside the main towns do not have access to them, lists made available are not complete and often outdated and do not reflect the frequent transfers from one place of internment to another. In the absence of a better alternative, the ICRC's delivery of accurate capture cards remains the most reliable, prompt and effective system to notify the families, provided cards are properly filled out.

The ICRC has raised this issue repeatedly with the detaining authorities since March 2003, including at the highest level of the CF in August 2003. Despite some improvement, hundreds of families have had to wait anxiously for weeks and sometimes months before learning of the whereabouts of their arrested family members. Many families travel for weeks throughout the country from one place of internment to another in search of their relatives and often come to learn about their whereabouts informally (through released detainees) or when the person deprived of his liberty is released and returns home.

12.    Similarly, transfers, cases of sickness at the time of arrest, deaths, escapes or repatriations continue to be notified only insufficiently or are not notified at all by the CF to the families in spite of their obligation to do so under International Humanitarian Law.

13.    *In accordance with provisions of both the Third Geneva Convention (Art. 70, 122, 123) and the Fourth Geneva Convention (Art. 106, 136, 137, 138, 140), the ICRC reminds the CF of their treaty-based obligation to notify promptly the families of all prisoners of war and other protected persons captured or arrested by them. Within one week, prisoners of war and civilian internees must be allowed to fill out capture or internment cards mentioning at the very least their capture/arrest, address (current place of detention/internment) and state of health. These cards must be forwarded as rapidly as possible and may not be delayed in any manner. As long as there is no centralized system of notifications of arrest set up by CF, it is of paramount importance that these capture cards be filled out properly, so as to allow the ICRC to transmit them rapidly to the concerned families.*

14.    *The same obligation of notification to families of captured or arrested persons applies to transfers, cases of sickness, deaths, escapes and repatriation and identification of the dead of the adverse party. All these events must be notified to the ICRC with the full details of the persons concerned, so as to allow the ICRC to inform the concerned families (Art. 120, 121, 122, 123 Third Geneva Convention; Art. 129,130, 136, 137, 140 Fourth Geneva Convention).*

## 2.    TREATMENT DURING TRANSFER AND INITIAL CUSTODY

15.    The ICRC collected several allegations indicating that following arrest, persons deprived of their liberty were ill-treated, sometimes during transfer from their place of arrest to their initial internment facility. This ill-treatment would normally stop

by the time the persons reached a regular internment facility, such as Camp Cropper, Camp Bucca or Abu Ghraib. The ICRC also collected one allegation of death resulting from harsh conditions of interment and ill-treatment during initial custody.

16.     One allegation collected by the ICRC concerned the arrest of nine men by the CF in a hotel in Basrah on 13 September 2003. Following their arrest, the nine men were made to kneel, face and hands against the ground, as if in a prayer position. The soldiers stamped on the back of the neck of those raising their head. They confiscated their money without issuing a receipt. The suspects were taken to Al-Hakimiya, a former office previously used by the *mukhabarat* in Basrah and then beaten severely by CF personnel. One of the arrestees died following the ill-treatment ▒▒▒▒▒▒▒▒▒▒▒▒ aged 28, married, father of two children). Prior to his death, his co-arrestees heard him screaming and asking for assistance.

The issued "International Death Certificate" mentioned "Cardio-respiratory arrest – asphyxia" as the condition directly leading to the death. As to the cause of that condition, it mentioned "Unknown" and "Refer to the coroner". The certificate did not bear any other mention. An eyewitness' description of the body given to the ICRC mentioned a broken nose, several broken ribs and skin lesions on the face consistent with beatings. The father of the victim was informed of his death on 18 September, and was invited to identify the body of his son. On 3 October, the commander of the CF in Basrah presented to him his condolences and informed him that an investigation had been launched and that those responsible would be punished. Two other persons deprived of their liberty were hospitalised with severe injuries. Similarly, a week later, an ICRC medical doctor examined them in the hospital and observed large haematomas with dried scabs on the abdomen, buttocks, sides, thigh, wrists, nose and forehead consistent with their accounts of beatings received.

17.     During a visit of the ICRC in Camp Bucca on 22 September 2003, a 61-year old person deprived of his liberty alleged that he had been tied, hooded and forced to sit on the hot surface of what he surmised to be the engine of a vehicle, which had caused severe burns to his buttocks. The victim had lost consciousness. The ICRC observed large crusted lesions consistent with his allegation.

18.     The ICRC examined another person deprived of his liberty in the "High Value Detainees" section in October 2003 who had been subjected to a similar treatment. He had been hooded, handcuffed in the back, and made to lie face down, on a hot surface during transportation. This had caused severe skin burns that required three months hospitalization. At the time of the interview he had been recently discharged from hospital. He had to undergo several skin grafts, the amputation of his right index finger, and suffered the permanent loss of the use of his left fifth finger secondary to burn-induced skin retraction. He also suffered extensive burns over the abdomen, anterior aspects of the lower extremities, the palm of his right hand and the sole of his left foot. The ICRC recommended to the CF that the case be investigated to determine the cause and circumstances of the injuries and the authority responsible for the ill-treatment. At the time of writing the results of the report were still pending.

19.     During transportation following arrest, *persons deprived of their liberty were almost always hooded* and tightly restrained with flexi-cuffs. They were occasionally

haematoma and linear marks compatible with repeated whipping or beating. He had wrist marks compatible with tight flexi-cuffs.

The ICRC also collected allegations of deaths as a result of harsh internment conditions, ill-treatment, lack of medical attention, or the combination thereof, notably in Tikrit holding area formerly known as the Saddam Hussein Islamic School.

22.    Some CF military intelligence officers told the ICRC that the widespread ill-treatment of persons deprived of their liberty during arrest, initial internment and "tactical questioning" was due to a lack of military police on the ground to supervise and control the behavior and activities of the battle groups units, and the lack of experience of intelligence officers in charge of the "tactical questioning".

23.    *In accordance with provisions of International Humanitarian Law which oblige the CF to treat prisoners of war and other protected persons humanely and to protect them against acts of violence, threats thereof, intimidation and insults (Art. 13, 14, 17, 87, Third Geneva Convention; Articles 5, 27, 31,32, 33 Fourth Geneva Convention), the ICRC asks the authorities of the CF to respect at all times the human dignity, physical integrity and cultural sensitivity of the persons deprived of their liberty held in Iraq under their control.*

*The ICRC also asks the authorities of the CF to ensure that battle group units transferring and/or holding individuals receive adequate training enabling them to operate in a proper manner and meet their responsibilities without resorting to brutality or using excessive force.*

## 3.    TREATMENT DURING INTERROGATION

24.    Arrests were usually followed by temporary internment at battle group level or at initial interrogation facilities managed by military intelligence personnel, but accessible to other intelligence personnel (especially in the case of security detainees). The ill-treatment by the CF personnel during interrogation was not systematic, except with regard to persons arrested in connection with suspected security offences or deemed to have an "intelligence" value. In these cases, persons deprived of their liberty supervised by the military intelligence were subjected to a variety of ill-treatments ranging from insults and humiliation to both physical and psychological coercion that in some cases might amount to torture in order to force them to cooperate with their interrogators. In certain cases, such as in Abu Ghraib military intelligence section, methods of physical and psychological coercion used by the interrogators appeared to be part of the standard operating procedures by military intelligence personnel to obtain confessions and extract information. Several military intelligence officers confirmed to the ICRC that it was part of the military intelligence process to hold a person deprived of his liberty naked in a completely dark and empty cell for a prolonged period to use inhumane and degrading treatment, including physical and psychological coercion, against persons deprived of their liberty to secure their cooperation.

### 3.1  Methods of ill-treatment

25.    The methods of ill-treatment most frequently alleged during interrogation included

- Hooding, used to prevent people from seeing and to disorient them, and also to prevent them from breathing freely. One or sometimes two bags, sometimes with an elastic blindfold over the eyes which, when slipped down, further impeded proper breathing. Hooding was sometimes used in conjunction with beatings thus increasing anxiety as to when blows would come. The practice of hooding also allowed the interrogators to remain anonymous and thus to act with impunity. Hooding could last for periods from a few hours to up to 2 to 4 consecutive days, during which hoods were lifted only for drinking, eating or going to the toilets;
- Handcuffing with flexi-cuffs, which were sometimes made so tight and used for such extended periods that they caused skin lesions and long-term after-effects on the hands (nerve damage), as observed by the ICRC;
- Beatings with hard objects (including pistols and rifles), slapping, punching, kicking with knees or feet on various parts of the body (legs, sides, lower back, groin);
- Pressing the face into the ground with boots;
- Threats (of ill-treatment, reprisals against family members, imminent execution or transfer to Guantanamo);
- Being stripped naked for several days while held in solitary confinement in an empty and completely dark cell that included a latrine.
- Being held in solitary confinement combined with threats (to intern the individual indefinitely, to arrest other family members, to transfer the individual to Guantanamo), insufficient sleep, food or water deprivation, minimal access to showers (twice a week), denial of access to open air and prohibition of contacts with other persons deprived of their liberty;
- Being paraded naked outside cells in front of other persons deprived of their liberty, and guards, sometimes hooded or with women's underwear over the head;
- Acts of humiliation such as being made to stand naked against the wall of the cell with arms raised or with women's underwear over the head for prolonged periods – while being laughed at by guards, including female guards, and sometimes photographed in this position;
- Being attached repeatedly over several days, for several hours each time, with handcuffs to the bars of their cell door in humiliating (i.e. naked or in underwear) and/or uncomfortable position causing physical pain;
- Exposure while hooded to loud noise or music, prolonged exposure while hooded to the sun over several hours, including during the hottest time of the day when temperatures could reach 50 degrees Celsius (122 degrees Fahrenheit) or higher;
- Being forced to remain for prolonged periods in stress positions such as squatting or standing with or without the arms lifted.

26.    These methods of physical and psychological coercion were used by the military intelligence in a systematic way to gain confessions and extract information or other forms of co-operation from persons who had been arrested in connection with suspected security offences or deemed to have an "intelligence value".



### 3.2  Military Intelligence section, "Abu Ghraib Correctional Facility"

27.    In mid-October 2003, the ICRC visited persons deprived of their liberty undergoing interrogation by military intelligence officers in Unit 1A, the "isolation section" of "Abu Ghraib" Correctional Facility. Most of these persons deprived of their liberty had been arrested in early October. During the visit, ICRC delegates directly witnessed and documented a variety of methods used to secure the cooperation of the persons deprived of their liberty with their interrogators. In particular they witnessed the practice of keeping persons deprived of their liberty completely naked in totally empty concrete cells and in total darkness, allegedly for several consecutive days. Upon witnessing such cases, the ICRC interrupted its visits and requested an explanation from the authorities. The military intelligence officer in charge of the interrogation explained that this practice was "part of the process". The process appeared to be a give-and-take policy whereby persons deprived of their liberty were "drip-fed" with new items (clothing, bedding, hygiene articles, lit cell, etc.) in exchange for their "cooperation". The ICRC also visited other persons deprived of their liberty held in total darkness, others in dimly lit cells who had been allowed to dress following periods during which they had been held naked. Several had been given women's underwear to wear under their jumpsuit (men's underwear was not distributed), which they felt to be humiliating.

The ICRC documented other forms of ill-treatment, usually combined with those described above, including threats, insults, verbal violence, sleep deprivation caused by the playing of loud music or constant light in cells devoid of windows, tight handcuffing with flexi-cuffs causing lesions and wounds around the wrists. Punishment included being made to walk in the corridors handcuffed and naked, or with women's underwear on the head, or being handcuffed either dressed or naked to the bed bars or the cell door. Some persons deprived of their liberty presented physical marks and psychological symptoms, which were compatible with these allegations. The ICRC medical delegate examined persons deprived of their liberty presenting signs of concentration difficulties, memory problems, verbal expression difficulties, incoherent speech, acute anxiety reactions, abnormal behaviour and suicidal tendencies. These symptoms appeared to have been caused by the methods and duration of interrogation. One person held in isolation that the ICRC examined, was unresponsive to verbal and painful stimuli. His heart rate was 120 beats per minute and his respiratory rate 18 per minute. He was diagnosed as suffering from somatoform (mental) disorder, specifically a conversion disorder, most likely due to the ill-treatment he was subjected to during interrogation.

According to the allegations collected by the ICRC, detaining authorities also continued to keep persons deprived of their liberty during the period of interrogation, uninformed of the reason for their arrest. They were often questioned without knowing what they were accused of. They were not allowed to ask questions and were not provided with an opportunity to seek clarification about the reason for their arrest. Their treatment tended to vary according to their degree of cooperation with their interrogators: those who cooperated were afforded preferential treatment such as being allowed contacts with other persons deprived of their liberty, being allowed to phone their families, being given clothes, bedding equipment, food, water or cigarettes, being allowed access to showers, being held in a lit cell, etc.

### 3.3    Umm Qasr (JFIT) and Camp Bucca (JIF/ICE)

28.    Since the establishment of Umm Qasr camp and its successor, Camp Bucca, persons deprived of their liberty undergoing interrogation, whether they had been arrested by British, Danish, Dutch or Italian armed forces were segregated from other internees in a separate section of the camp designed for investigation. This section was initially operated by the British Armed Forces who called it Joint Field Intelligence Team (JFIT). On 7 April, its administration was handed over to the US Armed Forces, which renamed it Joint Interrogation Facility/Interrogation Control Element (JIF/ICE). On 25 September 2003, its administration was handed back to the British Armed Forces.

29.    CF intelligence personnel interrogated persons deprived of their liberty of concern to them in this section. They were either accused of attacks against the CF or deemed to have an "intelligence value". They could be held there from a few days to several weeks, until their interrogation was completed. During a visit in September 2003, the ICRC interviewed in that section several persons deprived of their liberty that had been held there for periods from three to four weeks.

30.    Initially, inmates were routinely treated by their guards with general contempt, with petty violence such as having orders screamed at them and being cursed, kicked, struck with rifle butts, roughed up or pushed around. They were reportedly handcuffed in the back and hooded for the duration of the interrogation and were prohibited from talking to each other or to the guards. Hooding appeared to be motivated by security concerns as well as to be part of standard intimidation techniques used by military intelligence personnel to frighten inmates into cooperating. This was combined with deliberately maintaining uncertainty about what would happen to the inmates, and a generally hostile attitude on the part of the guards. Conditions of internment improved according to the degree of cooperation of the persons deprived of his liberty. Interrogated persons deprived of their liberty were held in two separate sections. Those under initial investigation were reportedly not allowed to talk to each other (purportedly to avoid exchange of information and "versions of events" between them). They were not allowed to stand up or walk out of the tent but they had access to water with which to wash themselves. Once they had cooperated with their interrogators, they were transferred to the "privileged" tent where the above-mentioned restrictions were lifted.

31.    Persons deprived of their liberty undergoing interrogation by the CF were allegedly subjected to frequent cursing, insults and threats, both physical and verbal, such as having rifles aimed at them in a general way or directly against the temple, the back of the head, or the stomach, and threatened with transfer to Guantanamo, death or indefinite internment. Besides mentioning the general climate of intimidation maintained as one of the methods used to pressure persons deprived of their liberty to cooperate with their interrogators, none of those interviewed by the ICRC in Umm Qasr and Camp Bucca spoke of physical ill-treatment during interrogation. All allegations of ill-treatment referred to the phase of arrest, initial internment (at collecting points, holding areas) and "tactical questioning" by military intelligence officers attached to battle group units, prior to transfer to Camp Bucca.

### 3.4   Previous actions taken by the ICRC in 2003 on the issue of treatment

32.   On 1 April, the ICRC informed orally the political advisor of the commander of British Armed Forces at the CF Central Command in Doha about methods of ill-treatment used by military intelligence personnel to interrogate persons deprived of their liberty in the internment camp of Umm Qasr. This intervention had the immediate effect to stop the systematic use of hoods and flexi-cuffs in the interrogation section of Umm Qasr. Brutal treatment of persons deprived of their liberty also allegedly ceased when the 800th MP Brigade took over the guarding of that section in Umm Qasr. UK Forces handed over Umm Qasr holding area to the 800th MP Brigade on 09.04.03. The 800th MP Brigade then built Camp Bucca two kilometers away.

33.   In May 2003, the ICRC sent to the CF a memorandum based on over 200 allegations of ill-treatment of prisoners of war during capture and interrogation at collecting points, battle group stations and temporary holding areas. The allegations were consistent with marks on bodies observed by the medical delegate. The memorandum was handed over to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ of the US Central Command in Doha, Sate of Qatar. Subsequently, one improvement consisted in the removal of wristbands with the remark "terrorist" given to foreign detainees.

34.   In early July the ICRC sent the CF a working paper detailing approximately 50 allegations of ill-treatment in the military intelligence section of Camp Cropper, at Baghdad International Airport. They included a combination of petty and deliberate acts of violence aimed at securing the cooperation of the persons deprived of their liberty with their interrogators: threats (to intern individuals indefinitely, to arrest other family members, to transfer individuals to Guantanamo) against persons deprived of their liberty or against members of their families (in particular wives and daughters); hooding; tight handcuffing; use of stress positions (kneeling, squatting, standing with arms raised over the head) for three or four hours; taking aim at individuals with rifles, striking them with rifle butts, slaps, punches, prolonged exposure to the sun, and isolation in dark cells. ICRC delegates witnessed marks on the bodies of several persons deprived of their liberty consistent with their allegations. In one illustrative case, a person deprived of his liberty arrested at home by the CF on suspicion of involvement in an attack against the CF, was allegedly beaten during interrogation in a location in the vicinity of Camp Cropper. He alleged that he had been hooded and cuffed with flexi-cuffs, threatened to be tortured and killed, urinated on, kicked in the head, lower back and groin, force-fed a baseball which was tied into the mouth using a scarf and deprived of sleep for four consecutive days. Interrogators would allegedly take turns ill-treating him. When he said he would complain to the ICRC he was allegedly beaten more. An ICRC medical examination revealed haematoma in the lower back, blood in urine, sensory loss in the right hand due to tight handcuffing with flexi-cuffs, and a broken rib.

Shortly after that intervention was sent, the military intelligence internment section was closed and persons deprived of their liberty were transferred to what became the "High Value Detainees" section of the airport, a regular internment facility under the command of the 115th Military Police Battalion. From this time onwards, the ICRC observed that the ill-treatment of this category of persons deprived of their liberty by

military intelligence declined significantly and even stopped, while their interrogation continued through to the end of the year 2003.

### 3.5  Allegations of ill-treatment by Iraqi police

35.   The ICRC has also collected a growing body of allegations relating to widespread abuse of power and ill-treatment of persons in the custody of Iraqi police. This included the extensive practice of threatening to handover these persons to the CF for internment, or claiming to act under the CF instructions, in order to abuse their power and extort money from persons taken in custody. Allegations collected by the ICRC indicated that numerous people had been handed over to the CF on the basis of unfounded accusations (of hostility against the CF, or belonging to opposition forces) because they were unable or unwilling, to pay bribes to the police. Alleged ill-treatment during arrest and transportation included hooding, tight handcuffing, verbal abuse, beating with fists and rifle butts, and kicking. During interrogation, the detaining authorities allegedly whipped persons deprived of their liberty with cables on the back, kicked them in the lower parts of the body, including in the testicles, handcuffed and left them hanging from the iron bars of the cell windows or doors in painful positions for several hours at a time, and burned them with cigarettes (signs on bodies witnessed by ICRC delegates). Several persons deprived of their liberty alleged that they had been made to sign a statement that they had not been allowed to read. These allegations concerned several police stations in Baghdad including Al-Qana, Al-Jiran Al-Kubra in al-Amariyya , Al-Hurriyyeh in Al-Doura, Al-Salhiyye in Salhiyye, and Al-Baiah. Many persons deprived of their liberty drew parallels between police practices under the occupation with those of the former regime.

36.    In early June 2003, for instance, a group of persons deprived of their liberty was taken to the former police academy after they had been arrested. There, they were allegedly hooded and cuffed and made to stand against a wall while a policeman placed his pistol against their heads and pulled the trigger In a mock execution (the pistol was in fact unloaded); they were also allegedly forced to sit on chairs where they were hit on the legs, the soles of their feet and on their sides with sticks. They also allegedly had water poured on their legs and had electrical shocks administered to them with stripped tips of electric wires. The mother of one of the persons deprived of liberty was reportedly brought in and the policemen threatened to mistreat her. Another person deprived of his liberty was threatened with having his wife brought in and raped. They were made to fingerprint their alleged confessions of guilt, which resulted in their transfer to the CF to be interned pending trial.

37.    *The ICRC reminds the authorities of the CF that prisoners of war and other protected persons in the custody of occupying forces must be humanely treated at all times; they must not be subjected to cruel or degrading treatment; and must be protected against all acts of violence (Art. 13, 14, Third Geneva Convention; Art. 27, Fourth Geneva Convention). Torture and other forms of physical and psychological coercion against prisoners of war and other interned persons for the purpose of extracting confession or information is prohibited in all cases and under all circumstances without exception (Art. 17 and 87, Third Geneva Convention; Art. 5, 31 and 32, Fourth Geneva Convention). Confessions extracted under coercion or torture can never be used as evidence of guilt (Art. 99, Third Geneva Convention, Art. 31, Fourth Geneva Convention). Such violations of International Humanitarian*

*Law should be thoroughly investigated i  order to determine responsibilities and prosecute those found responsible (Art. 129, Third Geneva Convention and Art. 146, Fourth Geneva Convention).*

## 4.   TREATMENT IN REGULAR INTERNMENT FACILITIES

### 4.1.   General conditions of treatment

38.    The ICRC assessed the treatment of persons deprived of their liberty in regular internment facilities by CF personnel as respectful, with a few individual exceptions due to individual personalities or occasional loss of control on the part of the guards. Abusive behavior by guards, when reported to their officers, was usually quickly reprimanded and disciplined by superiors.

39.    The ICRC often noted a serious communication gap between detention personnel and persons deprived of their liberty, primarily due to the language barrier, which resulted in frequent misunderstandings. This was compounded by a widespread attitude of contempt on the part of guards, in reaction to which persons deprived of their liberty, which often complained of being treated like inferiors, adopted a similar attitude.

40.    The ICRC occasionally observed persons deprived of their liberty being slapped, roughed up, pushed around or pushed to the ground either because of poor communication (a failure to understand or a misunderstanding of orders given in English was construed by guards as resistance or disobedience), a disrespectful attitude on the part of guards, a reluctance by persons deprived of their liberty to comply with orders, or a loss of temper by guards.

41.    Disciplinary measures included being taken out of the compound, handcuffed and made to stand, sit, squat or lie down in the sand under the sun for up to three or four hours, depending on the breach of discipline (disrespectful behavior towards guards, communication between persons deprived of their liberty transferring from one compound to another, disobeying orders); temporary suspension of cigarette distribution, and temporary segregation in disciplinary confinement sections of the detention facilities.

42.    Despite the fact that reductions in the availability of water or food rations or, more commonly, cigarettes were occasionally observed, the prohibition on collective punishment provided for under International Humanitarian Law (Art. 26.6, 87.3, Third Geneva Convention and Art. 33, Fourth Geneva Convention) appeared to be generally respected by detaining authorities.

### 4.2.   "High Value Detainees" section, Baghdad International Airport

43.    Since June 2003, over a hundred "high value detainees" have been held for nearly 23 hours a day in strict solitary confinement in small concrete cells devoid of daylight. This regime of complete isolation strictly prohibited any contact with other persons deprived of their liberty, guards, family members (except through Red Cross Messages) and the rest of the outside world. Even spouses and members of the

same family were subject to this regime. Persons deprived of their liberty whose "investigation" was nearing completion were reportedly allowed to exercise together outside their cells for twenty minutes twice a day or go to the showers or toilets together. The other persons deprived of their liberty still under interrogation reportedly continued to be interned in total "segregation" (i.e. they were allowed to exercise outside their cells for twenty minutes twice a day and to go to the showers or toilets but always alone and without any contact with others). Most had been subjected to this regime for the past five months. Attempts to contact other persons deprived of their liberty or simply to exchange glances or greetings were reportedly sanctioned by reprimand or temporary deprivation of time outside their cells. Since August 2003, the detainees have been provided with the Koran. They have been allowed to receive books of a non-political nature, but no newspapers or magazines on current affairs. The internment regime appeared to be motivated by a combination of security concerns (isolation of the persons deprived of their liberty from the outside world) and the collection of intelligence. All had been undergoing interrogation since their internment, in spite of the fact that none had been charged with criminal offence.

On 30 October 2003, the ICRC wrote to the Detaining Authorities recommending that this policy be discontinued and replaced by a regime of internment consistent with the CF's obligations under the Geneva Conventions.

44.    *The internment of persons in solitary confinement for months at a time in cells devoid of daylight for nearly 23 hours a day is more severe than the forms of internment provided for in the Third and Fourth Geneva Conventions (investigation of criminal offences or disciplinary punishment). It cannot be used as a regular, ordinary mode of holding of prisoners of war or civilian internees. The ICRC reminds the authorities of the Coalition Forces in Iraq that internment of this kind contravenes Articles 21, 25, 89, 90, 95, 103 of the Third Geneva Convention and Articles 27, 41, 42, 78, 82, 118, 125 of the Fourth Geneva Convention. The ICRC recommends to the authorities of the CF that they set up an internment regime which ensures respect for the psychological integrity and human dignity of the persons deprived of their liberty and that they make sure that all persons deprived of their liberty are allowed sufficient time every day outside in the sunlight and the opportunity to move about and exercise in the outside yard.*

## 5.    EXCESSIVE AND DISPROPORTIONATE USE OF FORCE AGAINST PERSONS DEPRIVED OF THEIR LIBERTY BY THE DETAINING AUTHORITIES

45.    Since March 2003, the ICRC recorded, and in some cases, witnessed, a number of incidents in which guards shot at persons deprived of their liberty with live ammunition, in the context either of unrest relating to internment conditions or of escape attempts by individuals:

Camp Cropper, 24 May 2003:    In the context of a hunger strike, unrest broke out in the camp prior to ICRC visit. One person deprived of his liberty suffered a gunshot wound.

Camp Cropper, 9 June 2003:    Six persons deprived of their liberty were injured by live ammunition after a guard opened fire on the group in an attempt to quell a demonstration.

Camp Cropper, 12 June 2003:    Two, or possibly three, persons deprived of their liberty were shot at when they attempted to escape through the barbed wire fence. One of them, Akheel Abd Al-Hussein from Baghdad, was wounded and later died after being taken to the hospital. The other person deprived of his liberty was recaptured and received treatment for gunshot wounds.

Abu Ghraib, 13 June 2003:    When unrest flared up, guards from three watchtowers opened fire at the demonstrators, injuring seven persons deprived of their liberty and killing another, Alaa Jasim Hassan. The authorities investigated the matter and concluded that the "shooting was justified as the "three tower [guards] determined that the lives of the interior guards were threatened".

Abu Ghraib, late June 2003:    During unrest, one person deprived of his liberty was injured by live ammunition when a guard opened fire.

Abu Ghraib, 24 November 2003:  During a riot four detainees were killed by US MP guards. The killing took place after unrest erupted in one of the compounds (no 4). The detainees claimed to be unhappy with the situation of detention. Specifically, lack of food, clothing, but more importantly the lack of judicial guarantees and, especially important during the time of Eid al-Fitr, lack of family visits or lack of contacts all together. The detainees alleged to have gathered near the gate whereupon the guards panicked and started shooting. Initially, non-lethal ammunition was used which was subsequently replaced by live ammunition.

The report handed over by the CF to the ICRC states that detainees were trying to force open the gate. It further states that several verbal warnings were given and non-lethal ammunition fired at the crowd. After 25 minutes deadly force was applied resulting in the death of four detainees.



The narrative report furnished by the CF does not address the reason for the riot in any way and does not give any recommendations as to how a similar incident could be avoided. It does not question the use of lethal force during such an incident.

Camp Bucca, 16-22 April 2003:    ICRC delegates witnessed a shooting incident, which caused the death of one person deprived of his liberty and injury of another. A first shot was fired on the ground by a soldier located outside the compound in a bid to rescue one of the guards, allegedly being threatened by a prisoner of war armed with a stick; the second shot injured a prisoner of war in the left forearm, and the third shot killed another prisoner of war.

Camp Bucca, 22 September 2003:        Following unrest in a section of the camp, one person deprived of his liberty, allegedly throwing stones, was fired upon by a guard in a watchtower. He suffered a gunshot wound to the upper part of the chest, the bullet passed through the chest and exited form the back. The investigation undertaken by the CF concluded that "the compound guards correctly utilized the rules of engagement and that numerous non-lethal rounds were dispersed to no avail". The person deprived of his liberty "was the victim of a justifiable shooting". An ICRC delegate and an interpreter witnessed most of the events. At no point did the persons deprived of their liberty, and the victim shot at, appear to pose a serious threat to the life or security of the guards who could have responded to the situation with less brutal measures. The shooting showed a clear disregard for human life and security of the persons deprived of their liberty.

46.    These incidents were investigated summarily by the CF. They concluded in all cases that a legitimate use of firearms had been made against persons deprived of their liberty, who, except perhaps in Abu Ghraib on 13 June 2003, were unarmed and did not appear to pose any serious threat to anyone's life justifying the use of firearms. In all cases, less extreme measures could have been used to quell the demonstrations or neutralize persons deprived of their liberty trying to escape.

47.    In connection with the 22 September 2003 incident, the ICRC wrote on 23 October to the Commander of the 800th MP Brigade and recommended the adoption of crowd control measures consistent with the rules and principles of the Third and Fourth Geneva Conventions and other applicable international norms relating to the use of force or fire arms by law-enforcement personnel.

48.    Since May 2003, the ICRC repeatedly recommended to the CF to use non-lethal methods to deal with demonstrations, riots or escape attempts. In Camp Cropper, its recommendations were heeded. After initial deplorable incidents no further shooting of persons deprived of their liberty has occurred since November 2003. In mid-July, the ICRC witnessed a demonstration in that camp: in spite of some violence by the persons deprived of their liberty, the problem was efficiently dealt with by the camp commander without any excessive use of force. He called in anti-riot military policemen, refrained from any act that might have provoked further anger from the persons deprived of their liberty, waited patiently for the emotions to calm down and then sought to establish dialogue with the persons deprived of their liberty through their section representatives. The unrest was quieted down without any violence.

49.    *The ICRC reminds the authorities of the CF that the use of firearms against persons deprived of their liberty, especially against those who are escaping or attempting to escape is an extreme measure which should not be disproportionate to the legitimate objective to be achieved (to apprehend the individual) and shall always be preceded by warning appropriate to the circumstances (Art. 42 Third Geneva Convention).*

*The CF detaining personnel should be provided with adequate training to deal with incidents in their internment facilities. Firearms should not be used except when a suspected offender offers armed resistance or otherwise jeopardizes the lives of others and only when less extreme measures are not sufficient to restrain or*

apprehend him (Article 3 of the Code of Conduct for Law Enforcement Officials and Article 9 of the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials).

*In every instance in which a firearm is discharged, a report should be made promptly to the competent authorities. All deaths or serious injuries of a person deprived of his liberty caused or suspected to have been caused by a sentry should be immediately followed by a proper inquiry by the Detaining Power which should ensure the prosecution of any person(s) found responsible (Art. 121, Third Geneva Convention; Art. 131, Fourth Geneva Convention).*

## 6. SEIZURE AND CONFISCATION OF PRIVATE BELONGINGS OF PERSONS DEPRIVED OF THEIR LIBERTY

50.     The ICRC collected numerous allegations of seizure and confiscation of private property (money, cars and other valuables) by the CF in the context of arrests. In only a few cases were receipts issued to the arrested person or his family, detailing the items confiscated. This was perceived by persons deprived of their liberty as outright theft or pillage. The following examples will serve to illustrate the allegations:

- ████████████████████████████████ alleged that the CF took US$22,000 in cash and his personal luggage during his arrest;
- ████████████████████████████████ claimed that large amounts of money and personal effects were confiscated by the CF when he was arrested at his home on 27-28 May 2003. The items confiscated allegedly included 71,450,000 Iraqi dinars, 14,000 US dollars, two wedding rings, a video camera, a watch, real-estate property documents, his wife's residential documents, his father's will, his private diaries, as well as most of the family private documents and personal identity and other papers;
- ████████████████████████████████ claimed that his car was confiscated when he was arrested by the CF in Basrah on 16 July 2003.
  ████████████████████████████████ claimed that CF confiscated two million Iraqi dinars when arrested at his home on 21 August 2003;
- ████████████████████████████████ claimed that his money and two cars were confiscated when he was arrested by the CF on 11 August 2003;

51.     In Camp Cropper, Camp Bucca and Abu Ghraib, a system was gradually put in place whereby personal belongings in the possession of persons deprived of their liberty at the time of their arrival in these facilities which they could not keep with them (money, other valuables, spare clothing, identity papers) were registered and kept until their release. In these cases, a receipt was usually issued to the person deprived of his liberty and his belongings were returned when he was released. However, this system took no account of the property seized during arrest.

52.     In response to property loss or damage caused to property by the CF during raids and also to complaints regarding pension or salaries, the CF established a compensation system open to everyone, including internees and the general public. Complaints could be filed at General Information Centers (GIC), set up under the responsibility of the Humanitarian Assistance Coordination Centers (HACC).

Supporting evidence, which is problematic given that arresting authorities rarely issue receipts, should back claims. The ICRC is not yet able to assess the efficiency of this compensation system although it has had the possibility to visit one of the GICs. There are nine GICs in the city of Baghdad and one in the city of Mosul, there are however none in the other parts of the country therefore depriving a large number of persons of the possibility to file complaints

53.    *In accordance with international legal provisions, the ICRC reminds the authorities of the CF that pillage is prohibited by International Humanitarian Law (Art. 33, Fourth Geneva Convention), that private property may not be confiscated (Art. 46.2, 1907 Hague Convention No IV), and that an army of occupation can only take possession of cash, funds, and realizable securities which are strictly the property of the State. (Art. 53, 1907 Hague Convention No IV).*

*In addition, persons deprived of their liberty shall be permitted to retain articles of personal use. Valuables may not be taken from them except in accordance with an established procedure and receipts must be issued. (Art. 18, 68.2, Third Geneva Convention and Art. 97, Fourth Geneva Convention).*

## 7.   EXPOSURE OF INTERNEES/DETAINEES TO DANGEROUS TASKS

54.    On 3 September 2003 in Camp Bucca, three persons deprived of their liberty were severely injured by the explosion of what apparently was a cluster bomb:



/bilateral below-knee amputation)

/bilateral above-knee amputation)

I (left above-knee amputation)

They were part of a group of 10 persons deprived of their liberty involved in voluntary work to clear rubbish along the barbed-wire fence of the camp. They were transferred to the British Field Military Hospital where they received appropriate medical treatment. Their injuries required limb amputations.

55.    On 23 October 2003, the ICRC wrote to the officer commanding the 800th MP Brigade to request an investigation into the incident. The ICRC encouraged the CF not to engage persons deprived of their liberty in dangerous labour.

56.    *The ICRC recommends to the authorities of the CF that all three victims be properly compensated as provided for by both Third and Fourth Geneva Conventions (Art. 68, Third Geneva Convention and Art. 95, Fourth Geneva Convention).*

## 8.   PROTECTION OF PERSONS DEPRIVED OF THEIR LIBERTY AGAINST SHELLING

57.   Since its reopening by the CF, Abu Ghraib prison has been the target of frequent night shelling by mortars and other weapons, which resulted, on several occasions, in persons deprived of their liberty being killed or injured. During the month of July, the Commander of the facility reported at least 25 such attacks. On 16 August, three mortar rounds landed in the prison compound, killing at least five and injuring 67 persons deprived of their liberty. Subsequent attacks caused further deaths and injuries. An ICRC team visited Abu Ghraib on 17 August and noticed the lack of protective measures: while the CF personnel were living in concrete buildings, all persons deprived of their liberty were sheltered under tents in compounds which had no bunkers or any other protection, rendering them totally vulnerable to shelling.

Persons deprived of their liberty alleged that they had not been advised on what to do to protect themselves in the event of shelling. They were dismayed and felt that the authorities "did not care". After these attacks, security was improved around the prison compound to reduce the risk of further attacks. However, steps taken to ensure the protection of persons deprived of their liberty remained insufficient. The inmates were allowed to fill and place sandbags around the perimeter of each tent. By late October, sandbags had not been placed around all tents and those sandbags that were in place did not offer adequate protection from shelling or projectile explosions.

58.   *In accordance with International Humanitarian Law provisions, the ICRC reminds the authorities of the CF that the detaining power must not set up places of internment in areas particularly exposed to the dangers of war (Art. 23.1, Third Geneva Convention and Art. 83, Fourth Geneva Convention). In all places of internment exposed to air raids and other hazards of war, shelters adequate in number and structure to ensure the necessary protection must be made available. In the event of an alarm, the internees must be free to enter such shelters as quickly as possible (Art. 23.2, Third Geneva Convention and Art. 88, Fourth Geneva Convention). When a place of internment is found to be unsafe, persons deprived of their liberty should be transferred to other places of internment, offering adequate security and living conditions in accordance with the Third and Fourth Geneva Conventions.*

## CONCLUSION

59.   This ICRC report documents serious violations of International Humanitarian Law relating to the conditions of treatment of the persons deprived of their liberty held by the CF in Iraq. In particular, it establishes that persons deprived of their liberty face the risk of being subjected to a process of physical and psychological coercion, in some cases tantamount to torture, in the early stages of the internment process.

60.   Once the interrogation process is over, the conditions of treatment for the persons deprived of their liberty generally improve, except in the "High Value Detainee" section at Baghdad International Airport where persons deprived of their liberty have been held for nearly 23 hours a day in strict solitary confinement in small



concrete cells devoid of daylight, an internment regime which does not comply with provisions of the Third and Fourth Geneva Conventions.

61.    During internment, persons deprived of their liberty also risk being victims of disproportionate and excessive use of force on the part of detaining authorities attempting to restore order in the event of unrest or to prevent escapes.

62.    Another serious violation of International Humanitarian Law described in the report is the CF's inability or lack of will to set up a system of notifications of arrests for the families of persons deprived of liberty in Iraq. This violation of provisions of International Humanitarian Law causes immense distress among persons deprived of their liberty and their families, the latter fearing that their relatives unaccounted for are dead. The uncaring behaviour of the CF and their inability to quickly provide accurate information on persons deprived of their liberty for the families concerned also seriously affects the image of the Occupying Powers amongst the Iraqi population.

63.    In addition to recommendations highlighted in the report relating to conditions of internment, information given to persons deprived of their liberty upon arrest, and the need to investigate violations of International Humanitarian Law and to prosecute those found responsible, the ICRC wishes particularly to remind the CF of their duty:

- to respect at all times the human dignity, physical integrity and cultural sensitivity of persons deprived of their liberty held under their control;
- to set up a system of notifications of arrests to ensure that the families persons deprived of their liberty are quickly and accurately informed;
- to prevent all forms of ill-treatment and moral or physical coercion of persons deprived of their liberty in connection with interrogations;
- to instruct the arresting and detaining authorities that causing serious bodily injury or serious harm to the health of protected persons is prohibited under the Third and Fourth Geneva Conventions
- to set up an internment regime that ensures respect for the psychological integrity and human dignity of the persons deprived of their liberty
- to ensure that battle group units arresting individuals and staff in charge of internment facilities receive adequate training enabling them to operate in a proper manner and fulfill their responsibilities without resorting to ill-treatment or using excessive force.

The practices described in this report are prohibited under International Humanitarian Law. They warrant serious attention by the CF. In particular, the CF should review their policies and practices, take corrective action and improve the treatment of prisoners of war and other protected persons under their authority. This report is part of the bilateral and confidential dialogue undertaken by the ICRC with the CF. In the future, the ICRC will continue its bilateral and confidential dialogue with the CF in accordance with provisions of International Humanitarian Law, on the basis of its monitoring of the conditions of arrest, interrogation and internment of persons deprived of their liberty held by the CF.

- End of report -

# Exhibit D

# ARTICLE 15-6 INVESTIGATION
# OF THE
# 800th MILITARY POLICE
# BRIGADE

SECRET/NO FOREIGN DISSEMINATION

# TABLE OF CONTENTS

References ............................................................................... 3

Background ......................................................................... 6

Assessment of DoD Counter-Terrorism
Interrogation and Detention Operations
In Iraq (MG Miller's Assessment)............................................ 8

IO Comments on MG Miller's Assessment.................................... 8

Report on Detention and Corrections
In Iraq (MG Ryder's Report)................................................... 9

IO Comments on MG Ryder's Report....................................... 12

Preliminary Investigative Actions ........................................... 12

<u>Findings and Recommendations</u>

Part One (Detainee Abuse). ................................................... 15

       Findings ................................................................. 15

       Recommendations .................................................... 20

Part Two (Escapes and Accountability) ...................................... 22

       Findings ................................................................. 22

       Recommendations. .................................................. 31

Part Three (Command Climate, Etc…). ..................................... 34

       Findings ................................................................. 36

       Recommendations .................................................... 44

Other Findings/Observations ................................................. 49

Conclusion ....................................................................... 50

Annexes .......................................................................... 51

**References**

1. Geneva Convention Relative to the Treatment of Prisoners of War, 12 August 1949

2. Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in the Armed Forces in the Field, 12 August 1949

3. Geneva Convention for the Amelioration of the Condition of the Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, 12 August 1949

4. Geneva Convention Protocol Relative to the Status of Refugees, 1967

5. Geneva Convention Relative to the Status of Refugees, 1951

6. Geneva Convention for the Protection of War Victims, 12 August 1949

7. Geneva Convention Relative to the Protection of Civilian Persons in Time of War, 12 August 1949

8. DOD Directive 5100.69, "DOD Program for Prisoners of War and other Detainees," 27 December 1972

9. DOD Directive 5100.77 "DOD Law of War Program," 10 July 1979

10. STANAG No. 2044, Procedures for Dealing with Prisoners of War (PW) (Edition 5), 28 June 1994

11. STANAG No. 2033, Interrogation of Prisoners of War (PW) (Edition 6), 6 December 1994

12. AR 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees, and Other Detainees, 1 October 1997

13. AR 190-47, The Army Corrections System, 15 August 1996

14. AR 190-14, Carrying of Firearms and Use of Force for Law Enforcement and Security Duties, 12 March 1993

15. AR 195-5, Evidence Procedures, 28 August 1992

16. AR 190-11, Physical Security of Arms, Ammunition and Explosives, 12 February 1998

17. AR 190-12, Military Police Working Dogs, 30 September 1993

18. AR 190-13, The Army Physical Security Program, 30 September 1993

19. AR 380-67, Personnel Security Program, 9 September 1988

20. AR 380-5, Department of the Army Information Security, 31 September 2000



21. AR 670-1, Wear and Appearance of Army Uniforms and Insignia, 5 September 2003

22. AR 190-40, Serious Incident Report, 30 November 1993

23. AR 15-6, Procedures for Investigating Officers and Boards of Officers, 11 May 1988

24. AR 27-10, Military Justice, 6 September 2002

25. AR 635-200, Enlisted Personnel, 1 November 2000

26. AR 600-8-24, Officer Transfers and Discharges, 29 June 2002

27. AR 500-5, Army Mobilization, 6 July 1996

28. AR 600-20, Army Command Policy, 13 May 2002

29. AR 623-105, Officer Evaluation Reports, 1 April 1998

30. AR 175-9, Contractors Accompanying the Force, 29 October 1999

31. FM 3-19.40, Military Police Internment/Resettlement Operations, 1 August 2001

32. FM 3-19.1, Military Police Operations, 22 March 2001

33. FM 3-19.4, Military Police Leaders' Handbook, 4 March 2002

34. FM 3-05.30, Psychological Operations, 19 June 2000

35. FM 33-1-1, Psychological Operations Techniques and Procedures, 5 May 1994

36. FM 34-52, Intelligence Interrogation, 28 September 1992

37. FM 19-15, Civil Disturbances, 25 November 1985

38. FM 3-0, Operations, 14 June 2001

39. FM 101-5, Staff Organizations and Functions, 23 May 1984

40. FM 3-19.30, Physical Security, 8 January 2001

41. FM 3-21.5, Drill and Ceremonies, 7 July 2003

42. ARTEP 19-546-30 MTP, Mission Training Plan for Military Police Battalion (IR)

43. ARTEP 19-667-30 MTP, Mission Training Plan for Military Police Guard Company

44. ARTEP 19-647-30 MTP, Mission Training Plan for Military Police Escort Guard Company

45. STP 19-95B1-SM, Soldier's Manual, MOS 95B, Military Police, Skill Level 1, 6 August 2002



46. STP 19-95C14-SM-TG, Soldier's Manual and Trainer's Guide for MOS 95C Internment/Resettlement Specialist, Skill Levels 1/2/3/4, 26 March 1999

47. STP 19-95C1-SM MOS 95C, Corrections Specialist, Skill Level 1, Soldier's Manual, 30 September 2003

48. STP 19-95C24-SM-TG MOS 95C, Corrections Specialist, Skill Levels 2/3/4, Soldier's Manual and Trainer's Guide, 30 September 2003

49. Assessment of DOD Counter-Terrorism Interrogation and Detention Operations in Iraq, (MG Geoffrey D. Miller, Commander JTF-GTMO, Guantanamo Bay, Cuba), 9 September 2003

50. Assessment of Detention and Corrections Operations in Iraq, (MG Donald J. Ryder, Provost Marshal General), 6 November 2003

51. CJTF-7 FRAGO #1108, Subject: *includes-* para 3.C.8 & 3.C.8.A.1, Assignment of 205 MI BDE CDR Responsibilities for the Baghdad Central Confinement Facility (BCCF), 19 November 2003

52. CJTF-7 FRAGO #749, Subject: Intelligence and Evidence-Led Detention Operations Relating to Detainees, 24 August 2003

53. 800th MP BDE FRAGO # 89, Subject: Rules of Engagement, 26 December 2003

54. CG CJTF-7 Memo: CJTF-7 Interrogation and Counter-Resistance Policy, 12 October 2003

55. CG CJTF-7 Memo:  Dignity and Respect While Conducting Operations, 13 December 2003

56. Uniform Code of Military Justice and Manual for Courts Martial, 2002 Edition

5

# ARTICLE 15-6 INVESTIGATION OF THE
## 800th MILITARY POLICE BRIGADE

# BACKGROUND

1. (U) On 19 January 2004, Lieutenant General (LTG) Ricardo S. Sanchez, Commander, Combined Joint Task Force Seven (CJTF-7) requested that the Commander, US Central Command, appoint an Investigating Officer (IO) in the grade of Major General (MG) or above to investigate the conduct of operations within the 800th Military Police (MP) Brigade. LTG Sanchez requested an investigation of detention and internment operations by the Brigade from 1 November 2003 to present. LTG Sanchez cited recent reports of detainee abuse, escapes from confinement facilities, and accountability lapses, which indicated systemic problems within the brigade and suggested a lack of clear standards, proficiency, and leadership. LTG Sanchez requested a comprehensive and all-encompassing inquiry to make findings and recommendations concerning the fitness and performance of the 800th MP Brigade. **(ANNEX 2)**

2. (U) On 24 January 2003, the Chief of Staff of US Central Command (CENTCOM), MG R. Steven Whitcomb, on behalf of the CENTCOM Commander, directed that the Commander, Coalition Forces Land Component Command (CFLCC), LTG David D. McKiernan, conduct an investigation into the 800th MP Brigade's detention and internment operations from 1 November 2003 to present. CENTCOM directed that the investigation should inquire into all facts and circumstances surrounding recent reports of suspected detainee abuse in Iraq. It also directed that the investigation inquire into detainee escapes and accountability lapses as reported by CJTF-7, and to gain a more comprehensive and all-encompassing inquiry into the fitness and performance of the 800th MP Brigade. **(ANNEX 3)**

3. (U) On 31 January 2004, the Commander, CFLCC, appointed MG Antonio M. Taguba, Deputy Commanding General Support, CFLCC, to conduct this investigation. MG Taguba was directed to conduct an informal investigation under AR 15-6 into the 800th MP Brigade's detention and internment operations. Specifically, MG Taguba was tasked to:

   a. (U) Inquire into all the facts and circumstances surrounding recent allegations of detainee abuse, specifically allegations of maltreatment at the Abu Ghraib Prison (Baghdad Central Confinement Facility (BCCF));

   b. (U) Inquire into detainee escapes and accountability lapses as reported by CJTF-7, specifically allegations concerning these events at the Abu Ghraib Prison;



c. (U) Investigate the training, standards, employment, command policies, internal procedures, and command climate in the 800th MP Brigade, as appropriate;

d. (U) Make specific findings of fact concerning all aspects of the investigation, and make any recommendations for corrective action, as appropriate. **(ANNEX 4)**

4. (U) LTG Sanchez's request to investigate the 800th MP Brigade followed the initiation of a criminal investigation by the US Army Criminal Investigation Command (USACIDC) into specific allegations of detainee abuse committed by members of the 372nd MP Company, 320th MP Battalion in Iraq. These units are part of the 800th MP Brigade. The Brigade is an Iraq Theater asset, TACON to CJTF-7, but OPCON to CFLCC at the time this investigation was initiated. In addition, CJTF-7 had several reports of detainee escapes from US/Coalition Confinement Facilities in Iraq over the past several months. These include Camp Bucca, Camp Ashraf, Abu Ghraib, and the High Value Detainee (HVD) Complex/Camp Cropper. The 800th MP Brigade operated these facilities. In addition, four Soldiers from the 320th MP Battalion had been formally charged under the Uniform Code of Military Justice (UCMJ) with detainee abuse in May 2003 at the Theater Internment Facility (TIF) at Camp Bucca, Iraq. **(ANNEXES 5-18, 34 and 35)**

5. (U) I began assembling my investigation team prior to the actual appointment by the CFLCC Commander. I assembled subject matter experts from the CFLCC Provost Marshal (PM) and the CFLCC Staff Judge Advocate (SJA). I selected COL Kinard J. La Fate, CFLCC Provost Marshal to be my Deputy for this investigation. I also contacted the Provost Marshal General of the Army, MG Donald J. Ryder, to enlist the support of MP subject matter experts in the areas of detention and internment operations. **(ANNEXES 4 and 19)**

6. (U) The Investigating Team also reviewed the Assessment of DoD Counter-Terrorism Interrogation and Detention Operations in Iraq conducted by MG Geoffrey D. Miller, Commander, Joint Task Force Guantanamo (JTF-GTMO). From 31 August to 9 September 2003, MG Miller led a team of personnel experienced in strategic interrogation to HQ, CJTF-7 and the Iraqi Survey Group (ISG) to review current Iraqi Theater ability to rapidly exploit internees for actionable intelligence. MG Miller's team focused on three areas: intelligence integration, synchronization, and fusion; interrogation operations; and detention operations. MG Miller's team used JTF-GTMO procedures and interrogation authorities as baselines. **(ANNEX 20)**

7. (U) The Investigating Team began its inquiry with an in-depth analysis of the Report on Detention and Corrections in Iraq, dated 5 November 2003, conducted by MG Ryder and a team of military police, legal, medical, and automation experts. The CJTF-7 Commander, LTG Sanchez, had previously requested a team of subject matter experts to assess, and make specific recommendations concerning detention and corrections operations. From 13 October to 6 November 2003, MG Ryder personally led this assessment/assistance team in Iraq. **(ANNEX 19)**

## ASSESSMENT OF DoD COUNTER-TERRORISM INTERROGATION AND DETENTION OPERATIONS IN IRAQ (MG MILLER'S ASSESSMENT)

1. (S/NF) The principal focus of MG Miller's team was on the strategic interrogation of detainees/internees in Iraq. Among its conclusions in its Executive Summary were that CJTF-7 did not have authorities and procedures in place to affect a unified strategy to detain, interrogate, and report information from detainees/internees in Iraq. The Executive Summary also stated that detention operations must act as an enabler for interrogation. **(ANNEX 20)**

2. (S/NF) With respect to interrogation, MG Miller's Team recommended that CJTF-7 dedicate and train a detention guard force subordinate to the Joint Interrogation Debriefing Center (JIDC) Commander that "sets the conditions for the successful interrogation and exploitation of internees/detainees." Regarding Detention Operations, MG Miller's team stated that the function of Detention Operations is to provide a safe, secure, and humane environment that supports the expeditious collection of intelligence. However, it also stated "it is essential that the guard force be actively engaged in setting the conditions for successful exploitation of the internees." **(ANNEX 20)**

3. (S/NF) MG Miller's team also concluded that Joint Strategic Interrogation Operations (within CJTF-7) are hampered by lack of active control of the internees within the detention environment. The Miller Team also stated that establishment of the Theater Joint Interrogation and Detention Center (JIDC) at Abu Ghraib (BCCF) will consolidate both detention and strategic interrogation operations and result in synergy between MP and MI resources and an integrated, synchronized, and focused strategic interrogation effort. **(ANNEX 20)**

4. (S/NF) MG Miller's team also observed that the application of emerging strategic interrogation strategies and techniques contain new approaches and operational art. The Miller Team also concluded that a legal review and recommendations on internee interrogation operations by a dedicated Command Judge Advocate is required to maximize interrogation effectiveness. **(ANNEX 20)**

### IO COMMENTS ON MG MILLER'S ASSESSMENT

1. (S/NF) MG Miller's team recognized that they were using JTF-GTMO operational procedures and interrogation authorities as baselines for its observations and recommendations. There is a strong argument that the intelligence value of detainees held at JTF-Guantanamo (GTMO) is different than that of the detainees/internees held at Abu Ghraib (BCCF) and other detention facilities in Iraq. Currently, there are a large number of Iraqi criminals held at Abu Ghraib (BCCF). These are not believed to be international terrorists or members of Al Qaida, Anser Al Islam, Taliban, and other international terrorist organizations. **(ANNEX 20)**

8

2. **(S/NF)** The recommendations of MG Miller's team that the "guard force" be actively engaged in setting the conditions for successful exploitation of the internees would appear to be in conflict with the recommendations of MG Ryder's Team and AR 190-8 that military police "do not participate in military intelligence supervised interrogation sessions." The Ryder Report concluded that the OEF template whereby military police actively set the favorable conditions for subsequent interviews runs counter to the smooth operation of a detention facility. **(ANNEX 20)**

## REPORT ON DETENTION AND CORRECTIONS
## IN IRAQ (MG RYDER'S REPORT)

1. (U) MG Ryder and his assessment team conducted a comprehensive review of the entire detainee and corrections system in Iraq and provided recommendations addressing each of the following areas as requested by the Commander CJTF-7:

    a. (U) Detainee and corrections system management
    b. (U) Detainee management, including detainee movement, segregation, and accountability
    c. (U) Means of command and control of the detention and corrections system
    d. (U) Integration of military detention and corrections with the Coalition Provisional Authority (CPA) and adequacy of plans for transition to an Iraqi-run corrections system
    e. (U) Detainee medical care and health management
    f. (U) Detention facilities that meet required health, hygiene, and sanitation standards
    g. (U) Court integration and docket management for criminal detainees
    h. (U) Detainee legal processing
    i. (U) Detainee databases and records, including integration with law enforcement and court databases **(ANNEX 19)**

2. (U) Many of the findings and recommendations of MG Ryder's team are beyond the scope of this investigation. However, several important findings are clearly relevant to this inquiry and are summarized below (emphasis is added in certain areas):

    A. (U) **Detainee Management (including movement, segregation, and accountability)**

    1. (U) There is a wide variance in standards and approaches at the various detention facilities. Several Division/Brigade collection points and US monitored Iraqi prisons had flawed or insufficiently detailed use of force and other standing operating procedures or policies (e.g. weapons in the facility, improper restraint techniques, detainee management, etc.) Though, there were no military police units purposely applying inappropriate confinement practices. **(ANNEX 19)**

9




2. (U) Currently, due to lack of adequate Iraqi facilities, Iraqi criminals (generally Iraqi-on-Iraqi crimes) are detained with security internees (generally Iraqi-on-Coalition offenses) and EPWs in the same facilities, though segregated in different cells/compounds. **(ANNEX 19)**

3. (U) The management of multiple disparate groups of detained people in a single location by members of the same unit invites confusion about handling, processing, and treatment, and typically facilitates the transfer of information between different categories of detainees. **(ANNEX 19)**

4. (U) The 800th MP (I/R) units did not receive Internment/Resettlement (I/R) and corrections specific training during their mobilization period. Corrections training is only on the METL of two MP (I/R) Confinement Battalions throughout the Army, one currently serving in Afghanistan, and elements of the other are at Camp Arifjan, Kuwait. MP units supporting JTF-GTMO received ten days of training in detention facility operations, to include two days of unarmed self-defense, training in interpersonal communication skills, forced cell moves, and correctional officer safety. **(ANNEX 19)**

B. (U) **Means of Command and Control of the Detention and Corrections System**

1. (U) The 800th MP Brigade was originally task organized with eight MP(I/R) Battalions consisting of both MP Guard and Combat Support companies. Due to force rotation plans, the 800th redeployed two Battalion HHCs in December 2003, the 115th MP Battalion and the 324th MP Battalion. In December 2003, the 400th MP Battalion was relieved of its mission and redeployed in January 2004. The 724th MP Battalion redeployed on 11 February 2004 and the remainder is scheduled to redeploy in March and April 2004. They are the 310th MP Battalion, 320th MP Battalion, 530th MP Battalion, and 744th MP Battalion. The units that remain are generally understrength, as Reserve Component units do not have an individual personnel replacement system to mitigate medical losses or the departure of individual Soldiers that have reached 24 months of Federal active duty in a five-year period. **(ANNEX 19)**

2. (U) The 800th MP Brigade (I/R) is currently a CFLCC asset, TACON to CJTF-7 to conduct Internment/Resettlement (I/R) operations in Iraq. All detention operations are conducted in the CJTF-7 AO; Camps Ganci, Vigilant, Bucca, TSP Whitford, and a separate High Value Detention (HVD) site. **(ANNEX 19)**

3. (U) The 800th MP Brigade has experienced challenges adapting its task organizational structure, training, and equipment resources from a unit designed to conduct standard EPW operations in the COMMZ (Kuwait). Further, the doctrinally trained MP Soldier-to-detainee population ratio and facility layout templates are predicated on a compliant, self-disciplining EPW population, and not criminals or high-risk security internees. **(ANNEX 19)**



4. (U) EPWs and Civilian Internees should receive the full protections of the Geneva
Conventions, unless the denial of these protections is due to specifically
articulated military necessity (e.g., no visitation to preclude the direction of
insurgency operations). **(ANNEXES 19 and 24)**

5. (U) AR 190-8, *Enemy Prisoners of War, Retained Personnel, Civilian Internees,
and other Detainees*, FM 3-19.40, *Military Police Internment and Resettlement
Operations,* and FM 34-52, *Intelligence Interrogations*, require military police to
provide an area for intelligence collection efforts within EPW facilities. Military
Police, though adept at passive collection of intelligence within a facility, do not
participate in Military Intelligence supervised interrogation sessions. Recent
intelligence collection in support of Operation Enduring Freedom posited a
template whereby military police actively set favorable conditions for subsequent
interviews. Such actions generally run counter to the smooth operation of a
detention facility, attempting to maintain its population in a compliant and docile
state. **The 800th MP Brigade has not been directed to change its facility
procedures to set the conditions for MI interrogations, nor participate in
those interrogations.** **(ANNEXES 19 and 21-23)**

6. MG Ryder's Report also made the following, inter alia, near-term and mid-term
recommendations regarding the command and control of detainees:

    a. (U) Align the release process for security internees with DoD Policy. The
process of screening security internees should include intelligence
findings, interrogation results, and current threat assessment.

    b. (U) Determine the scope of intelligence collection that will occur at Camp
Vigilant. Refurbish the Northeast Compound to separate the screening
operation from the Iraqi run Baghdad Central Correctional Facility.
**Establish procedures that define the role of military police Soldiers
securing the compound, clearly separating the actions of the guards
from those of the military intelligence personnel.**

    c. (U) **Consolidate all Security Internee Operations, except the MEK
security mission, under a single Military Police Brigade Headquarters
for OIF 2.**

    d. (U) **Insist that all units identified to rotate into the Iraqi Theater of
Operations (ITO) to conduct internment and confinement operations
in support of OIF 2 be organic to CJTF-7.** **(ANNEX 19)**

### IO COMMENTS REGARDING MG RYDER'S REPORT

1. (U) The objective of MG Ryder's Team was to observe detention and prison operations, identify potential systemic and human rights issues, and provide near-term, mid-term, and long-term recommendations to improve CJTF-7 operations and transition of the Iraqi prison system from US military control/oversight to the Coalition Provisional Authority and eventually to the Iraqi Government. The Findings and Recommendations of MG Ryder's Team are thorough and precise and should be implemented immediately. **(ANNEX 19)**

2. (U) **Unfortunately, many of the systemic problems that surfaced during MG Ryder's Team's assessment are the very same issues that are the subject of this investigation. In fact, many of the abuses suffered by detainees occurred during, or near to, the time of that assessment.** As will be pointed out in detail in subsequent portions of this report, I disagree with the conclusion of MG Ryder's Team in one critical aspect, that being its conclusion that the 800th MP Brigade had not been asked to change its facility procedures to set the conditions for MI interviews. **While clearly the 800th MP Brigade and its commanders were not tasked to set conditions for detainees for subsequent MI interrogations, it is obvious from a review of comprehensive CID interviews of suspects and witnesses that this was done at lower levels. (ANNEX 19)**

3. (U) I concur fully with MG Ryder's conclusion regarding the effect of AR 190-8. Military Police, though adept at passive collection of intelligence within a facility, should not participate in Military Intelligence supervised interrogation sessions. Moreover, Military Police should not be involved with setting **"favorable conditions"** for subsequent interviews. These actions, as will be outlined in this investigation, clearly run counter to the smooth operation of a detention facility. **(ANNEX 19)**

## PRELIMINARY INVESTIGATIVE ACTIONS

1. (U) Following our review of MG Ryder's Report and MG Miller's Report, my investigation team immediately began an in-depth review of all available documents regarding the 800th MP Brigade. We reviewed in detail the voluminous CID investigation regarding alleged detainee abuses at detention facilities in Iraq, particularly the Abu Ghraib (BCCF) Detention Facility. We analyzed approximately fifty witness statements from military police and military intelligence personnel, potential suspects, and detainees. We reviewed numerous photos and videos of actual detainee abuse taken by detention facility personnel, which are now in the custody and control of the US Army Criminal Investigation Command and the CJTF-7 prosecution team. The photos and videos are not contained in this investigation. We obtained copies of the 800th MP Brigade roster, rating chain, and assorted internal

investigations and disciplinary actions involving that command for the past several months. **(All ANNEXES Reviewed by Investigation Team)**

2. (U) In addition to military police and legal officers from the CFLCC PMO and SJA Offices we also obtained the services of two individuals who are experts in military police detention practices and training. These were LTC Timothy Weathersbee, Commander, 705th MP Battalion, United States Disciplinary Barracks, Fort Leavenworth, and SFC Edward Baldwin, Senior Corrections Advisor, US Army Military Police School, Fort Leonard Wood. I also requested and received the services of Col (Dr) Henry Nelson, a trained US Air Force psychiatrist assigned to assist my investigation team. **(ANNEX 4)**

3. (U) In addition to MG Ryder's and MG Miller's Reports, the team reviewed numerous reference materials including the 12 October 2003 CJTF-7 Interrogation and Counter-Resistance Policy, the AR 15-6 Investigation on Riot and Shootings at Abu Ghraib on 24 November 2003, the 205th MI Brigade's Interrogation Rules of Engagement (IROE), facility staff logs/journals and numerous records of AR 15-6 investigations and Serious Incident Reports (SIRs) on detainee escapes/shootings and disciplinary matters from the 800th MP Brigade. **(ANNEXES 5-20, 37, 93, and 94)**

4. (U) On 2 February 2004, I took my team to Baghdad for a one-day inspection of the Abu Ghraib Prison (BCCF) and the High Value Detainee (HVD) Complex in order to become familiar with those facilities. We also met with COL Jerry Mocello, Commander, 3rd MP Criminal Investigation Group (CID), COL Dave Quantock, Commander, 16th MP Brigade, COL Dave Phillips, Commander, 89th MP Brigade, and COL Ed Sannwaldt, CJTF-7 Provost Marshal. On 7 February 2004, the team visited the Camp Bucca Detention Facility to familiarize itself with the facility and operating structure. In addition, on 6 and 7 February 2004, at Camp Doha, Kuwait, we conducted extensive training sessions on approved detention practices. We continued our preparation by reviewing the ongoing CID investigation and were briefed by the Special Agent in Charge, CW2 Paul Arthur. We refreshed ourselves on the applicable reference materials within each team member's area of expertise, and practiced investigative techniques. I met with the team on numerous occasions to finalize appropriate witness lists, review existing witness statements, arrange logistics, and collect potential evidence. We also coordinated with CJTF-7 to arrange witness attendance, force protection measures, and general logistics for the team's move to Baghdad on 8 February 2004. **(ANNEXES 4 and 25)**

5. (U) At the same time, due to the Transfer of Authority on 1 February 2004 between III Corps and V Corps, and the upcoming demobilization of the 800th MP Brigade Command, I directed that several critical witnesses who were preparing to leave the theater remain at Camp Arifjan, Kuwait until they could be interviewed **(ANNEX 29)**. My team deployed to Baghdad on 8 February 2004 and conducted a series of interviews with a variety of witnesses **(ANNEX 30)**. We returned to Camp Doha, Kuwait on 13 February 2004. On 14 and 15 February we interviewed a number of witnesses from the 800th MP Brigade. On 17 February we returned to Camp Bucca,

13

 

Iraq to complete interviews of witnesses at that location.  From 18 February thru 28 February we collected documents, compiled references, did follow-up interviews, and completed a detailed analysis of the volumes of materials accumulated throughout our investigation.  On 29 February we finalized our executive summary and out-briefing slides.  On 9 March we submitted the AR 15-6 written report with findings and recommendations to the CFLCC Deputy SJA, LTC Mark Johnson, for a legal sufficiency review.  The out-brief to the appointing authority, LTG McKiernan, took place on 3 March 2004.  **(ANNEXES 26 and 45-91)**

## FINDINGS AND RECOMMENDATIONS

## (PART ONE)

## (U) The investigation should inquire into all of the facts and circumstances surrounding recent allegations of detainee abuse, specifically, allegations of maltreatment at the Abu Ghraib Prison (Baghdad Central Confinement Facility).

1. (U) The US Army Criminal Investigation Command (CID), led by COL Jerry Mocello, and a team of highly trained professional agents have done a superb job of investigating several complex and extremely disturbing incidents of detainee abuse at the Abu Ghraib Prison. They conducted over 50 interviews of witnesses, potential criminal suspects, and detainees. They also uncovered numerous photos and videos portraying in graphic detail detainee abuse by Military Police personnel on numerous occasions from October to December 2003. Several potential suspects rendered full and complete confessions regarding their personal involvement and the involvement of fellow Soldiers in this abuse. Several potential suspects invoked their rights under Article 31 of the Uniform Code of Military Justice (UCMJ) and the 5th Amendment of the U.S. Constitution. **(ANNEX 25)**

2. (U) In addition to a comprehensive and exhaustive review of all of these statements and documentary evidence, we also interviewed numerous officers, NCOs, and junior enlisted Soldiers in the 800th MP Brigade, as well as members of the 205th Military Intelligence Brigade working at the prison. We did not believe it was necessary to re-interview all the numerous witnesses who had previously provided comprehensive statements to CID, and I have adopted those statements for the purposes of this investigation. **(ANNEXES 26, 34, 35, and 45-91)**

### REGARDING PART ONE OF THE INVESTIGATION, I MAKE THE FOLLOWING SPECIFIC FINDINGS OF FACT:

1. (U) That Forward Operating Base (FOB) Abu Ghraib (BCCF) provides security of both criminal and security detainees at the Baghdad Central Correctional Facility, facilitates the conducting of interrogations for CJTF-7, supports other CPA operations at the prison, and enhances the force protection/quality of life of Soldiers assigned in order to ensure the success of ongoing operations to secure a free Iraq. **(ANNEX 31)**

2. (U) That the Commander, 205th Military Intelligence Brigade, was designated by CJTF-7 as the Commander of FOB Abu Ghraib (BCCF) effective 19 November 2003. That the 205th MI Brigade conducts operational and strategic interrogations for CJTF-7. That from 19 November 2003 until Transfer of Authority (TOA) on 6



February 2004, COL Thomas M. Pappas was the Commander of the 205th MI Brigade and the Commander of FOB Abu Ghraib (BCCF). **(ANNEX 31)**

3. (U) That the 320th Military Police Battalion of the 800th MP Brigade is responsible for the Guard Force at Camp Ganci, Camp Vigilant, & Cellblock 1 of FOB Abu Ghraib (BCCF). That from February 2003 to until he was suspended from his duties on 17 January 2004, LTC Jerry Phillabaum served as the Battalion Commander of the 320th MP Battalion. That from December 2002 until he was suspended from his duties, on 17 January 2004, CPT Donald Reese served as the Company Commander of the 372nd MP Company, which was in charge of guarding detainees at FOB Abu Ghraib. I further find that both the 320th MP Battalion and the 372nd MP Company were located within the confines of FOB Abu Ghraib. **(ANNEXES 32 and 45)**

4. (U) That from July of 2003 to the present, BG Janis L. Karpinski was the Commander of the 800th MP Brigade. **(ANNEX 45)**

5. (S) That between October and December 2003, at the Abu Ghraib Confinement Facility (BCCF), numerous incidents of sadistic, blatant, and wanton criminal abuses were inflicted on several detainees. This systemic and illegal abuse of detainees was intentionally perpetrated by several members of the military police guard force (372nd Military Police Company, 320th Military Police Battalion, 800th MP Brigade), in Tier (section) 1-A of the Abu Ghraib Prison (BCCF). The allegations of abuse were substantiated by detailed witness statements **(ANNEX 26)** and the discovery of extremely graphic photographic evidence. Due to the extremely sensitive nature of these photographs and videos, the ongoing CID investigation, and the potential for the criminal prosecution of several suspects, the photographic evidence is not included in the body of my investigation. The pictures and videos are available from the Criminal Investigative Command and the CTJF-7 prosecution team. In addition to the aforementioned crimes, there were also abuses committed by members of the 325th MI Battalion, 205th MI Brigade, and Joint Interrogation and Debriefing Center (JIDC). Specifically, on 24 November 2003, SPC Luciana Spencer, 205th MI Brigade, sought to degrade a detainee by having him strip and returned to cell naked. **(ANNEXES 26 and 53)**

6. (S) I find that the intentional abuse of detainees by military police personnel included the following acts:

    a.  (S) Punching, slapping, and kicking detainees; jumping on their naked feet;
    b.  (S) Videotaping and photographing naked male and female detainees;
    c.  (S) Forcibly arranging detainees in various sexually explicit positions for photographing;
    d.  (S) Forcing detainees to remove their clothing and keeping them naked for several days at a time;
    e.  (S) Forcing naked male detainees to wear women's underwear;
    f.  (S) Forcing groups of male detainees to masturbate themselves while being photographed and videotaped;



  g. (S) Arranging naked male detainees in a pile and then jumping on them;
  h. (S) Positioning a naked detainee on a MRE Box, with a sandbag on his head, and
    attaching wires to his fingers, toes, and penis to simulate electric torture;
  i. (S) Writing "I am a Rapest" (sic) on the leg of a detainee alleged to have forcibly
    raped a 15-year old fellow detainee, and then photographing him naked;
  j. (S) Placing a dog chain or strap around a naked detainee's neck and having a
    female Soldier pose for a picture;
  k. (S) A male MP guard having sex with a female detainee;
  l. (S) Using military working dogs (without muzzles) to intimidate and frighten
    detainees, and in at least one case biting and severely injuring a detainee;
  m. (S) Taking photographs of dead Iraqi detainees.
  **(ANNEXES 25 and 26)**

7. (U) These findings are amply supported by written confessions provided by several of
  the suspects, written statements provided by detainees, and witness statements.  In
  reaching my findings, I have carefully considered the pre-existing statements of the
  following witnesses and suspects **(ANNEX 26)**:

  a. (U) SPC Jeremy Sivits, 372nd MP Company - **Suspect**
  b. (U) SPC Sabrina Harman, 372nd MP Company – **Suspect**
  c. (U) SGT Javal S. Davis, 372nd MP Company - **Suspect**
  c. (U) PFC Lynndie R. England, 372nd MP Company - **Suspect**
  d. (U) Adel Nakhla, Civilian Translator, Titan Corp., Assigned to the 205th MI
    Brigade- **Suspect**
  e. (U) SPC Joseph M. Darby, 372nd MP Company
  f. (U) SGT Neil A. Wallin, 109th Area Support Medical Battalion
  g (U) SGT Samuel Jefferson Provance, 302nd MI Battalion
  h (U) Torin S. Nelson, Contractor, Titan Corp., Assigned to the 205th MI Brigade
  j. (U) CPL Matthew Scott Bolanger, 372nd MP Company
  k. (U) SPC Mathew C. Wisdom, 372nd MP Company
  l. (U) SSG Reuben R. Layton, Medic, 109th Medical Detachment
  m. (U) SPC John V. Polak, 229th MP Company

8. (U) In addition, several detainees also described the following acts of abuse, which
  under the circumstances, I find credible based on the clarity of their statements and
  supporting evidence provided by other witnesses **(ANNEX 26)**:

  a. (U) Breaking chemical lights and pouring the phosphoric liquid on detainees;
  b. (U) Threatening detainees with a charged 9mm pistol;
  c. (U) Pouring cold water on naked detainees;
  d. (U) Beating detainees with a broom handle and a chair;
  e. (U) Threatening male detainees with rape;
  f. (U) Allowing a military police guard to stitch the wound of a detainee who was
    injured after being slammed against the wall in his cell;
  g. (U) Sodomizing a detainee with a chemical light and perhaps a broom stick.



    h. (U) Using military working dogs to frighten and intimidate detainees with threats of attack, and in one instance actually biting a detainee.

9. (U) I have carefully considered the statements provided by the following detainees, which under the circumstances I find credible based on the clarity of their statements and supporting evidence provided by other witnesses:

    a. (U) Amjed Isail Waleed, Detainee # 151365
    b. (U) Hiadar Saber Abed Miktub-Aboodi, Detainee # 13077
    c. (U) Huessin Mohssein Al-Zayiadi, Detainee # 19446
    d. (U) Kasim Mehaddi Hilas, Detainee # 151108
    e. (U) Mohanded Juma Juma (sic), Detainee # 152307
    f. (U) Mustafa Jassim Mustafa, Detainee # 150542
    g. (U) Shalan Said Alsharoni, Detainee, # 150422
    h. (U) Abd Alwhab Youss, Detainee # 150425
    i. (U) Asad Hamza Hanfosh, Detainee # 152529
    j. (U) Nori Samir Gunbar Al-Yasseri, Detainee # 7787
    k. (U) Thaar Salman Dawod, Detainee # 150427
    l. (U) Ameen Sa'eed Al-Sheikh, Detainee # 151362
    m. (U) Abdou Hussain Saad Faleh, Detainee # 18470  **(ANNEX 26)**

10. (U) I find that contrary to the provision of AR 190-8, and the findings found in MG Ryder's Report, Military Intelligence (MI) interrogators and Other US Government Agency's (OGA) interrogators actively requested that MP guards set physical and mental conditions for favorable interrogation of witnesses. Contrary to the findings of MG Ryder's Report, I find that personnel assigned to the 372nd MP Company, 800th MP Brigade were directed to change facility procedures to "set the conditions" for MI interrogations. I find no direct evidence that MP personnel actually participated in those MI interrogations. **(ANNEXES 19, 21, 25, and 26)**.

11. (U) I reach this finding based on the actual proven abuse that I find was inflicted on detainees and by the following witness statements. **(ANNEXES 25 and 26)**:

    a. (U) <u>**SPC Sabrina Harman**</u>, **372nd MP Company**, stated in her sworn statement regarding the incident where a detainee was placed on a box with wires attached to his fingers, toes, and penis, "that her job was to keep detainees awake." She stated that MI was talking to CPL Grainer. She stated: **"MI wanted to get them to talk. It is Grainer and Frederick's job to do things for MI and OGA to get these people to talk."**

    b. (U) <u>**SGT Javal S. Davis**</u>, **372nd MP Company**, stated in his sworn statement as follows: **"I witnessed prisoners in the MI hold section, wing 1A being made to do various things that I would question morally. In Wing 1A we were told that they had different rules and different SOP for treatment. I never saw a set of rules or SOP for that section just word of mouth. The Soldier in charge of 1A was Corporal Granier. He stated that the Agents and MI Soldiers would ask**

him to do things, but nothing was ever in writing he would complain (sic)."
When asked why the rules in 1A/1B were different than the rest of the wings, SGT Davis stated: **"The rest of the wings are regular prisoners and 1A/B are Military Intelligence (MI) holds."** When asked why he did not inform his chain of command about this abuse, SGT Davis stated: **" Because I assumed that if they were doing things out of the ordinary or outside the guidelines, someone would have said something. Also the wing belongs to MI and it appeared MI personnel approved of the abuse."** SGT Davis also stated that he had heard MI insinuate to the guards to abuse the inmates. When asked what MI said he stated: **"Loosen this guy up for us." Make sure he has a bad night." "Make sure he gets the treatment."** He claimed these comments were made to CPL Granier and SSG Frederick. Finally, SGT Davis stated that (sic): **"the MI staffs to my understanding have been giving Granier compliments on the way he has been handling the MI holds. Example being statements like, "Good job, they're breaking down real fast. They answer every question. They're giving out good information, Finally, and Keep up the good work . Stuff like that."**

c. (U) <u>SPC Jason Kennel</u>, **372nd MP Company,** was asked if he were present when any detainees were abused. He stated: **"I saw them nude, but MI would tell us to take away their mattresses, sheets, and clothes."** He could not recall who in MI had instructed him to do this, but commented that, "if they wanted me to do that they needed to give me paperwork." He was later informed that "we could not do anything to embarrass the prisoners."

d. (U) <u>Mr. Adel L. Nakhla</u>, a US civilian contract translator was questioned about several detainees accused of rape. He observed (sic): **"They (detainees) were all naked, a bunch of people from MI, the MP were there that night and the inmates were ordered by SGT Granier and SGT Frederick ordered the guys while questioning them to admit what they did. They made them do strange exercises by sliding on their stomach, jump up and down, throw water on them and made them some wet, called them all kinds of names such as "gays" do they like to make love to guys, then they handcuffed their hands together and their legs with shackles and started to stack them on top of each other by insuring that the bottom guys penis will touch the guy on tops butt."**

e. (U) <u>SPC Neil A Wallin,</u> **109th Area Support Medical Battalion,** a medic testified that: **"Cell 1A was used to house high priority detainees and cell 1B was used to house the high risk or trouble making detainees. During my tour at the prison I observed that when the male detainees were first brought to the facility, some of them were made to wear female underwear, which I think was to somehow break them down."**

12. (U) **I find that prior to its deployment to Iraq for Operation Iraqi Freedom, the 320th MP Battalion and the 372nd MP Company had received no training in detention/internee operations.** I also find that very little instruction or training was provided to MP personnel on the applicable rules of the Geneva Convention Relative

to the Treatment of Prisoners of War, FM 27-10, AR 190-8, or FM 3-19.40. Moreover, I find that few, if any, copies of the Geneva Conventions were ever made available to MP personnel or detainees. **(ANNEXES 21-24, 33, and multiple witness statements)**

13. (U) Another obvious example of the Brigade Leadership not communicating with its Soldiers or ensuring their tactical proficiency concerns the incident of detainee abuse that occurred at Camp Bucca, Iraq, on May 12, 2003. Soldiers from the 223rd MP Company reported to the 800th MP Brigade Command at Camp Bucca, that four Military Police Soldiers from the 320th MP Battalion had abused a number of detainees during inprocessing at Camp Bucca. An extensive CID investigation determined that four soldiers from the 320th MP Battalion had kicked and beaten these detainees following a transport mission from Talil Air Base. **(ANNEXES 34 and 35)**

14. (U) Formal charges under the UCMJ were preferred against these Soldiers and an Article-32 Investigation conducted by LTC Gentry. He recommended a general court martial for the four accused, which BG Karpinski supported. Despite this documented abuse, there is no evidence that BG Karpinski ever attempted to remind 800th MP Soldiers of the requirements of the Geneva Conventions regarding detainee treatment or took any steps to ensure that such abuse was not repeated. Nor is there any evidence that LTC(P) Phillabaum, the commander of the Soldiers involved in the Camp Bucca abuse incident, took any initiative to ensure his Soldiers were properly trained regarding detainee treatment. **(ANNEXES 35 and 62)**

## RECOMMENDATIONS AS TO PART ONE OF THE INVESTIGATION:

1. (U) Immediately deploy to the Iraq Theater an integrated multi-discipline Mobile Training Team (MTT) comprised of subject matter experts in internment/resettlement operations, international and operational law, information technology, facility management, interrogation and intelligence gathering techniques, chaplains, Arab cultural awareness, and medical practices as it pertains to I/R activities. This team needs to oversee and conduct comprehensive training in all aspects of detainee and confinement operations.

2. (U) That all military police and military intelligence personnel involved in any aspect of detainee operations or interrogation operations in CJTF-7, and subordinate units, be immediately provided with training by an international/operational law attorney on the specific provisions of The Law of Land Warfare FM 27-10, specifically the Geneva Convention Relative to the Treatment of Prisoners of War, Enemy Prisoners of War, Retained Personnel, Civilian Internees, and Other Detainees, and AR 190-8.

3. (U) **That a single commander in CJTF-7 be responsible for overall detainee operations throughout the Iraq Theater of Operations**. I also recommend that the Provost Marshal General of the Army assign a minimum of two (2) subject matter experts, one officer and one NCO, to assist CJTF-7 in coordinating detainee operations.

4. (U) That detention facility commanders and interrogation facility commanders ensure that appropriate copies of the Geneva Convention Relative to the Treatment of Prisoners of War and notice of protections be made available in both English and the detainees' language and be prominently displayed in all detention facilities. Detainees with questions regarding their treatment should be given the full opportunity to read the Convention.

5. (U) That each detention facility commander and interrogation facility commander publish a complete and comprehensive set of Standing Operating Procedures (SOPs) regarding treatment of detainees, and that all personnel be required to read the SOPs and sign a document indicating that they have read and understand the SOPs.

6. (U) That in accordance with the recommendations of MG Ryder's Assessment Report, and my findings and recommendations in this investigation, all units in the Iraq Theater of Operations conducting internment/confinement/detainment operations in support of Operation Iraqi Freedom be OPCON for all purposes, to include action under the UCMJ, to CJTF-7.

7. (U) Appoint the C3, CJTF as the staff proponent for detainee operations in the Iraq Joint Operations Area (JOA).  (MG Tom Miller, C3, CJTF-7, has been appointed by COMCJTF-7).

8. (U) That an inquiry UP AR 381-10, Procedure 15 be conducted to determine the extent of culpability of Military Intelligence personnel, assigned to the 205th MI Brigade and the Joint Interrogation and Debriefing Center (JIDC) regarding abuse of detainees at Abu Ghraib (BCCF).

9. (U) That it is critical that the proponent for detainee operations is assigned a dedicated Senior Judge Advocate, with specialized training and knowledge of international and operational law, to assist and advise on matters of detainee operations.

# FINDINGS AND RECOMMENDATIONS

## (PART TWO)

## (U) The Investigation inquire into detainee escapes and accountability lapses as reported by CJTF-7, specifically allegations concerning these events at the Abu Ghraib Prison:

### REGARDING PART TWO OF THE INVESTIGATION, I MAKE THE FOLLOWING SPECIFIC FINDINGS OF FACT:

1. The 800th MP Brigade was responsible for theater-wide Internment and Resettlement (I/R) operations. **(ANNEXES 45 and 95)**

2. (U) The 320th MP Battalion, 800th MP Brigade was tasked with detainee operations at the Abu Ghraib Prison Complex during the time period covered in this investigation. **(ANNEXES 41, 45, and 59)**

3. (U) The 310th MP Battalion, 800th MP Brigade was tasked with detainee operations and Forward Operating Base (FOB) Operations at the Camp Bucca Detention Facility until TOA on 26 February 2004. **(ANNEXES 41 and 52)**

4. (U) The 744th MP Battalion, 800th MP Brigade was tasked with detainee operations and FOB Operations at the HVD Detention Facility until TOA on 4 March 2004. **(ANNEXES 41 and 55)**

5. (U) The 530th MP Battalion, 800th MP Brigade was tasked with detainee operations and FOB Operations at the MEK holding facility until TOA on 15 March 2004. **(ANNEXES 41 and 97)**

6. (U) Detainee operations include accountability, care, and well being of Enemy Prisoners of War, Retained Person, Civilian Detainees, and Other Detainees, as well as Iraqi criminal prisoners. **(ANNEX 22)**

7. (U) The accountability for detainees is doctrinally an MP task IAW FM 3-19.40. **(ANNEX 22)**

8. (U) There is a general lack of knowledge, implementation, and emphasis of basic legal, regulatory, doctrinal, and command requirements within the 800th MP Brigade and its subordinate units. **(Multiple witness statements in ANNEXES 45-91)**.

9. (U) The handling of detainees and criminal prisoners after in-processing was inconsistent from detention facility to detention facility, compound to compound, encampment to encampment, and even shift to shift throughout the 800th MP Brigade AOR. **(ANNEX 37)**

10. (U) Camp Bucca, operated by the 310th MP Battalion, had a "Criminal Detainee In-Processing SOP" and a "Training Outline" for transferring and releasing detainees, which appears to have been followed. **(ANNEXES 38 and 52)**

11. (U) Incoming and outgoing detainees are being documented in the National Detainee Reporting System (NDRS) and Biometric Automated Toolset System (BATS) as required by regulation at all detention facilities. However, it is underutilized and often does not give a "real time" accurate picture of the detainee population due to untimely updating. **(ANNEX 56)**

12. (U) There was a severe lapse in the accountability of detainees at the Abu Ghraib Prison Complex. The 320th MP Battalion used a self-created "change sheet" to document the transfer of a detainee from one location to another. For proper accountability, it is imperative that these change sheets be processed and the detainee manifest be updated within 24 hours of movement. At Abu Ghraib, this process would often take as long as 4 days to complete. This lag-time resulted in inaccurate detainee Internment Serial Number (ISN) counts, gross differences in the detainee manifest and the actual occupants of an individual compound, and significant confusion of the MP Soldiers. The 320th MP Battalion S-1, CPT Theresa Delbalso, and the S-3, MAJ David DiNenna, explained that this breakdown was due to the lack of manpower to process change sheets in a timely manner. **(ANNEXES 39 and 98)**

13. (U) The 320th Battalion TACSOP requires detainee accountability at least 4 times daily at Abu Ghraib. However, a detailed review of their operational journals revealed that these accounts were often not done or not documented by the unit. Additionally, there is no indication that accounting errors or the loss of a detainee in the accounting process triggered any immediate corrective action by the Battalion TOC. **(ANNEX 44)**

14. (U) There is a lack of standardization in the way the 320th MP Battalion conducted physical counts of their detainees. Each compound within a given encampment did their headcounts differently. Some compounds had detainees line up in lines of 10, some had them sit in rows, and some moved all the detainees to one end of the compound and counted them as they passed to the other end of the compound. **(ANNEX 98)**

15. (U) FM 3-19.40 outlines the need for 2 roll calls (100% ISN band checks) per day. The 320th MP Battalion did this check only 2 times per week. Due to the lack of real-time updates to the system, these checks were regularly inaccurate. **(ANNEXES 22 and 98)**

23

16. (U) The 800th MP Brigade and subordinate units adopted non-doctrinal terms such as "band checks," "roll-ups," and "call-ups," which contributed to the lapses in accountability and confusion at the soldier level. **(ANNEXES 63, 88, and 98)**

17. (U) Operational journals at the various compounds and the 320th Battalion TOC contained numerous unprofessional entries and flippant comments, which highlighted the lack of discipline within the unit. There was no indication that the journals were ever reviewed by anyone in their chain of command. **(ANNEX 37)**

18. (U) Accountability SOPs were not fully developed and standing TACSOPs were widely ignored. Any SOPs that did exist were not trained on, and were never distributed to the lowest level. Most procedures were shelved at the unit TOC, rather than at the subordinate units and guards mount sites. **(ANNEXES 44, 67, 71, and 85)**

19. (U) Accountability and facility operations SOPs lacked specificity, implementation measures, and a system of checks and balances to ensure compliance. **(ANNEXES 76 and 82)**

20. (U) Basic Army Doctrine was not widely referenced or utilized to develop the accountability practices throughout the 800th MP Brigade's subordinate units. Daily processing, accountability, and detainee care appears to have been made up as the operations developed with reliance on, and guidance from, junior members of the unit who had civilian corrections experience. **(ANNEX 21)**

21. (U) Soldiers were poorly prepared and untrained to conduct I/R operations prior to deployment, at the mobilization site, upon arrival in theater, and throughout their mission. **(ANNEXES 62, 63, and 69)**

22. (U) The documentation provided to this investigation identified 27 escapes or attempted escapes from the detention facilities throughout the 800th MP Brigade's AOR. Based on my assessment and detailed analysis of the substandard accountability process maintained by the 800th MP Brigade, it is highly likely that there were several more unreported cases of escape that were probably "written off" as administrative errors or otherwise undocumented. 1LT Lewis Raeder, Platoon Leader, 372nd MP Company, reported knowing about at least two additional escapes (one from a work detail and one from a window) from Abu Ghraib (BCCF) that were not documented. LTC Dennis McGlone, Commander, 744th MP Battalion, detailed the escape of one detainee at the High Value Detainee Facility who went to the latrine and then outran the guards and escaped. Lastly, BG Janis Karpinski, Commander, 800th MP Brigade, stated that there were more than 32 escapes from her holding facilities, which does not match the number derived from the investigation materials. **(ANNEXES 5-10, 45, 55, and 71)**

23. (U) The Abu Ghraib and Camp Bucca detention facilities are significantly over their intended maximum capacity while the guard force is undermanned and under resourced. This imbalance has contributed to the poor living conditions, escapes, and accountability lapses at the various facilities. The overcrowding of the facilities also limits the ability to identify and segregate leaders in the detainee population who may be organizing escapes and riots within the facility. **(ANNEXES 6, 22, and 92)**

24. (U) The screening, processing, and release of detainees who should not be in custody takes too long and contributes to the overcrowding and unrest in the detention facilities. There are currently three separate release mechanisms in the theater-wide internment operations. First, the apprehending unit can release a detainee if there is a determination that their continued detention is not warranted. Secondly, a criminal detainee can be released after it has been determined that the detainee has no intelligence value, and that their release would not be detrimental to society. BG Karpinski had signature authority to release detainees in this second category. Lastly, detainees accused of committing "Crimes Against the Coalition," who are held throughout the separate facilities in the CJTF-7 AOR, can be released upon a determination that they are of no intelligence value and no longer pose a significant threat to Coalition Forces. The release process for this category of detainee is a screening by the local US Forces Magistrate Cell and a review by a Detainee Release Board consisting of BG Karpinski, COL Marc Warren, SJA, CJTF-7, and MG Barbara Fast, C-2, CJTF-7. MG Fast is the "Detainee Release Authority" for detainees being held for committing crimes against the coalition. According to BG Karpinski, this category of detainee makes up more than 60% of the total detainee population, and is the fastest growing category. However, MG Fast, according to BG Karpinski, routinely denied the board's recommendations to release detainees in this category who were no longer deemed a threat and clearly met the requirements for release. According to BG Karpinski, the extremely slow and ineffective release process has significantly contributed to the overcrowding of the facilities. **(ANNEXES 40, 45, and 46)**

25. (U) After Action Reviews (AARs) are not routinely being conducted after an escape or other serious incident. No lessons learned seem to have been disseminated to subordinate units to enable corrective action at the lowest level. The Investigation Team requested copies of AARs, and none were provided. **(Multiple Witness Statements)**

26. (U) Lessons learned (i.e. Findings and Recommendations from various 15-6 Investigations concerning escapes and accountability lapses) were rubber stamped as approved and ordered implemented by BG Karpinski. There is no evidence that the majority of her orders directing the implementation of substantive changes were ever acted upon. Additionally, there was no follow-up by the command to verify the corrective actions were taken. Had the findings and recommendations contained within their own investigations been analyzed and actually implemented by BG



Karpinski, many of the subsequent escapes, accountability lapses, and cases of abuse may have been prevented. **(ANNEXES 5-10)**

27. (U) The perimeter lighting around Abu Ghraib and the detention facility at Camp Bucca is inadequate and needs to be improved to illuminate dark areas that have routinely become avenues of escape. **(ANNEX 6)**

28. (U) Neither the camp rules nor the provisions of the Geneva Conventions are posted in English or in the language of the detainees at any of the detention facilities in the 800th MP Brigade's AOR, even after several investigations had annotated the lack of this critical requirement. **(Multiple Witness Statements and the Personal Observations of the Investigation Team)**

29. (U) The Iraqi guards at Abu Ghraib BCCF) demonstrate questionable work ethics and loyalties, and are a potentially dangerous contingent within the Hard-Site. These guards have furnished the Iraqi criminal inmates with contraband, weapons, and information. Additionally, they have facilitated the escape of at least one detainee. **(ANNEX 8 and 26-SPC Polak's Statement)**

30. (U) In general, US civilian contract personnel (Titan Corporation, CACI, etc...), third country nationals, and local contractors do not appear to be properly supervised within the detention facility at Abu Ghraib. During our on-site inspection, they wandered about with too much unsupervised free access in the detainee area. Having civilians in various outfits (civilian and DCUs) in and about the detainee area causes confusion and may have contributed to the difficulties in the accountability process and with detecting escapes. **(ANNEX 51, Multiple Witness Statements, and the Personal Observations of the Investigation Team)**

31. (U) SGM Marc Emerson, Operations SGM, 320th MP Battalion, contended that the Detainee Rules of Engagement (DROE) and the general principles of the Geneva Convention were briefed at every guard mount and shift change on Abu Ghraib. However, none of our witnesses, nor our personal observations, support his contention. I find that SGM Emerson was not a credible witness. **(ANNEXES 45, 80, and the Personal Observations of the Investigation Team)**

32. (U) Several interviewees insisted that the MP and MI Soldiers at Abu Ghraib (BCCF) received regular training on the basics of detainee operations; however, they have been unable to produce any verifying documentation, sign-in rosters, or soldiers who can recall the content of this training. **(ANNEXES 59, 80, and the Absence of any Training Records)**

33. (S/NF) The various detention facilities operated by the 800th MP Brigade have routinely held persons brought to them by Other Government Agencies (OGAs) without accounting for them, knowing their identities, or even the reason for their detention. The Joint Interrogation and Debriefing Center (JIDC) at Abu Ghraib called these detainees "ghost detainees." On at least one occasion, the 320th MP

Battalion at Abu Ghraib held a handful of "ghost detainees" (6-8) for OGAs that they moved around within the facility to hide them from a visiting International Committee of the Red Cross (ICRC) survey team. This maneuver was deceptive, contrary to Army Doctrine, and in violation of international law. **(ANNEX 53)**

34. (U) The following riots, escapes, and shootings have been documented and reported to this Investigation Team. Although there is no data from other missions of similar size and duration to compare the number of escapes with, the most significant factors derived from these reports are twofold. First, investigations and SIRs lacked critical data needed to evaluate the details of each incident. Second, each investigation seems to have pointed to the same types of deficiencies; however, little to nothing was done to correct the problems and to implement the recommendations as was ordered by BG Karpinski, nor was there any command emphasis to ensure these deficiencies were corrected:

    a. **(U) 4 June 03- This escape was mentioned in the 15-6 Investigation covering the 13 June 03 escape, recapture, and shootings of detainees at Camp Vigilant (320th MP Battalion).** However, no investigation or additional information was provided as requested by this investigation team. **(ANNEX 7)**

    b. **(U) 9 June 03- Riot and shootings of five detainees at Camp Cropper. (115th MP Battalion)** Several detainees allegedly rioted after a detainee was subdued by MPs of the 115th MP Battalion after striking a guard in compound B of Camp Cropper. A 15-6 investigation by 1LT Magowan (115th MP Battalion, Platoon Leader) concluded that a detainee had acted up and hit an MP. After being subdued, one of the MPs took off his DCU top and flexed his muscles to the detainees, which further escalated the riot. The MPs were overwhelmed and the guards fired lethal rounds to protect the life of the compound MPs, whereby 5 detainees were wounded. Contributing factors were poor communications, no clear chain of command, facility-obstructed views of posted guards, the QRF did not have non-lethal equipment, and the SOP was inadequate and outdated. **(ANNEX 5)**

    c. **(U) 12 June 03- Escape and recapture of detainee #8399, escape and shooting of detainee # 7166, and attempted escape of an unidentified detainee from Camp Cropper Holding Area (115th MP Battalion).** Several detainees allegedly made their escape in the nighttime hours prior to 0300. A 15-6 investigation by CPT Wendlandt (115th MP Battalion, S-2) concluded that the detainees allegedly escaped by crawling under the wire at a location with inadequate lighting. One detainee was stopped prior to escape. An MP of the 115th MP Battalion search team recaptured detainee # 8399, and detainee # 7166 was shot and killed by a Soldier during the recapture process. Contributing factors were overcrowding, poor lighting, and the nature of the hardened criminal detainees at that location. It is of particular note that the command was informed at least 24 hours in advance of the

upcoming escape attempt and started doing amplified announcements in
Arabic stating the camp rules. The investigation pointed out that rules and
guidelines were not posted in the camps in the detainees' native languages.
(ANNEX 6)

d. (U) **13 June 03- Escape and recapture of detainee # 8968 and the shooting
of eight detainees at Abu Ghraib (BCCF) (320th MP Battalion).** Several
detainees allegedly attempted to escape at about 1400 hours from the Camp
Vigilant Compound, Abu Ghraib (BCCF). A 15-6 investigation by CPT
Wyks (400th MP Battalion, S-1) concluded that the detainee allegedly
escaped by sliding under the wire while the tower guard was turned in the
other direction. This detainee was subsequently apprehended by the QRF. At
about 1600 the same day, 30-40 detainees rioted and pelted three interior MP
guards with rocks. One guard was injured and the tower guards fired lethal
rounds at the rioters injuring 7 and killing 1 detainee. (ANNEX 7)

e. (U) **05 November 03- Escape of detainees # 9877 and # 10739 from Abu
Ghraib (320th MP Battalion).** Several detainees allegedly escaped at 0345
from the Hard-Site, Abu Ghraib (BCCF). An SIR was initiated by SPC
Warner (320th MP Battalion, S-3 RTO). The SIR indicated that 2 criminal
prisoners escaped through their cell window in tier 3A of the Hard-Site. No
information on findings, contributing factors, or corrective action has been
provided to this investigation team. (ANNEX 11)

f. (U) **07 November 03- Escape of detainee # 14239 from Abu Ghraib (320th
MP Battalion).** A detainee allegedly escaped at 1330 from Compound 2 of
the Ganci Encampment, Abu Ghraib (BCCF). An SIR was initiated by SSG
Hydro (320th MP Battalion, S-3 Asst. NCOIC). The SIR indicated that a
detainee escaped from the North end of the compound and was discovered
missing during distribution of the noon meal, but there is no method of escape
listed in the SIR. No information on findings, contributing factors, or
corrective action has been provided to this investigation team. (ANNEX 12)

g. (U) **08 November 03- Escape of detainees # 115089, # 151623, # 151624, #
116734, # 116735, and # 116738 from Abu Ghraib (320th MP Battalion).**
Several detainees allegedly escaped at 2022 from Compound 8 of the Ganci
encampment, Abu Ghraib. An SIR was initiated by MAJ DiNenna (320th MP
Battalion, S-3). The SIR indicated that 5-6 prisoners escaped from the North
end of the compound, but there is no method of escape listed in the SIR. No
information on findings, contributing factors, or corrective action has been
provided to this investigation team. (ANNEX 13)

h. (U) **24 November 03- Riot and shooting of 12 detainees # 150216, #150894,
#153096, 153165, #153169, #116361, #153399, #20257, #150348, #152616,
#116146, and #152156 at Abu Ghraib (320th MP Battalion).** Several
detainees allegedly began to riot at about 1300 in all of the compounds at the



Ganci encampment. This resulted in the shooting deaths of 3 detainees, 9 wounded detainees, and 9 injured US Soldiers. A 15-6 investigation by COL Bruce Falcone (220th MP Brigade, Deputy Commander) concluded that the detainees rioted in protest of their living conditions, that the riot turned violent, the use of non-lethal force was ineffective, and, after the 320th MP Battalion CDR executed "Golden Spike," the emergency containment plan, the use of deadly force was authorized. Contributing factors were lack of comprehensive training of guards, poor or non-existent SOPs, no formal guard-mount conducted prior to shift, no rehearsals or ongoing training, the mix of less than lethal rounds with lethal rounds in weapons, no AARs being conducted after incidents, ROE not posted and not understood, overcrowding, uniforms not standardized, and poor communication between the command and Soldiers. **(ANNEX 8)**

i.   (U) **24 November 03- Shooting of detainee at Abu Ghraib (320th MP Battalion).** A detainee allegedly had a pistol in his cell and around 1830 an extraction team shot him with less than lethal and lethal rounds in the process of recovering the weapon. A 15-6 investigation by COL Bruce Falcone (220th Brigade, Deputy Commander) concluded that one of the detainees in tier 1A of the Hard Site had gotten a pistol and a couple of knives from an Iraqi Guard working in the encampment. Immediately upon receipt of this information, an ad-hoc extraction team consisting of MP and MI personnel conducted what they called a routine cell search, which resulted in the shooting of an MP and the detainee. Contributing factors were a corrupt Iraqi Guard, inadequate SOPs, the Detention ROE in place at the time was ineffective due to the numerous levels of authorization needed for use of lethal force, poorly trained MPs, unclear lanes of responsibility, and ambiguous relationship between the MI and MP assets. **(ANNEX 8)**

j.   (U) **13 December 03- Shooting by non-lethal means into crowd at Abu Ghraib (320th MP Battalion).** Several detainees allegedly got into a detainee-on-detainee fight around 1030 in Compound 8 of the Ganci encampment, Abu Ghraib. An SIR was initiated by SSG Matash (320th MP Battalion, S-3 Section). The SIR indicated that there was a fight in the compound and the MPs used a non-lethal crowd-dispersing round to break up the fight, which was successful. No information on findings, contributing factors, or corrective action has been provided to this investigation team. **(ANNEX 14)**

k.   (U) **13 December 03- Shooting by non-lethal means into crowd at Abu Ghraib (320th MP Battalion).** Several detainees allegedly got into a detainee-on-detainee fight around 1120 in Compound 2 of the Ganci encampment, Abu Ghraib. An SIR was initiated by SSG Matash (320th MP Battalion, S-3 Section). The SIR indicated that there was a fight in the compound and the MPs used two non-lethal shots to disperse the crowd,



which was successful.  No information on findings, contributing factors, or corrective action has been provided to this investigation team.  (**ANNEX 15**)

l.  (U) **13 December 03- Shooting by non-lethal means into crowd at Abu Ghraib (320th MP Battalion).**  Approximately 30-40 detainees allegedly got into a detainee-on-detainee fight around 1642 in Compound 3 of the Ganci encampment, Abu Ghraib (BCCF).  An SIR was initiated by SSG Matash (320th MP Battalion, S-3 Section).  The SIR indicates that there was a fight in the compound and the MPs used a non-lethal crowd-dispersing round to break up the fight, which was successful.  No information on findings, contributing factors, or corrective action has been provided to this investigation team.  (**ANNEX 16**)

m.  (U) **17 December 03- Shooting by non-lethal means of detainee from Abu Ghraib (320th MP Battalion).**  Several detainees allegedly assaulted an MP at 1459 inside the Ganci Encampment, Abu Ghraib (BCCF).  An SIR was initiated by SSG Matash (320th MP BRIGADE, S-3 Section).  The SIR indicated that three detainees assaulted an MP, which resulted in the use of a non-lethal shot that calmed the situation.  No information on findings, contributing factors, or corrective action has been provided to this investigation team.  (**ANNEX 17**)

n.  (U) **07 January 04- Escape of detainee #115032 from Camp Bucca (310th MP Battalion).**  A detainee allegedly escaped between the hours of 0445 and 0640 from Compound 12, of Camp Bucca.  Investigation by CPT Kaires (310th MP Battalion S-3) and CPT Holsombeck (724th MP Battalion S-3) concluded that the detainee escaped through an undetected weakness in the wire.  Contributing factors were inexperienced guards, lapses in accountability, complacency, lack of leadership presence, poor visibility, and lack of clear and concise communication between the guards and the leadership.  (**ANNEX 9**)

o.  (U) **12 January 04- Escape of Detainees #115314 and #109950 as well as the escape and recapture of 5 unknown detainees at the Camp Bucca Detention Facility (310th MP Battalion).**  Several detainees allegedly escaped around 0300 from Compound 12, of Camp Bucca.  An AR 15-6 Investigation by LTC Leigh Coulter (800th MP Brigade, OIC Camp Arifjan Detachment) concluded that three of the detainees escaped through the front holding cell during conditions of limited visibility due to fog.  One of the detainees was noticed, shot with a non-lethal round, and returned to his holding compound.  That same night, 4 detainees exited through the wire on the South side of the camp and were seen and apprehended by the QRF.  Contributing factors were the lack of a coordinated effort for emplacement of MPs during implementation of the fog plan, overcrowding, and poor communications.  (**ANNEX 10**)

30

p. (U) **14 January 04- Escape of detainee #12436 and missing Iraqi guard
from Hard-Site, Abu Ghraib (320th MP Battalion).** A detainee allegedly
escaped at 1335 from the Hard Site at Abu Ghraib (BCCF). An SIR was
initiated by SSG Hydro (320th MP Battalion, S-3 Asst. NCOIC). The SIR
indicates that an Iraqi guard assisted a detainee to escape by signing him out
on a work detail and disappearing with him. At the time of the second SIR,
neither missing person had been located. No information on findings,
contributing factors, or corrective action has been provided to this
investigation team. **(ANNEX 99)**

q. (U) **26 January 04- Escape of detainees #s 115236, 116272, and 151933
from Camp Bucca (310th MP Battalion).** Several Detainees allegedly
escaped between the hours of 0440 and 0700 during a period of intense fog.
Investigation by CPT Kaires (310th MP Battalion S-3) concluded that the
detainees crawled under a fence when visibility was only 10-15 meters due to
fog. Contributing factors were the limited visibility (darkness under foggy
conditions), lack of proper accountability reporting, inadequate number of
guards, commencement of detainee feeding during low visibility operations,
and poorly rested MPs. **(ANNEX 18)**

36. (U) As I have previously indicated, this investigation determined that there was
virtually a complete lack of detailed SOPs at any of the detention facilities.
Moreover, despite the fact that there were numerous reported escapes at detention
facilities throughout Iraq (in excess of 35), AR 15-6 Investigations following these
escapes were simply forgotten or ignored by the Brigade Commander with no
dissemination to other facilities. After-Action Reports and Lessons Learned, if done
at all, remained at individual facilities and were not shared among other commanders
or soldiers throughout the Brigade. The Command never issued standard TTPs for
handling escape incidents. **(ANNEXES 5-10, Multiple Witness Statements, and
the Personal Observations of the Investigation Team)**

**RECOMMENDATIONS REGARDING PART TWO OF THE INVESTIGATION:**

1. (U) **ANNEX 100** of this investigation contains a detailed and referenced series of
recommendations for improving the detainee accountability practices throughout
the OIF area of operations.

2. (U) Accountability practices throughout any particular detention facility must be
standardized and in accordance with applicable regulations and international law.

3. (U) The NDRS and BATS accounting systems must be expanded and used to
their fullest extent to facilitate real time updating when detainees are moved and
or transferred from one location to another.



4. (U) "Change sheets," or their doctrinal equivalent must be immediately processed and updated into the system to ensure accurate accountability. The detainee roll call or ISN counts must match the manifest provided to the compound guards to ensure proper accountability of detainees.

5. (U) Develop, staff, and implement comprehensive and detailed SOPs utilizing the lessons learned from this investigation as well as any previous findings, recommendations, and reports.

6. (U) SOPs must be written, disseminated, trained on, and understood at the lowest level.

7. (U) Iraqi criminal prisoners must be held in separate facilities from any other category of detainee.

8. (U) All of the compounds should be wired into the master manifest whereby MP Soldiers can account for their detainees in real time and without waiting for their change sheets to be processed. This would also have the change sheet serve as a way to check up on the accuracy of the manifest as updated by each compound. The BATS and NDRS system can be utilized for this function.

9. (U) Accountability lapses, escapes, and disturbances within the detainment facilities must be immediately reported through both the operational and administrative Chain of Command via a Serious Incident Report (SIR). The SIRs must then be tracked and followed by daily SITREPs until the situation is resolved.

10. (U) Detention Rules of Engagement (DROE), Interrogation Rules of Engagement (IROE), and the principles of the Geneva Conventions need to be briefed at every shift change and guard mount.

11. (U) AARs must be conducted after serious incidents at any given facility. The observations and corrective actions that develop from the AARs must be analyzed by the respective MP Battalion S-3 section, developed into a plan of action, shared with the other facilities, and implemented as a matter of policy.

12. (U) There must be significant structural improvements at each of the detention facilities. The needed changes include significant enhancement of perimeter lighting, additional chain link fencing, staking down of all concertina wire, hard site development, and expansion of Abu Ghraib (BCCF).

13. (U) The Geneva Conventions and the facility rules must be prominently displayed in English and the language of the detainees at each compound and encampment at every detention facility IAW AR 190-8.



14. (U) Further restrict US civilians and other contractors' access throughout the facility. Contractors and civilians must be in an authorized and easily identifiable uniform to be more easily distinguished from the masses of detainees in civilian clothes.

15. (U) Facilities must have a stop movement/transfer period of at least 1 hour prior to every 100% detainee roll call and ISN counts to ensure accurate accountability.

16. (U) The method for doing head counts of detainees within a given compound must be standardized.

17. (U) Those military units conducting I/R operations must know of, train on, and constantly reference the applicable Army Doctrine and CJTF command policies. The references provided in this report cover nearly every deficiency I have enumerated. Although they do not, and cannot, make up for leadership shortfalls, all soldiers, at all levels, can use them to maintain standardized operating procedures and efficient accountability practices.

# FINDINGS AND RECOMMENDATIONS
# (PART THREE)

## (U) Investigate the training, standards, employment, command policies, internal procedures, and command climate in the 800th MP Brigade, as appropriate:

Pursuant to Part Three of the Investigation, select members of the Investigation team (Primarily COL La Fate and I) personally interviewed the following witnesses:

1.  (U) BG Janis Karpinski, Commander, 800th MP Brigade

2.  (U) COL Thomas Pappas, Commander, 205th MI Brigade

3.  (U) COL Ralph Sabatino, CFLCC Judge Advocate, CPA Ministry of Justice (Interviewed by COL Richard Gordon, CFLCC SJA)

4.  (U) LTC Gary W. Maddocks, S-5 and Executive Officer, 800th MP Brigade

5.  (U) LTC James O'Hare, Command Judge Advocate, 800th MP Brigade

6.  (U) LTC Robert P. Walters Jr., Commander, 165th MI Battalion (Tactical Exploitation)

7.  (U) LTC James D. Edwards, Commander, 202nd MI Battalion

8.  (U) LTC Vincent Montera, Commander, 310th MP Battalion

9.  (U) LTC Steve Jordan, former Director, Joint Interrogation and Debriefing Center/LNO to the 205th MI Brigade

10. (U) LTC Leigh A. Coulter, Commander, 724th MP Battalion and OIC Arifjan Detachment, 800th MP Brigade

11. (U) LTC Dennis McGlone, Commander, 744th MP Battalion

12. (U) MAJ David Hinzman, S-1, 800th MP Brigade

13. (U) MAJ William D. Proietto, Deputy CJA, 800th MP Brigade

14. (U) MAJ Stacy L. Garrity, S-1 (FWD), 800th MP Brigade

15. (U) MAJ David W. DiNenna, S-3, 320th MP Battalion

34



16. (U) MAJ Michael Sheridan, XO, 320th MP Battalion

17. (U) MAJ Anthony Cavallaro, S-3, 800th MP Brigade

18. (U) CPT Marc C. Hale, Commander, 670th MP Company

19. (U) CPT Donald Reese, Commander, 372nd MP Company

20. (U) CPT Darren Hampton, Assistant S-3, 320th MP Battalion

21. (U) CPT John Kaires, S-3, 310th MP Battalion

22. (U) CPT Ed Diamantis, S-2, 800th MP Brigade

23. (U) CPT Marc C. Hale, Commander, 670th MP Company

24. (U) CPT Donald Reese, Commander, 372nd MP Company

25. (U) CPT James G. Jones, Commander, 229th MP Company

26. (U) CPT Michael Anthony Mastrangelo, Jr., Commander, 310th MP Company

27. (U) CPT Lawrence Bush, IG, 800th MP Brigade

28. (U) 1LT Lewis C. Raeder, Platoon Leader, 372nd MP Company

29. (U) 1LT Elvis Mabry, Aide-de-camp to Brigade Commander, 800th MP Brigade

30. (U) 1LT Warren E. Ford, II, Commander, HHC 320th MP Battalion

31. (U) 2LT David O. Sutton, Platoon Leader, 229th MP Company

32. (U) CW2 Edward J. Rivas, 205th MI Brigade

33. (U) CSM Joseph P. Arrington, Command Sergeant Major, 320th MP Battalion

34. (U) SGM Pascual Cartagena, Acting Command Sergeant Major, 800th MP Brigade

35. (U) CSM Timothy L. Woodcock, Command Sergeant Major, 310th MP Battalion

36. (U) 1SG Dawn J. Rippelmeyer, First Sergeant, 977th MP Company

37. (U) SGM Mark Emerson, Operations SGM, 320th MP Battalion

38. (U) MSG Brian G. Lipinski, First Sergeant, 372nd MP Company



39. (U) MSG Andrew J. Lombardo, Operations Sergeant, 310th MP Battalion

40. (U) SFC Daryl J. Plude, Platoon Sergeant, 229th MP Company

41. (U) SFC Shannon K. Snider, Platoon SGT, 372nd MP Company

42. (U) SFC Keith A. Comer, 372nd MP Company

43. (U) SSG Robert Elliot, Squad Leader, 372nd MP Company

44. (U) SSG Santos A. Cardona, Army Dog Handler, 42nd MP Detachment, 16th MP Brigade

45. (U) SGT Michael Smith, Army Dog Handler, 523rd MP Detachment, 937th Engineer Group

46. (U) MA1 William J. Kimbro, USN Dog Handler, NAS Signal and Canine Unit

47. (U) Mr. Steve Stephanowicz, US civilian Contract Interrogator, CACI, 205th MI Brigade

48. (U) Mr. John Israel, US civilian Contract Interpreter, Titan Corporation, 205th MI Brigade
(ANNEXES 45-91)


## REGARDING PART THREE OF THE INVESTIGATION, I MAKE THE FOLLOWING SPECIFIC FINDINGS OF FACT:

1. (U) I find that BG Janis Karpinski took command of the 800th MP Brigade on 30 June 2003 from BG Paul Hill. BG Karpinski has remained in command since that date. The 800th MP Brigade is comprised of eight MP battalions in the Iraqi TOR: 115th MP Battalion, 310th MP Battalion, 320th MP Battalion, 324th MP Battalion, 400th MP Battalion, 530th MP Battalion, 724th MP Battalion, and 744th MP Battalion. (ANNEXES 41 and 45)

2. (U) Prior to BG Karpinski taking command, members of the 800th MP Brigade believed they would be allowed to go home when all the detainees were released from the Camp Bucca Theater Internment Facility following the cessation of major ground combat on 1 May 2003. At one point, approximately 7,000 to 8,000 detainees were held at Camp Bucca. Through Article-5 Tribunals and a screening process, several thousand detainees were released. Many in the command believed they would go home when the detainees were released. In late May-early June 2003 the 800th MP Brigade was given a new mission to manage the Iraqi penal system and several detention centers. This new mission meant Soldiers would not redeploy to CONUS

36



when anticipated. Morale suffered, and over the next few months there did not appear to have been any attempt by the Command to mitigate this morale problem. **(ANNEXES 45 and 96)**

3. (U) There is abundant evidence in the statements of numerous witnesses that soldiers throughout the 800th MP Brigade were not proficient in their basic MOS skills, particularly regarding internment/resettlement operations. Moreover, there is no evidence that the command, although aware of these deficiencies, attempted to correct them in any systemic manner other than ad hoc training by individuals with civilian corrections experience. **(Multiple Witness Statements and the Personal Observations of the Investigation Team)**

4. (U) I find that the 800th MP Brigade was not adequately trained for a mission that included operating a prison or penal institution at Abu Ghraib Prison Complex. As the Ryder Assessment found, I also concur that units of the 800th MP Brigade did not receive corrections-specific training during their mobilization period. MP units did not receive pinpoint assignments prior to mobilization and during the post mobilization training, and thus could not train for specific missions. The training that was accomplished at the mobilization sites were developed and implemented at the company level with little or no direction or supervision at the Battalion and Brigade levels, and consisted primarily of common tasks and law enforcement training. However, I found no evidence that the Command, although aware of this deficiency, ever requested specific corrections training from the Commandant of the Military Police School, the US Army Confinement Facility at Mannheim, Germany, the Provost Marshal General of the Army, or the US Army Disciplinary Barracks at Fort Leavenworth, Kansas. **(ANNEXES 19 and 76)**

5. (U) I find that without adequate training for a civilian internee detention mission, Brigade personnel relied heavily on individuals within the Brigade who had civilian corrections experience, including many who worked as prison guards or corrections officials in their civilian jobs. Almost every witness we interviewed had no familiarity with the provisions of AR 190-8 or FM 3-19.40. It does not appear that a Mission Essential Task List (METL) based on in-theater missions was ever developed nor was a training plan implemented throughout the Brigade. **(ANNEXES 21, 22, 67, and 81)**

6. (U) I also find, as did MG Ryder's Team, that the 800th MP Brigade as a whole, was understrength for the mission for which it was tasked. Army Doctrine dictates that an I/R Brigade can be organized with between 7 and 21 battalions, and that the average battalion size element should be able to handle approximately 4000 detainees at a time. This investigation indicates that BG Karpinski and her staff did a poor job allocating resources throughout the Iraq JOA. Abu Ghraib (BCCF) normally housed between 6000 and 7000 detainees, yet it was operated by only one battalion. In contrast, the HVD Facility maintains only about 100 detainees, and is also run by an entire battalion. **(ANNEXES 19, 22, and 96)**

7. (U) Reserve Component units do not have an individual replacement system to mitigate medical or other losses. Over time, the 800th MP Brigade clearly suffered from personnel shortages through release from active duty (REFRAD) actions, medical evacuation, and demobilization. In addition to being severely undermanned, the quality of life for Soldiers assigned to Abu Ghraib (BCCF) was extremely poor. There was no DFAC, PX, barbershop, or MWR facilities. There were numerous mortar attacks, random rifle and RPG attacks, and a serious threat to Soldiers and detainees in the facility. The prison complex was also severely overcrowded and the Brigade lacked adequate resources and personnel to resolve serious logistical problems. Finally, because of past associations and familiarity of Soldiers within the Brigade, it appears that friendship often took precedence over appropriate leader and subordinate relationships. **(ANNEX 101, Multiple Witness Statements, and the Personal Observations of the Investigation Team)**

8. (U) With respect to the 800th MP Brigade mission at Abu Ghraib (BCCF), I find that there was clear friction and lack of effective communication between the Commander, 205th MI Brigade, who controlled FOB Abu Ghraib (BCCF) after 19 November 2003, and the Commander, 800th MP Brigade, who controlled detainee operations inside the FOB. There was no clear delineation of responsibility between commands, little coordination at the command level, and no integration of the two functions. Coordination occurred at the lowest possible levels with little oversight by commanders. **(ANNEXES 31, 45, and 46)**

9. (U) I find that this ambiguous command relationship was exacerbated by a CJTF-7 Fragmentary Order (FRAGO) 1108 issued on 19 November 2003. Paragraph 3.C.8, Assignment of 205th MI Brigade Commander's Responsibilities for the Baghdad Central Confinement Facility, states as follows:

> **3.C.8. A. (U) 205 MI BRIGADE.**
>
> **3.C.8. A. 1. (U) EFFECTIVE IMMEDIATELY COMMANDER 205 MI BRIGADE ASSUMES RESPONSIBILITY FOR THE BAGHDAD CONFINEMENT FACILITY (BCCF) AND IS APPOINTED THE FOB COMMANDER. UNITS CURRENTLY AT ABU GHRAIB (BCCF) ARE TACON TO 205 MI BRIGADE FOR "SECURITY OF DETAINEES AND FOB PROTECTION."**

Although not supported by BG Karpinski, FRAGO 1108 made all of the MP units at Abu Ghraib TACON to the Commander, 205th MI Brigade. This effectively made an MI Officer, rather than an MP Officer, responsible for the MP units conducting detainee operations at that facility. This is not doctrinally sound due to the different missions and agendas assigned to each of these respective specialties. **(ANNEX 31)**

10 (U) Joint Publication 0-2, Unified Action Armed Forces (UNAAF), 10 July 2001 defines Tactical Control (TACON) as the detailed direction and control of movements or maneuvers within the operational area necessary to accomplish assigned missions or tasks. **(ANNEX 42)**

> **"TACON is the command authority over assigned or attached forces or commands or military capability made available for tasking that is limited to the detailed direction and control of movements or maneuvers within the operational area necessary to accomplish assigned missions or tasks. TACON is inherent in OPCON and may be delegated to and exercised by commanders at any echelon at or below the level of combatant commander."**

11. (U) Based on all the facts and circumstances in this investigation, I find that there was little, if any, recognition of this TACON Order by the 800th MP Brigade or the 205th MI Brigade. Further, there was no evidence if the Commander, 205th MI Brigade clearly informed the Commander, 800th MP Brigade, and specifically the Commander, 320th MP Battalion assigned at Abu Ghraib (BCCF), on the specific requirements of this TACON relationship. **(ANNEXES 45 and 46)**

12. (U) It is clear from a comprehensive review of witness statements and personal interviews that the 320th MP Battalion and 800th MP Brigade continued to function as if they were responsible for the security, health and welfare, and overall security of detainees within Abu Ghraib (BCCF) prison. Both BG Karpinski and COL Pappas clearly behaved as if this were still the case. **(ANNEXES 45 and 46)**

13. (U) With respect to the 320th MP Battalion, I find that the Battalion Commander, LTC (P) Jerry Phillabaum, was an extremely ineffective commander and leader. Numerous witnesses confirm that the Battalion S-3, MAJ David W. DiNenna, basically ran the battalion on a day-to-day basis. At one point, BG Karpinski sent LTC (P) Phillabaum to Camp Arifjan, Kuwait for approximately two weeks, apparently to give him some relief from the pressure he was experiencing as the 320th Battalion Commander. This movement to Camp Arifjan immediately followed a briefing provided by LTC (P) Phillabaum to the CJTF-7 Commander, LTG Sanchez, near the end of October 2003. BG Karpinski placed LTC Ronald Chew, Commander of the 115th MP Battalion, in charge of the 320th MP Battalion for a period of approximately two weeks. LTC Chew was also in command of the 115th MP Battalion assigned to Camp Cropper, BIAP, Iraq. I could find no orders, either suspending or relieving LTC (P) Phillabaum from command, nor any orders placing LTC Chew in command of the 320th. In addition, there was no indication this removal and search for a replacement was communicated to the Commander CJTF-7, the Commander 377th TSC, or to Soldiers in the 320th MP Battalion. Temporarily removing one commander and replacing him with another serving Battalion Commander without an order and without notifying superior or subordinate commands is without precedent in my military career. LTC (P) Phillabaum was also reprimanded for lapses in accountability that resulted in several escapes. The 320th MP Battalion was stigmatized as a unit due to previous detainee abuse which

occurred in May 2003 at the Bucca Theater Internment Facility (TIF), while under the command of LTC (P) Phillabaum.  Despite his proven deficiencies as both a commander and leader, BG Karpinski allowed LTC (P) Phillabaum to remain in command of her most troubled battalion guarding, by far, the largest number of detainees in the 800th MP Brigade.  LTC (P) Phillabaum was suspended from his duties by LTG Sanchez, CJTF-7 Commander on 17 January 2004. **(ANNEXES 43, 45, and 61)**

14. (U) During the course of this investigation I conducted a lengthy interview with BG Karpinski that lasted over four hours, and is included verbatim in the investigation Annexes.  BG Karpinski was extremely emotional during much of her testimony.  What I found particularly disturbing in her testimony was her complete unwillingness to either understand or accept that many of the problems inherent in the 800th MP Brigade were caused or exacerbated by poor leadership and the refusal of her command to both establish and enforce basic standards and principles among its soldiers.  **(ANNEX 45 and the Personal Observations of the Interview Team)**

15. (U) BG Karpinski alleged that she received no help from the Civil Affairs Command, specifically, no assistance from either BG John Kern or COL Tim Regan.  She blames much of the abuse that occurred in Abu Ghraib (BCCF) on MI personnel and stated that MI personnel had given the MPs "ideas" that led to detainee abuse.  In addition, she blamed the 372nd Company Platoon Sergeant, SFC Snider, the Company Commander, CPT Reese, and the First Sergeant, MSG Lipinski, for the abuse.  She argued that problems in Abu Ghraib were the fault of COL Pappas and LTC Jordan because COL Pappas was in charge of FOB Abu Ghraib.  **(ANNEX 45)**

16. (U) BG Karpinski also implied during her testimony that the criminal abuses that occurred at Abu Ghraib (BCCF) might have been caused by the ultimate disposition of the detainee abuse cases that originally occurred at Camp Bucca in May 2003.  She stated that **"about the same time those incidents were taking place out of Baghdad Central, the decisions were made to give the guilty people at Bucca plea bargains.  So, the system communicated to the soldiers, the worst that's gonna happen is, you're gonna go home."**  I think it important to point out that almost every witness testified that the serious criminal abuse of detainees at Abu Ghraib (BCCF) occurred in late October and early November 2003.  The photographs and statements clearly support that the abuses occurred during this time period.  The Bucca cases were set for trial in January 2004 and were not finally disposed of until 29 December 2003.  There is entirely no evidence that the decision of numerous MP personnel to intentionally abuse detainees at Abu Ghrabid (BCCF) was influenced in any respect by the Camp Bucca cases.  **(ANNEXES 25, 26, and 45)**

17. (U) Numerous witnesses stated that the 800th MP Brigade S-1, MAJ Hinzman and S-4, MAJ Green, were essentially dysfunctional, but that despite numerous complaints, these officers were not replaced.  This had a detrimental effect on the Brigade Staff's effectiveness and morale.  Moreover, the Brigade Command Judge Advocate, LTC James O'Hare, appears to lack initiative and was unwilling to accept responsibility

40

for any of his actions.   LTC Gary Maddocks, the Brigade XO did not properly supervise the Brigade staff by failing to lay out staff priorities, take overt corrective action when needed, and supervise their daily functions.  **(ANNEXES 45, 47, 48, 62, and 67)**

18.  (U) In addition to poor morale and staff inefficiencies, I find that the 800th MP Brigade did not articulate or enforce clear and basic Soldier and Army standards.  I specifically found these examples of unenforced standards:

    a.  There was no clear uniform standard for any MP Soldiers assigned detention duties.  Despite the fact that hundreds of former Iraqi soldiers and officers were detainees, MP personnel were allowed to wear civilian clothes in the FOB after duty hours while carrying weapons.  **(ANNEXES 51 and 74)**

    b.  Some Soldiers wrote poems and other sayings on their helmets and soft caps.  **(ANNEXES 51 and 74)**

    c.  In addition, numerous officers and senior NCOs have been reprimanded/disciplined for misconduct during this period.  Those disciplined include;  **(ANNEXES 43 and 102)**

        1).  (U) BG Janis Karpinski, Commander, 800th MP Brigade
          • Memorandum of Admonishment by LTG Sanchez, Commander, CJTF-7, on 17 January 2004.

        2).  (U) LTC (P) Jerry Phillabaum, Commander, 320th MP Battalion
          • GOMOR from BG Karpinski, Commander 800th MP Brigade, on 10 November 2003, for lack of leadership and for failing to take corrective security measures as ordered by the Brigade Commander; filed locally
          • Suspended by BG Karpinski, Commander 800th MP Brigade, 17 January 2004; Pending Relief for Cause, for dereliction of duty

        3).  (U) LTC Dale Burtyk, Commander, 400th MP Battalion
          • GOMOR from BG Karpinski, Commander 800th MP Brigade, on 20 August 2003, for failure to properly train his Soldiers. (Soldier had negligent discharge of M-16 while exiting his vehicle, round went into fuel tank); filed locally.

        4).  (U) MAJ David DiNenna, S-3, 320th MP Battalion
          • GOMOR from LTG McKiernan, Commander CFLCC, on 25 May 2003, for dereliction of duty for failing to report a violation of CENTCOM General Order #1 by a subordinate Field Grade Officer and Senior Noncommissioned Officer, which he personally observed; returned to soldier unfiled.



- GOMOR from BG Karpinski, Commander 800th MP Brigade, on 10 November 03, for failing to take corrective security measures as ordered by the Brigade Commander; filed locally.

5). (U) MAJ Stacy Garrity, Finance Officer, 800th MP Brigade
   - GOMOR from LTG McKiernan, Commander CFLCC, on 25 May 2003, for violation of CENTCOM General Order #1, consuming alcohol with an NCO; filed locally.

6). (U) CPT Leo Merck, Commander, 870th MP Company
   - Court-Martial Charges Preferred, for Conduct Unbecoming an Officer and Unauthorized Use of Government Computer in that he was alleged to have taken nude pictures of his female Soldiers without their knowledge; Trial date to be announced.

7). (U) CPT Damaris Morales, Commander, 770th MP Company
   - GOMOR from BG Karpinski, Commander 800th MP Brigade, on 20 August 2003, for failing to properly train his Soldiers (Soldier had negligent discharge of M-16 while exiting his vehicle, round went into fuel tank); filed locally.

8). (U) CSM Roy Clement, Command Sergeant Major, 800th MP Brigade
   - GOMOR and Relief for Cause from BG Janis Karpinski, Commander 800th MP Brigade, for fraternization and dereliction of duty for fraternizing with junior enlisted soldiers within his unit; GOMOR officially filed and he was removed from the CSM list.

9). (U) CSM Edward Stotts, Command Sergeant Major, 400th MP Battalion
   - GOMOR from BG Karpinski, Commander 800th MP Brigade, on 20 August 2003, for failing to properly train his Soldiers (Soldier had negligent discharge of M-16 while exiting his vehicle, round went into fuel tank); filed locally

10). (U) 1SG Carlos Villanueva, First Sergeant, 770th MP Company
   - GOMOR from BG Karpinski, Commander 800th MP Brigade, on 20 August 2003, for failing to properly train his Soldiers (Soldier had negligent discharge of M-16 while exiting his vehicle, round went into fuel tank); filed locally.

11). (U) MSG David Maffett, NBC NCO, 800th MP Brigade,
   - GOMOR from LTG McKiernan, Commander CFLCC, on 25 May 2003, for violation of CENTCOM General Order #1, consuming alcohol; filed locally.



12) (U) SGM Marc Emerson, Operations SGM, 320th MP Battalion,
- Two GO Letters of Concern and a verbal reprimand from BG Karpinski, Commander 800th MP Brigade, for failing to adhere to the guidance/directives given to him by BG Karpinski; filed locally.

d. (U) Saluting of officers was sporadic and not enforced.  LTC Robert P. Walters, Jr., Commander of the 165th Military Intelligence Battalion (Tactical Exploitation), testified that the saluting policy was enforced by COL Pappas for all MI personnel, and that BG Karpinski approached COL Pappas to reverse the saluting policy back to a no-saluting policy as previously existed. **(ANNEX 53)**

19. (U) I find that individual Soldiers within the 800th MP Brigade and the 320th Battalion stationed throughout Iraq had very little contact during their tour of duty with either LTC (P) Phillabaum or BG Karpinski.  BG Karpinski claimed, during her testimony, that she paid regular visits to the various detention facilities where her Soldiers were stationed.  However, the detailed calendar provided by her Aide-de-Camp, 1LT Mabry, does not support her contention.  Moreover, numerous witnesses stated that they rarely saw BG Karpinski or LTC (P) Phillabaum.  **(Multiple Witness Statements)**

20. (U) In addition I find that psychological factors, such as the difference in culture, the Soldiers' quality of life, the real presence of mortal danger over an extended time period, and the failure of commanders to recognize these pressures contributed to the perversive atmosphere that existed at Abu Ghraib (BCCF) Detention Facility and throughout the 800th MP Brigade.  **(ANNEX 1)**.

21. As I have documented in other parts of this investigation, I find that there was no clear emphasis by BG Karpinski to ensure that the 800th MP Brigade Staff, Commanders, and Soldiers were trained to standard in detainee operations and proficiency or that serious accountability lapses that occurred over a significant period of time, particularly at Abu Ghraib (BCCF), were corrected.  AR 15-6 Investigations regarding detainee escapes were not acted upon, followed up with corrective action, or disseminated to subordinate commanders or Soldiers.  Brigade and unit SOPs for dealing with detainees if they existed at all, were not read or understood by MP Soldiers assigned the difficult mission of detainee operations.  Following the abuse of several detainees at Camp Bucca in May 2003, I could find no evidence that BG Karpinski ever directed corrective training for her soldiers or ensured that MP Soldiers throughout Iraq clearly understood the requirements of the Geneva Conventions relating to the treatment of detainees.  **(Multiple Witness Statements and the Personal Observations of the Investigation Team )**

22. On 17 January 2004 BG Karpinski was formally admonished in writing by LTG Sanchez regarding the serious deficiencies in her Brigade. LTG Sanchez found that the performance of the 800th MP Brigade had not met the standards set by the Army or by CJTF-7. He found that incidents in the preceding six months had occurred that reflected a lack of clear standards, proficiency and leadership within the Brigade. LTG Sanchez also cited the recent detainee abuse at Abu Ghraib (BCCF) as the most recent example of a poor leadership climate that "permeates the Brigade." I totally concur with LTG Sanchez' opinion regarding the performance of BG Karpinski and the 800th MP Brigade. (**ANNEX 102 and the Personal Observations of the Investigating Officer**)

## RECOMMENDATIONS AS TO PART THREE OF THE INVESTIGATION:

1. (U) That **BG Janis L. Karpinski, Commander, 800th MP Brigade** be Relieved from Command and given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:
    - Failing to ensure that MP Soldiers at theater-level detention facilities throughout Iraq had appropriate SOPs for dealing with detainees and that Commanders and Soldiers had read, understood, and would adhere to these SOPs.
    - Failing to ensure that MP Soldiers in the 800th MP Brigade knew, understood, and adhered to the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
    - Making material misrepresentations to the Investigation Team as to the frequency of her visits to her subordinate commands.
    - Failing to obey an order from the CFLCC Commander, LTG McKiernan, regarding the withholding of disciplinary authority for Officer and Senior Noncommissioned Officer misconduct.
    - Failing to take appropriate action regarding the ineffectiveness of a subordinate Commander, LTC (P) Jerry Phillabaum.
    - Failing to take appropriate action regarding the ineffectiveness of numerous members of her Brigade Staff including her XO, S-1, S-3, and S-4.
    - Failing to properly ensure the results and recommendations of the AARs and numerous 15-6 Investigation reports on escapes and shootings (over a period of several months) were properly disseminated to, and understood by, subordinate commanders.
    - Failing to ensure and enforce basic Soldier standards throughout her command.
    - Failing to establish a Brigade METL.
    - Failing to establish basic proficiency in assigned tasks for Soldiers throughout the 800th MP Brigade.



- Failing to ensure that numerous and reported accountability lapses at detention facilities throughout Iraq were corrected.

2. (U) That **COL Thomas M. Pappas, Commander, 205th MI Brigade,** be given a General Officer Memorandum of Reprimand and Investigated UP Procedure 15, AR 381-10, US Army Intelligence Activities for the following acts which have been previously referred to in the aforementioned findings:
   - Failing to ensure that Soldiers under his direct command were properly trained in and followed the IROE.
   - Failing to ensure that Soldiers under his direct command knew, understood, and followed the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
   - Failing to properly supervise his soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).

3. (U) That **LTC (P) Jerry L. Phillabaum, Commander, 320th MP Battalion,** be Relieved from Command, be given a General Officer Memorandum of Reprimand, and be removed from the Colonel/O-6 Promotion List for the following acts which have been previously referred to in the aforementioned findings:
   - Failing to properly ensure the results, recommendations, and AARs from numerous reports on escapes and shootings over a period of several months were properly disseminated to, and understood by, subordinates.
   - Failing to implement the appropriate recommendations from various 15-6 Investigations as specifically directed by BG Karpinski.
   - Failing to ensure that Soldiers under his direct command were properly trained in Internment and Resettlement Operations.
   - Failing to ensure that Soldiers under his direct command knew and understood the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
   - Failing to properly supervise his soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).
   - Failing to properly establish and enforce basic soldier standards, proficiency, and accountability.
   - Failure to conduct an appropriate Mission Analysis and to task organize to accomplish his mission.

4. (U) That **LTC Steven L. Jordan, Former Director, Joint Interrogation and Debriefing Center and Liaison Officer to 205th Military Intelligence Brigade,** be relieved from duty and be given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:
   - Making material misrepresentations to the Investigating Team, including his leadership roll at Abu Ghraib (BCCF).
   - Failing to ensure that Soldiers under his direct control were properly trained in and followed the IROE.

- Failing to ensure that Soldiers under his direct control knew, understood, and followed the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
- Failing to properly supervise soldiers under his direct authority working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).

5. (U) That **MAJ David W. DiNenna, Sr., S-3, 320th MP Battalion,** be Relieved from his position as the Battalion S-3 and be given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:

- Received a GOMOR from LTG McKiernan, Commander CFLCC, on 25 May 2003, for dereliction of duty for failing to report a violation of CENTCOM General Order #1 by a subordinate Field Grade Officer and Senior Noncommissioned Officer, which he personally observed; GOMOR was returned to Soldier and not filed.
- Failing to take corrective action and implement recommendations from various 15-6 investigations even after receiving a GOMOR from BG Karpinski, Commander 800th MP Brigade, on 10 November 03, for failing to take corrective security measures as ordered; GOMOR was filed locally.
- Failing to take appropriate action and report an incident of detainee abuse, whereby he personally witnessed a Soldier throw a detainee from the back of a truck.

6. (U) That **CPT Donald J. Reese, Commander, 372nd MP Company,** be Relieved from Command and be given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:

- Failing to ensure that Soldiers under his direct command knew and understood the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
- Failing to properly supervise his Soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).
- Failing to properly establish and enforce basic soldier standards, proficiency, and accountability.
- Failing to ensure that Soldiers under his direct command were properly trained in Internment and Resettlement Operations.

7. (U) That **1LT Lewis C. Raeder, Platoon Leader, 372nd MP Company,** be Relieved from his duties as Platoon Leader and be given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:

- Failing to ensure that Soldiers under his direct command knew and understood the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
- Failing to properly supervise his soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).
- Failing to properly establish and enforce basic Soldier standards, proficiency, and accountability.

46



- Failing to ensure that Soldiers under his direct command were properly trained in Internment and Resettlement Operations.

8. (U) That **SGM Marc Emerson, Operations SGM, 320th MP Battalion,** be Relieved from his duties and given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:
   - Making a material misrepresentation to the Investigation Team stating that he had "never" been admonished or reprimanded by BG Karpinski, when in fact he had been admonished for failing to obey an order from BG Karpinski to "stay out of the towers" at the holding facility.
   - Making a material misrepresentation to the Investigation Team stating that he had attended every shift change/guard-mount conducted at the 320th MP Battalion, and that he personally briefed his Soldiers on the proper treatment of detainees, when in fact numerous statements contradict this assertion.
   - Failing to ensure that Soldiers in the 320th MP Battalion knew and understood the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
   - Failing to properly supervise his soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).
   - Failing to properly establish and enforce basic soldier standards, proficiency, and accountability.
   - Failing to ensure that his Soldiers were properly trained in Internment and Resettlement Operations.

9. (U) That **1SG Brian G. Lipinski, First Sergeant, 372nd MP Company,** be Relieved from his duties as First Sergeant of the 372nd MP Company and given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:
   - Failing to ensure that Soldiers in the 372nd MP Company knew and understood the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
   - Failing to properly supervise his soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).
   - Failing to properly establish and enforce basic soldier standards, proficiency, and accountability.
   - Failing to ensure that his Soldiers were properly trained in Internment and Resettlement Operations.

10. (U) That **SFC Shannon K. Snider, Platoon Sergeant, 372nd MP Company,** be Relieved from his duties, receive a General Officer Memorandum of Reprimand, and receive action under the Uniform Code of Military Justice for the following acts which have been previously referred to in the aforementioned findings:
   - Failing to ensure that Soldiers in his platoon knew and understood the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.

47



- Failing to properly supervise his soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).
- Failing to properly establish and enforce basic soldier standards, proficiency, and accountability.
- Failing to ensure that his Soldiers were properly trained in Internment and Resettlement Operations.
- Failing to report a Soldier, who under his direct control, abused detainees by stomping on their bare hands and feet in his presence.

11. (U) That **Mr. Steven Stephanowicz, Contract US Civilian Interrogator, CACI, 205th Military Intelligence Brigade**, be given an Official Reprimand to be placed in his employment file, termination of employment, and generation of a derogatory report to revoke his security clearance for the following acts which have been previously referred to in the aforementioned findings:
- Made a false statement to the investigation team regarding the locations of his interrogations, the activities during his interrogations, and his knowledge of abuses.
- Allowed and/or instructed MPs, who were not trained in interrogation techniques, to facilitate interrogations by "setting conditions" which were neither authorized and in accordance with applicable regulations/policy. He clearly knew his instructions equated to physical abuse.

12. (U) **That Mr. John Israel, Contract US Civilian Interpreter, CACI, 205th Military Intelligence Brigade,** be given an Official Reprimand to be placed in his employment file and have his security clearance reviewed by competent authority for the following acts or concerns which have been previously referred to in the aforementioned findings:
- Denied ever having seen interrogation processes in violation of the IROE, which is contrary to several witness statements.
- Did not have a security clearance.

13. (U) I find that there is sufficient credible information to warrant an Inquiry UP Procedure 15, AR 381-10, US Army Intelligence Activities, be conducted to determine the extent of culpability of MI personnel, assigned to the 205th MI Brigade and the Joint Interrogation and Debriefing Center (JIDC) at Abu Ghraib (BCCF). Specifically, I suspect that **COL Thomas M. Pappas, LTC Steve L. Jordan, Mr. Steven Stephanowicz,** and **Mr. John Israel** were either directly or indirectly responsible for the abuses at Abu Ghraib (BCCF) and strongly recommend immediate disciplinary action as described in the preceding paragraphs as well as the initiation of a Procedure 15 Inquiry to determine the full extent of their culpability. **(ANNEX 36)**

# OTHER FINDINGS/OBSERVATIONS

1. (U) Due to the nature and scope of this investigation, I acquired the assistance of Col (Dr.) Henry Nelson, a USAF Psychiatrist, to analyze the investigation materials from a psychological perspective. He determined that there was evidence that the horrific

abuses suffered by the detainees at Abu Ghraib (BCCF) were wanton acts of select soldiers in an unsupervised and dangerous setting. There was a complex interplay of many psychological factors and command insufficiencies. A more detailed analysis is contained in **ANNEX 1** of this investigation.

2. (U) During the course of this investigation I conducted a lengthy interview with BG Karpinski that lasted over four hours, and is included verbatim in the investigation Annexes. BG Karpinski was extremely emotional during much of her testimony. What I found particularly disturbing in her testimony was her complete unwillingness to either understand or accept that many of the problems inherent in the 800th MP Brigade were caused or exacerbated by poor leadership and the refusal of her command to both establish and enforce basic standards and principles among its Soldiers. **(ANNEX 45)**

3. (U) Throughout the investigation, we observed many individual Soldiers and some subordinate units under the 800th MP Brigade that overcame significant obstacles, persevered in extremely poor conditions, and upheld the Army Values. We discovered numerous examples of Soldiers and Sailors taking the initiative in the absence of leadership and accomplishing their assigned tasks.

    a. (U) The 744th MP Battalion, commanded by LTC Dennis McGlone, efficiently operated the HVD Detention Facility at Camp Cropper and met mission requirements with little to no guidance from the 800th MP Brigade. The unit was disciplined, proficient, and appeared to understand their basic tasks.

    b. (U) The 530th MP Battalion, commanded by LTC Stephen J. Novotny, effectively maintained the MEK Detention Facility at Camp Ashraf. His Soldiers were proficient in their individual tasks and adapted well to this highly unique and non-doctrinal operation.

    c. (U) The 165th MI Battalion excelled in providing perimeter security and force protection at Abu Ghraib (BCCF). LTC Robert P. Walters, Jr., demanded standards be enforced and worked endlessly to improve discipline throughout the FOB.

4. (U) The individual Soldiers and Sailors that we observed and believe should be favorably noted include:

    a. (U) Master-at-Arms First Class William J. Kimbro, US Navy Dog Handler, knew his duties and refused to participate in improper interrogations despite significant pressure from the MI personnel at Abu Ghraib.

    b. (U) SPC Joseph M. Darby, 372nd MP Company discovered evidence of abuse and turned it over to military law enforcement.

    c. (U) 1LT David O. Sutton, 229th MP Company, took immediate action and stopped an abuse, then reported the incident to the chain of command.

# CONCLUSION

1. (U) Several US Army Soldiers have committed egregious acts and grave breaches of international law at Abu Ghraib/BCCF and Camp Bucca, Iraq.  Furthermore, key senior leaders in both the 800th MP Brigade and the 205th MI Brigade failed to comply with established regulations, policies, and command directives in preventing detainee abuses at Abu Ghraib (BCCF) and at Camp Bucca during the period August 2003 to February 2004.

2. (U) Approval and implementation of the recommendations of this AR 15-6 Investigation and those highlighted in previous assessments are essential to establish the conditions with the resources and personnel required to prevent future occurrences of detainee abuse.

# Annexes

1. Psychological Assessment
2. Request for investigation from CJTF-7 to CENTCOM
3. Directive to CFLCC from CENTCOM directing investigation
4. Appointment Memo from CFLCC CDR to MG Taguba
5. 15-6 Investigation 9 June 2003
6. 15-6 Investigation 12 June 2003
7. 15-6 Investigation 13 June 2003
8. 15-6 Investigation 24 November 2003
9. 15-6 Investigation 7 January 2004
10. 15-6 Investigation 12 January 2004
11. SIR 5 November 2003
12. SIR 7 November 2003
13. SIR 8 November 2003
14. SIR 13 December 2003
15. SIR 13 December 2003
16. SIR 13 December 2003
17. SIR 17 December 2003
18. Commander's Inquiry 26 January 2004
19. MG Ryder's Report, 6 November 2003
20. MG Miller's Report, 9 September 2003
21. AR 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees, and Other Detainees, 1 October 1997
22. FM 3-19.40, Military Police Internment/Resettlement Operations, 1 August 2001
23. FM 34-52, Intelligence Interrogation, 28 September 1992
24. Fourth Geneva Convention, 12 August 1949
25. CID Report on criminal abuses at Abu Ghraib, 28 January 2004
26. CID Interviews, 10-25 January 2004
27. 800th MP Brigade Roster, 29 January 2004
28. 205th MI Brigade's IROE, Undated
29. TOA Order (800th MP Brigade) and letter holding witnesses
30. Investigation Team's witness list
31. FRAGO #1108
32. Letters suspending several key leaders in the 800th MP Brigade and Rating Chain with suspensions annotated
33. FM 27-10, Military Justice, 6 September 2002
34. CID Report on abuse of detainees at Camp Bucca, 8 June 2003
35. Article 32 Findings on abuse of detainees at Camp Bucca, 26 August 2003
36. AR 381-10, 1 July 1984
37. Excerpts from log books, 320th MP Battalion
38. 310th MP Battalion's Inprocessing SOP
39. 320th MP Battalion's "Change Sheet"
40. Joint Interrogation and Debriefing Center's (JIDC) Slides, Undated
41. Order of Battle Slides, 12 January 2004
42. Joint Publication 0-2, Unified Actions Armed Forces, 10 July 2001

43. General Officer Memorandums of Reprimand
44. 800th MP Battalion's TACSOP
45. BG Janis Karpinski, Commander, 800th MP Brigade
46. COL Thomas Pappas, Commander, 205th MI Brigade
47. COL Ralph Sabatino, CFLCC Judge Advocate, CPA Ministry of Justice
48. LTC Gary W. Maddocks, S-5 and Executive Officer, 800th MP Brigade
49. LTC James O'Hare, Command Judge Advocate, 800th MP Brigade
50. LTC Robert P. Walters Jr., Commander, 165th MI Battalion (Tactical exploitation)
51. LTC James D. Edwards, Commander, 202nd MI Battalion
52. LTC Vincent Montera, Commander 310th MP Battalion
53. LTC Steve Jordan, former Director, Joint Interrogation and Debriefing Center/LNO to the 205th MI Brigade
54. LTC Leigh A. Coulter, Commander 724th MP Battalion and OIC Arifjan Detachment, 800th MP Brigade
55. LTC Dennis McGlone, Commander, 744th MP Battalion
56. MAJ David Hinzman, S-1, 800th MP Brigade
57. MAJ William D. Proietto, Deputy CJA, 800th MP Brigade
58. MAJ Stacy L. Garrity, S-1 (FWD), 800th MP Brigade
59. MAJ David W. DiNenna, S-3, 320th MP Battalion
60. MAJ Michael Sheridan, XO, 320th MP Battalion
61. MAJ Anthony Cavallaro, S-3, 800th MP Brigade
62. CPT Marc C. Hale, Commander, 670th MP Company
63. CPT Donald Reese, Commander, 372nd MP Company
64. CPT Darren Hampton, Assistant S-3, 320th MP Battalion
65. CPT John Kaires, S-3, 310th MP Battalion
66. CPT Ed Diamantis, S-2, 800th MP Brigade
67. LTC Jerry L. Phillabaum, Commander, 320th MP Battalion
68. CPT James G. Jones, Commander, 229th MP Company
69. CPT Michael A. Mastrangelo, Jr., Commander, 310th MP Company
70. CPT Lawrence Bush, IG, 800th MP Brigade
71. 1LT Lewis C. Raeder, Platoon Leader, 372nd MP Company
72. 1LT Elvis Mabry, Aide-de-Camp to Brigade Commander, 800th MP Brigade
73. 1LT Warren E. Ford, II, Commander, HHC 320th MP Battalion
74. 2LT David O. Sutton, Platoon Leader, 229th MP Company
75. CW2 Edward J. Rivas, 205th MI Brigade
76. CSM Joseph P. Arrison, Command Sergeant Major, 320th MP Battalion
77. SGM Pascual Cartagena, Command Sergeant Major, 800th MP Brigade
78. CSM Timothy L. Woodcock, Command Sergeant Major, 310th MP Battalion
79. 1SG Dawn J. Rippelmeyer, First Sergeant, 977th MP Company
80. SGM Mark Emerson, Operations SGM, 320th MP Battalion
81. MSG Brian G. Lipinski, First Sergeant, 372nd MP Company
82. MSG Andrew J. Lombardo, Operations Sergeant, 310th MP Battalion
83. SFC Daryl J. Plude, Platoon Sergeant, 229th MP Company
84. SFC Shannon K. Snider, Platoon SGT, 372nd MP Company
85. SFC Keith A. Comer, 372nd MP Company



86. SSG Robert Elliot, Squad Leader, 372nd MP Company
87. SSG Santos A. Cardona, Army Dog Handler
88. SGT Michael Smith, Army Dog Handler
89. MA1 William J. Kimbro, USN Dog Handler
90. Mr. Steve Stephanowicz, US civilian contract Interrogator, CACI, 205th MI Brigade
91. Mr. John Israel, US civilian contract Interpreter, Titan Corporation, 205th MI Brigade
92. FM 3-19.1, Military Police Operations, 22 March 2001
93. CJTF-7 IROE and DROE, Undated
94. CJTF-7 Interrogation and Counter Resistance Policy, 12 October 2003
95. 800th MP Brigade Mobilization Orders
96. Sample Detainee Status Report, 13 March 2004
97. 530th MP Battalion Mission Brief, 11 February 2004
98. Memorandum for Record, CPT Ed Ray, Chief of Military Justice, CFLCC, 9 March 2004
99. SIR 14 January 2004
100. Accountability Plan Recommendations, 9 March 2004
101. 2LT Michael R. Osterhout, S-2, 320th MP Battalion
102. Memorandum of Admonishment from LTG Sanchez to BG Karpinski, 17 January 2004
103. Various SIRs from the 800th MP Brigade/320th MP Battalion
104. 205th MI Brigade SITREP to MG Miller, 12 December 2003
105. SGT William A. Cathcart, 372nd MP Company
106. 1LT Michael A. Drayton, Commander, 870th MP Company

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**
SAMI ABBAS AL RAWI; MWAFAQ SAMI ABBAS AL RAWI; AHMED; ISMAEL; NEISEF; ESTATE OF IBRAHIM; RASHEED; JOHN DOE NO. 1; JANE DOE NO. 2; A CLASS OF PERSONS SIMILARLY SITUATED, KNOWN HEREINAFTER AS JOHN and JANE DOES NOS. 3 – 1050

(b) COUNTY OF RESIDENCE OF FIRST LISTED   Bhagdad, Iraq
PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**                                          04 JUN -9 AM 8:36

TITAN CORPORATION, a Delaware Corporation; ADEL NAHKLA; CACI INTERNATIONAL INC., a Delaware Corporation; CACI INCORPORATED-FEDERAL, a Delaware Corporation; CACI N.V., a Netherlands Corporation; STEPHEN A. STEPHANOWICZ, JOHN B. ISRAEL      SAN DIEGO CA

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)          BY:              DEPUTY

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
See attached

**ATTORNEYS (IF KNOWN)**          BY FACSIMILE
See attached   04 CV 1143      R (NLS)

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

- 1 U.S. Government Plaintiff
- X 3 Federal Question (U.S. Government Not a Party)
- 2 U.S. Government Defendant
- 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | X 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | X 3 | 3 | Foreign Nation | 6 | 6 |

## IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

18: 1961   SD

Defendants violated and conspired to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-68, violated the Alien Tort Claims Act, 28 U.S.C. 1350, violated the Religous Land Use and Institutionalized Persons Act, 24 U.S.C. § 2000cc-1, violated the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, committed common law torts, and violated laws governing contracting with the United States   Diversity jurisdiction exists under 28 U.S.C. § 1332.

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | PERSONAL INJURY | PERSONAL INJURY | | 422 Appeal 28 USC 158 | 400 State Reapportionment |
| 110 Insurance | 310 Airplane | 362 Personal Injury-Medical Malpractice | 610 Agriculture | 423 Withdrawal 28 USC 157 | 410 Antitrust |
| 120 Marine | 315 Airplane Product Liability | | 620 Other Food & Drug | PROPERTY RIGHTS | 430 Banks and Banking |
| 130 Miller Act | 320 Assault, Libel & Slander | 365 Personal Injury-Product Liability | 625 Drug Related Seizure of Property 21 USC881 | 820 Copyrights | 450 Commerce/ICC Rates/etc. |
| 140 Negotiable Instrument | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 630 Liquor Laws | 830 Patent | 460 Deportation |
| 150 Recovery of Overpayment &Enforcement of Judgment | 340 Marine | | 640 RR & Truck | 840 Trademark | 470 Racketeer Influenced and Corrupt Organizations |
| 151 Medicare Act | 345 Marine Product Liability | PERSONAL PROPERTY | 650 Airline Regs | SOCIAL SECURITY | 810 Selective Service |
| 152 Recovery of Defaulted Student Loans (Excl. Veterans) | 350 Motor Vehicle | 370 Other Fraud | 660 Occupational Safety/Health | 861 HIA (1395ff) | 850 Securities/Commodities Exchange |
| 153 Recovery of Overpayment of Veterans Benefits | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 690 Other | 862 Black Lung (923) | 875 Customer Challenge 12 USC |
| 160 Stockholders Suits | 360 Other Personal Injury | 380 Other Personal Property Damage | LABOR | 863 DIWC/DIWW (405(g)) | 891 Agricultural Acts |
| 190 Other Contract | | 385 Property Damage Product Liability | 710 Fair Labor Standards Act | 864 SSID Title XVI | 892 Economic Stabilization Act |
| 195 Contract Product Liability | | | 720 Labor/Mgmt. Relations | 865 RSI (405(g)) | 893 Environmental Matters |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | 730 Labor/Mgmt. Reporting & Disclosure Act | FEDERAL TAX SUITS | 894 Energy Allocation Act |
| 210 Land Condemnation | 441 Voting | 510 Motions to Vacate Sentence Habeas Corpus | 740 Railway Labor Act | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 220 Foreclosure | 442 Employment | | 790 Other Labor Litigation | 871 IRS - Third Party 26 USC 7609 | 900 Appeal of Fee Determination Under Equal Access to Justice |
| 230 Rent Lease & Ejectment | 443 Housing/Accommodations | 530 General | 791 Empl. Ret. Inc. Security Act | | 950 Constitutionality of State |
| 240 Tort to Land | 444 Welfare | 535 Death Penalty | | | 890 Other Statutory Actions |
| 245 Tort Product Liability | 440 Other Civil Rights | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prisoner Conditions | | | |

## VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

- X 1 Original Proceeding
- 2 Removal from State Court
- 3 Remanded from Appellate Court
- 4 Reinstated or Reopened
- 5 Transferred from another district (specify)
- 6 Multidistrict Litigation
- 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**   X CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23
DEMAND $ Compensatory and punitive damages,   Check YES only if demanded in complaint:
equitable, declaratory and injunctive relief   JURY DEMAND: X YES   NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE _____   Docket Number _____

DATE   June 9, 2004   SIGNATURE OF ATTORNEY OF RECORD

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

104370   JG
6/8/04   150.00

**Attorneys for Plaintiffs**

William J. Aceves
225 Cedar Street
San Diego, CA  92101
Telephone:     (619) 515-1589
Facsimile:     (619) 696-9999

Michael Ratner
Barbara Olshansky
Jeffrey Fogel
Jennifer Green
Judith Brown Chomsky
Jules Lobel
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone:     (212) 614-6431
Facsimile:     (212) 614-6499

Susan L. Burke
Joyce S. Meyers
MONTGOMERY, MCCRACKEN,
        WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA  19109
Telephone:     (215) 772-7514
Facsimile:     (215) 772-7620

Shereef Hadi Akeel
MELAMED, DAILEY & AKEEL, P.C.
26611 Woodward Avenue
Huntington Woods, MI  48070
Telephone:     (248) 591-5000

Susan Feathers
UNIVERSITY OF PENNSYLVANIA
LAW SCHOOL
3400 Chestnut Street
Philadelphia, PA  19104-6204
Telephone:     (215) 898-0459



## Known Attorneys for Individual Defendants

Henry E. Hockeimer, Jr., Esq.
Hangley, Aronchick, Segal & Pudlin
One Logan Square, 27th Floor
Philadelphia, PA  19103
Telephone:    (215) 568-6200
*Counsel for Stephen A. Stefanowicz*

Christopher A. Darden, Esq.
5757 W. Century Blvd., # 700
Los Angeles, CA  90045
Telephone:    (310) 568-1804
*Counsel for John B. Israel*

Francis Q. Hoang, Esq.
Williams & Connolly
725 12th Street, NW
Washington, DC  20005-5901
Telephone:    (202) 434-5000
*Counsel for Adel Nakhla*